# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

S. STANLEY YOUNG,

       *Plaintiff,*

   *v.*

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, *et al.*,

       *Defendants.*

No. 1:21-CV-2623-TJK

---

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION OR, IN THE ALTERNATIVE, FOR
<u>EXPEDITED PARTIAL SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................ii

INTRODUCTION ................................................................................ 1

STATEMENT OF UNDISPUTED FACTS .................................................... 4

I.    Federal Advisory Committee Act ........................................................ 4

II.   Clean Air Act........................................................................................ 6

III.  Clean Air Scientific Advisory Committee .......................................... 7

IV.  The Committee Blocks EPA's Reconsideration Of The National
Ambient Air Quality Standards For Particulate Matter .................... 9

V.   EPA Reconstitutes the Committee .................................................. 10

VI.  The Committee's Imminent Reconsideration Of National Ambient
Air Quality Standards For Particulate Matter ............................... 12

VII. Plaintiff Dr. S. Stanley Young................................................ 13

LEGAL STANDARDS ........................................................................ 14

ARGUMENT ..................................................................................... 15

I.    The Court Should Preliminarily Enjoin the Committee's Activities ............... 15

    A.   EPA's Reconstitution of the Committee Is Unlawful.............................. 16

        1.   The reconstitution is substantively unlawful................................... 17

        2.   The reconstitution is procedurally unlawful .................................... 25

        3.   The reconstitution is reviewable ...................................................... 30

    B.   Dr. Young Will Suffer Irreparable Harm If The Unlawfully
Reconstituted Committee Completes Its Work ........................................ 36

    C.   The Balance of the Equities Weighs in Favor of Pausing the
Committee's Activities................................................................... 41

II.   In the Alternative, the Court Should Grant Expedited Partial
Summary Judgment on Counts V–VIII and Award Declaratory
and Injunctive Relief .......................................................................... 44

CONCLUSION.................................................................................... 45

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ala. Ass'n of Realtors v. HHS,*
  141 S. Ct. 2485 (2021) ........................................................................... 43

*\*Alabama-Tombigbee Rivers Coal. v. Dep't of Interior,*
  26 F.3d 1103 (11th Cir. 1994) ..........................................................*passim*

*Am. Bioscience., Inc. v. Thompson,*
  269 F.3d 1077 (D.C. Cir. 2001) .............................................................. 15

*Amoco Prod. Co. v. Vill. of Gambell,*
  480 U.S. 531 (1987) ............................................................................... 14

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ............................................................................... 15

*Animal Legal Def. Fund v. Shalala,*
  53 F.3d 363 (D.C. Cir. 1995) ................................................................. 37

*Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton,*
  813 F. Supp. 82 (D.D.C. 1993) ........................................................ 16, 43

*Biden v. Texas,*
  No. 21A21, 2021 WL 3732667 (U.S. Aug. 24, 2021) ............................ 30

*Cal. Forestry Ass'n v. U.S. Forest Serv.,*
  102 F.3d 609 (D.C. Cir. 1996) ............................................................... 41

*Cap. Area Immigrants' Rts. Coal. v. Trump,*
  471 F. Supp. 3d 25 (D.D.C. 2020) ........................................................ 44

*Cargill, Inc. v. United States,*
  173 F.3d 323 (5th Cir. 1999) ........................................................... 33, 35

*CC Distribs., Inc. v. United States,*
  883 F.2d 146 (D.C. Cir. 1989) ............................................................... 37

*Cody v. Cox,*
  509 F.3d 606 (D.C. Cir. 2007) ............................................................... 33

*Colo. Env't Coal. v. Wenker,*
  353 F.3d 1221 (10th Cir. 2004) ................................................... 32, 35, 37

*Ctr. for Pol'y Analysis on Trade & Health v. Off.*
  *of U.S. Trade Representative,*
  540 F.3d 940 (9th Cir. 2008) ................................................................. 36

ii

# TABLE OF AUTHORITIES

(continued)

**Page(s)**

*Cummock v. Gore,*
180 F.3d 282 (D.C. Cir. 1999) .......................................................... 4, 43

*Dep't of Com. v. New York,*
139 S. Ct. 2551 (2019) ................................................... 30, 31, 33, 34

*DHS v. Regents of Univ. of Cal.,*
140 S. Ct. 1891 (2020) .............................................. 28, 29, 31

*Dickson v. Sec'y of Def.,*
68 F.3d 1396 (D.C. Cir. 1995) ........................................... 36

*\*Dunlap v. Presidential Advisory Comm'n on Election Integrity,*
286 F. Supp. 3d 96 (D.D.C. 2017) ........................... 16, 38, 40, 44

*Elec. Privacy Info. Ctr. v. Nat'l Sec. Comm'n on*
*Artificial Intelligence,*
466 F. Supp. 3d 100 (D.D.C. 2020) ..................................... 45

*FCC v. Fox Television Stations, Inc.,*
556 U.S. 502 (2009) ........................................................... 27

*Filazapovich v. Dep't of State,*
No. 21-CV-00943, 2021 WL 4127726 (D.D.C. Sept. 9, 2021) ................ 40

*Gates v. Schlesinger,*
366 F. Supp. 797 (D.D.C. 1973)............................................. 16

*Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives,*
920 F.3d 1 (D.C. Cir. 2019) .............................................. 14

*League of Women Voters of U.S. v. Newby,*
838 F.3d 1 (D.C. Cir. 2016) ............................................... 43

*Mach Mining, LLC v. EEOC,*
575 U.S. 480 (2015) ........................................................ 34

*Michigan v. EPA,*
576 U.S. 743 (2015) ........................................................ 25

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State*
*Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983) ................................................. 25, 26, 29

*NAACP Legal Def. & Educ. Fund, Inc. v. Barr,*
No. 20-CV-1132, 2020 WL 6392777 (D.D.C. Nov. 2, 2020)..................... 42

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*NAACP Legal Def. & Educ. Fund v. Barr,*
   496 F. Supp. 3d 116 (D.D.C. 2020) ...................................................*passim*

*NAACP v. DeVos,*
   485 F. Supp. 3d 136 (D.D.C. 2020) ............................................... 15, 44

*Nat'l Anti-Hunger Coal. v. Exec. Comm. of President's Priv.*
   *Sector Surv. on Cost Control,*
   711 F.2d 1071 (D.C. Cir. 1983) .............................................................. 17

*NRDC v. Dep't of Interior,*
   410 F. Supp. 3d 582 (S.D.N.Y. 2019) .................................................... 37

*NRDC v. Pena,*
   147 F.3d 1012 (D.C. Cir. 1998) ................................................... 40, 42, 43

*NRDC, Inc. v. EPA,*
   438 F. Supp. 3d 220 (S.D.N.Y. 2020) .................................................... 24

*Nw. Ecosystem All. v. Off. of U.S. Trade Representative,*
   No. C99-1165R, 1999 WL 33526001 (W.D. Wash. Nov. 9, 1999)............. 21, 38, 39

*Physicians for Soc. Resp. v. Wheeler,*
   359 F. Supp. 3d 27 (D.D.C. 2019) .......................................................... 31

*Physicians for Soc. Resp. v. Wheeler,*
   956 F.3d 634 (D.C. Cir. 2020) ........................................................*passim*

*Protect Democracy Project, Inc. v. U.S. Dep't of Def.,*
   263 F. Supp. 3d 293 (D.D.C. 2017) ........................................................ 43

*Pub. Citizen v. Nat'l Advisory Comm. on*
   *Microbiological Criteria for Foods,*
   886 F.2d 419 (D.C. Cir. 1989) ........................................................*passim*

*Pub. Citizen v. Nat'l Econ. Comm'n,*
   703 F. Supp. 113 (D.D.C. 1989)........................................................ 16, 38

*Pub. Citizen v. U.S. Dep't of Just.,*
   491 U.S. 440 (1989) ................................................................................ 37

*Seattle Audubon Soc'y v. Lyons,*
   871 F. Supp. 1291 (W.D. Wash. 1994) .................................................... 40

*Shawnee Tribe v. Mnuchin,*
   984 F.3d 94 (D.C. Cir. 2021) .................................................................. 43

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Sherley v. Sebelius,*
  644 F.3d 388 (D.C. Cir. 2011) .............................................................................. 14

*Sierra Club v. Mainella,*
  459 F. Supp. 2d 76 (D.D.C. 2006) ...................................................................... 15

*State v. Biden,*
  10 F.4th 538 (5th Cir. 2021)................................................................................. 30

\**Union of Concerned Scientists v. Wheeler,*
  954 F.3d 11 (1st Cir. 2020)...............................................................................*passim*

*Webster v. Doe,*
  486 U.S. 592 (1988) .............................................................................................. 33

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.,*
  139 S. Ct. 361 (2018) ........................................................................................... 35

*Winter v. NRDC, Inc.,*
  555 U.S. 7 (2008) ............................................................................................ 14, 45

**STATUTES**

5 U.S.C. app. 2 § 5.................................................................................................*passim*

5 U.S.C. § 701.........................................................................................................*passim*

5 U.S.C. § 706............................................................................................... 15, 16, 44

28 U.S.C. § 2201.......................................................................................................... 44

28 U.S.C. § 2202.......................................................................................................... 44

42 U.S.C. § 7408........................................................................................................ 6, 7

42 U.S.C. § 7409.................................................................................................... 6, 7, 19

42 U.S.C. § 7607................................................................................................. 8, 39, 42

**OTHER AUTHORITIES**

41 C.F.R. pt. 102-3 ................................................................................................*passim*

  41 C.F.R. § 102-3.30 ................................................................................................... 5

  41 C.F.R. § 102-3.60 ................................................................................................. 25

161 Cong. Rec. H10,161 (daily ed. Dec. 17, 2015) ...................................... 23

Jennifer Dlouhy & Stephen Lee, *Biden Purges Science Adviser Panels
  Trump Tilted Toward Industry*, BLOOMBERG (Mar. 31, 2021) ............................ 2

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

Exec. Order 13990, *Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis*, 86 Fed. Reg. 7,037 (Jan. 20, 2021) ................................................................................... 10

Fed. R. Civ. P. 56 .......................................................................................... 15

Fed. R. Civ. P. 57 .......................................................................................... 44

Fed. R. Civ. P. 65 ................................................................................... 14, 44

Dino Grandoni, *EPA dismisses dozens of key science advisers picked under Trump*, WASH. POST (Mar. 31, 2021) ....................................... 2, 28

GSA Office of Governmentwide Policy, *Federal Advisory Committee Membership Balance Plan* (Jan. 2011) ................................................... 6

Kristen Holmes, *EPA removes dozens of Trump-appointed advisers from two advisory panels*, CNN (Mar. 31, 2021) ................................... 2

Independent Particulate Matter Review Board, *The Need for a Tighter Particulate-Matter Air-Quality Standard*, 383 New Eng. J. Med. 680 (2020) ........................................................ 20

National Ambient Air Quality Standards for Particulate Matter, 78 Fed. Reg. 3086 (Jan. 15, 2013) ...................................................... 19

Notification of Public Meetings of the Clean Air Scientific Advisory Committee Particulate Matter Panel, 86 Fed. Reg. 52,673 (Sept. 22, 2021) ................................................................................... 12

Off. of Inspector Gen., EPA, *EPA Can Better Document Resolution of Ethics and Partiality Concerns in Managing Clean Air Federal Advisory Committees*, Report No. 13-P-0387 (2013) ........................... 23

Request for Nominations of Candidates to the EPA's Clean Air Scientific Advisory Committee (CASAC), 86 Fed. Reg. 17,146 (Apr. 1, 2021) ....................................................................... 10, 24, 26

Review of the National Ambient Air Quality Standards for Particulate Matter, 85 Fed. Reg. 82,684 (Dec. 18, 2020) ........................... 9, 12, 20

# INTRODUCTION

Rather than follow the science, the Environmental Protection Agency (EPA or Agency) has moved to sideline anyone who might dissent from the President's climate-change agenda.  On his first day in office, the President ordered EPA "to immediately commence work to confront the climate crisis."  Among other measures, the President directed EPA to review its national ambient air-quality standards for particulate matter (*e.g.*, dust and soot) under the Clean Air Act—rules that can impose billions of dollars of costs on regulated industries.  Six months later, EPA announced that it would do so "expeditiously."  And earlier this month, to the surprise of none, Agency staff recommended the stricter standards the President demanded.

There is just one problem:  EPA cannot complete this momentous policy change without first consulting with a statutorily mandated federal advisory committee— the Clean Air Scientific Advisory Committee.  The Committee's core function is to advise EPA on changes to the air-quality standards.  To revise those standards, EPA must summarize the Committee's recommendations and explain any disagreements.

During the last administration, the Committee thwarted EPA staff's goal of adopting stricter air-quality standards for particulate matter by concluding that such a move was unsupported by the science.  The new EPA Administrator decided that he could not risk that happening again.  So, rather than consider the Committee's view on this scientific issue and proceed in a reasoned manner—as the Federal Advisory Committee Act (FACA or Act) and the Administrative Procedure Act (APA) require—the Administrator simply fired the entire Committee.  His decision was

1

promptly derided as an "unusual," "ham-handed" "purge" "designed to shrink the influence of industry on" the Committee.[1]

After purging the Committee, the Administrator proceeded to pack it with EPA loyalists who are financially dependent on the Agency for multi-million dollar research grants and who already publicly support EPA's policy objectives. In doing so, the Administrator guaranteed that the new Committee members will rubberstamp his already-made decision to adopt stricter air-quality standards in order to keep their grant money flowing. Indeed, five of the seven new members are academics who have benefited from sizeable research grants from EPA, including three professors who have enjoyed multi-million dollar windfalls. The Committee's new chair, Professor Elizabeth Sheppard, for example, is associated with grants totaling a staggering $60 million. But by contrast, not one of the new members of the Committee represents any industries that will actually be affected by EPA's stricter air-quality standards.

In reconstituting the Committee in this manner, EPA violated the law several times over. To start, the Agency created an advisory body that is neither "fairly balanced" nor protected from "inappropriate[] influence[]" as required by FACA.

---

[1] Dino Grandoni, *EPA dismisses dozens of key science advisers picked under Trump*, WASH. POST (Mar. 31, 2021), https://www.washingtonpost.com/climate-environment/2021/03/31/epa-advisory-panels; Kristen Holmes, *EPA removes dozens of Trump-appointed advisers from two advisory panels*, CNN (Mar. 31, 2021), https://www.cnn.com/2021/03/31/politics/environmental-protection-agency-trump-appointees/index.html; Jennifer Dlouhy & Stephen Lee, *Biden Purges Science Adviser Panels Trump Tilted Toward Industry*, BLOOMBERG (Mar. 31, 2021), https://www.bloomberg.com/news/articles/2021-03-31/biden-purges-science-adviser-panels-trump-tilted-toward-industry.

5 U.S.C. app. 2 § 5(b)(2), (b)(3), (c).  The Committee is not fairly balanced because it is packed with academics who agree with EPA's policy goals but contains not a single industry representative who might have a different view.  *See, e.g.*, *NAACP Legal Def. & Educ. Fund v. Barr*, 496 F. Supp. 3d 116 (D.D.C. 2020).  Nor is the Committee protected from "inappropriate influence" because its members are financially beholden to EPA through their reliance on multi-million dollar research grants.  Moreover, in its haste to recreate a Committee that would bless the adoption of stricter air-quality standards, EPA flunked basic requirements of reasoned decisionmaking—thus violating the APA, too.  *See, e.g.*, *Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634 (D.C. Cir. 2020).

Immediate relief is necessary to pause the Committee's work *before* it is complete.  *See, e.g.*, *Alabama-Tombigbee Rivers Coal. v. Dep't of Interior*, 26 F.3d 1103 (11th Cir. 1994).  Very soon, EPA will ask the Committee to rubberstamp the staff's policy assessment that the Agency should adopt stricter air-quality standards for particulate matter.  If, as all expect, the Committee provides a quick and favorable recommendation and EPA proceeds with a rulemaking, Dr. Young—a former Committee nominee who has a different, industry perspective—will suffer irreparable harm because he will lose the opportunity to participate in the Committee's deliberations and provide input to EPA as a member of the Committee on this important question at the heart of the Committee's purpose.  A preliminary injunction suspending the Committee's activities would preserve Dr. Young's ability

3

to participate in a lawfully reconstituted Committee's deliberations regarding the air-quality standards and his ability to advise EPA as a member of the Committee.

Counsel for Dr. Young conferred with the government about this motion on October 8, 13, 14, 15, and 18. The government would not agree to pause the Committee's activities until the Court enters judgment, but stated that the Committee will not meet to consider EPA staff's policy assessment until January or February 2022. To prevent the Committee from providing its recommendation to EPA before the Court reviews the Agency's compliance with FACA and the APA, this Court should preliminarily enjoin the Committee from conducting further activity and EPA from receiving any recommendation or advice from the Committee until it is lawfully reconstituted. In the alternative, the Court should grant expedited summary judgment to Dr. Young on Counts V–VIII of the Complaint, vacate the Committee's reconstitution, and enter declaratory and permanent injunctive relief.

## STATEMENT OF UNDISPUTED FACTS

### I.   Federal Advisory Committee Act

Congress enacted FACA in 1976 based on concerns that the burgeoning number of advisory committees would be controlled by "special interests seeking to advance their own agendas." *Cummock v. Gore*, 180 F.3d 282, 284 (D.C. Cir. 1999). To counter this possibility, FACA imposes two fundamental requirements. First, advisory committee "membership" must be "fairly balanced in terms of the points of view represented and the functions to be performed." 5 U.S.C. app. 2 § 5(b)(2); *see id.* app. 2 § 5(c). Second, agencies shall adopt "appropriate provisions to assure that the

advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority or by any special interest." *Id.* § 5(b)(3); *see id.* app. 2 § 5(c).

To further these commands, FACA directs the General Services Administration to develop government-wide standards for convening advisory committees. *Id.* app. 2 § 7(c). Accordingly, that agency has issued regulations reiterating that an advisory committee "must be fairly balanced in its membership in terms of the points of view represented and the functions to be performed." 41 C.F.R. § 102-3.30(c). The regulations further specify that, in order to achieve a "balanced" advisory committee, the agency should consider the "economic … impact of the advisory committee's recommendations"; "[t]he types of specific perspectives required … such as those of consumers, technical experts, the public at-large, academia, business, or other sectors"; and the "need to obtain divergent points of view on the issues before the advisory committee." *Id.* pt. 102-3, subpt. B, app. A. EPA's own handbook on advisory committees reiterates these factors and directs the Agency to consider "[g]roups that have been involved or have a particular interest in the subject matter of the committee." Shumate Decl., Ex. S, EPA, *FACA Advisory Committee Handbook* § 5.2.1 (2003) (EPA Handbook).

Additionally, the General Services Administration "strongly recommend[s]" that agencies forming non-discretionary committees such as the one here "ensure 'that, in the selection of members for the advisory committee, the agency will consider a cross-section of those directly affected, interested, and qualified, as appropriate to

the nature and functions of the advisory committee.'"  GSA Office of Governmentwide Policy, *Federal Advisory Committee Membership Balance Plan* 1 (Jan. 2011), https:// bit.ly/3ji8RfY.  EPA therefore has adopted a policy requiring the "consider[ation]" of "a cross-section of stakeholders directly affected/interested and qualified when selecting … members" for the Committee.  Shumate Decl., Ex. S, EPA Handbook § 4.3.2.

## II.    Clean Air Act

Under the Clean Air Act, EPA is required to publish a list of "air pollutant[s]," which, in its judgment, "may reasonably be anticipated to endanger public health or welfare."  42 U.S.C. § 7408(a).  For each pollutant identified by EPA, the Agency must also establish "national primary and secondary ambient air quality standards."  *Id.* § 7409(a).  These standards are based on EPA's judgment regarding what is adequate to "protect the public health" (for the primary standards) and "protect the public welfare" (for the secondary standards).  *Id.* § 7409(b).

EPA has established national ambient air-quality standards for six criteria pollutants, one of which is particulate matter.  Shumate Decl., Ex. A, EPA, National Ambient Air Quality Standards Table.   There are four air-quality standards for particulate matter, including one primary annual standard for fine inhalable particles—referred to as PM2.5—that was last updated in 2012.  *Id.*; Shumate Decl., Ex. B, EPA, Timeline of Particulate Matter National Ambient Air Quality Standards. These standards can subject regulated industries to costs totaling billions of dollars. *See, e.g.*, Shumate Decl., Ex. C, EPA, *Regulatory Impact Analysis for the Final*

*Revisions to the National Ambient Air Quality Standards for Particulate Matter* ES-15, 8-2 to 8-4 (Dec. 2012).

To ensure that the standards established for criteria pollutants "accurately reflect the latest scientific knowledge," 42 U.S.C. § 7408, the Clean Air Act requires that EPA "shall complete a thorough review of the … national ambient air quality standards" every five years and "shall make such revisions" as may be appropriate. *Id.* § 7409(d)(1).  To aid EPA in this review, Congress directed the Agency to create "an independent scientific review committee" to review the current standards and "recommend to the Administrator any new national ambient air quality standards." *Id.* § 7409(d)(2).  To comply with this mandate, the Administrator created the Clean Air Scientific Advisory Committee, a federal advisory committee subject to FACA.

## III.    Clean Air Scientific Advisory Committee

The Clean Air Act requires the Committee to be "composed of seven members including at least one member of the National Academy of Sciences, one physician, and one person representing State air pollution control agencies."  *Id.* § 7409(d)(2)(A).  In addition to advising on the air-quality standards, the Committee counsels EPA on additional research or information that may be necessary to advise on these standards as well as the "relative contribution" of natural and "anthropogenic activity" to air pollution.  *Id.* § 7409(d)(2)(C).  Importantly, the Committee shall also "advise the Administrator of any adverse public health, welfare, social, economic, or energy effects which may result from various strategies for attainment and maintenance of such national ambient air quality standards."  *Id.* § 7409(d)(2).

7

Although the Committee is advisory in nature, the Clean Air Act requires EPA to engage with the Committee and consider its recommendations. When issuing a notice of proposed rulemaking establishing new air-quality standards or revising previous standards, EPA must "set forth or summarize" the findings and recommendations of the Committee and, "if the proposal differs in any important respect from any of these recommendations," the Agency must provide "an explanation of the reasons for such differences." *Id.* § 7607(d)(3).

As required by FACA, the Committee is governed by a charter, which incorporates the Committee's statutory membership requirements. Shumate Decl., Ex. D, Clean Air Scientific Advisory Committee Charter (2021). The charter also allows EPA—or the Committee with EPA's approval—to form subcommittees. These subcommittees "may not work independently of the chartered committee," have "no authority to make decisions on behalf of the chartered committee," and may not report directly to the EPA. *Id.* Rather, any subcommittee "must report their recommendations and advice to the chartered [Committee]," who will determine what, if any, recommendations to pass along to the EPA. *Id.* One of the subcommittees is the Committee's Particulate Matter Panel. *See* Shumate Decl., Ex. E, EPA, 2021 CASAC Particulate Matter Panel. All seven members of the Committee serve on the Particulate Matter Panel. *See id.*; Shumate Decl., Ex. F, EPA, CASAC.

## IV.    The Committee Blocks EPA's Reconsideration Of The National Ambient Air Quality Standards For Particulate Matter

In May 2018, the former EPA Administrator announced the agency's intention to review the air-quality standards for particulate matter.  Shumate Decl., Ex. G, EPA, Policy Assessment for the Reconsideration of the National Ambient Air Quality Standards for Particulate Matter, External Review Draft 1-13 (Oct. 2021) (Draft Policy Assessment). As part of this review process, EPA staff released a draft policy assessment in September 2019, which the Committee reviewed.  *Id.* at 1-13 to 1-14. In that review, the Committee did not recommend strengthening the air-quality standards for particulate matter.  *See id.*; Cox Decl. ¶ 9; Enstrom Decl. ¶ 10.  All but one of the Committee members concluded that the September 2019 draft policy assessment did not provide valid scientific evidence and data that reasonably called into question the public-health protection afforded by the current annual primary standard for particulate matter.  Cox. Decl. ¶ 9; *see* Shumate Decl., Ex. A, EPA, National Ambient Air Quality Standards Table.  In turn, EPA published a final rule in December 2020 that retained all of the primary and secondary standards without revision.  *See* Review of the National Ambient Air Quality Standards for Particulate Matter, 85 Fed. Reg. 82,684 (Dec. 18, 2020).  Several parties have filed petitions for review of this final rule in the D.C. Circuit, but the litigation has been stayed at the request of the new administration.  *See* Order Granting Motion to Hold Consolidated Cases in Abeyance, *California v. EPA*, No. 21-1014 (D.C. Cir. Oct. 1, 2021); *see also* Shumate Decl., Ex. G, Draft Policy Assessment at 1-18.

## V.    EPA Reconstitutes the Committee

Just over a month after EPA issued its final rule and on his first day in office, the current President ordered executive agencies to "immediately review" a number of rules promulgated under the previous administration that may conflict with his objective to "confront the climate crisis."  *See* Exec. Order 13990, *Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis*, 86 Fed. Reg. 7,037, 7,037 (Jan. 20, 2021).  One of the regulations specifically identified by the President for review was EPA's December 2020 rule retaining the current air-quality standards for particulate matter.  Shumate Decl., Ex. H, The White House, Fact Sheet: List of Agency Actions for Review (Jan. 20, 2021).

In accordance with the President's directive, EPA began clearing the decks to revise those standards.  In March 2021, only twenty days after being sworn in, EPA Administrator Regan terminated all then-current members of the Committee—all but one of whom had opposed the revision in 2020—in an effort to "reset" and "reestablish" the Committee's membership.    Shumate Decl., Ex. I, EPA, Administrator Regan Directs EPA to Reset Critical Science-Focused Federal Advisory Committees (Mar. 31, 2021) (Termination Announcement).

Following this purge, EPA solicited nominations for new members of the Committee.  Request for Nominations of Candidates to the EPA's Clean Air Scientific Advisory Committee (CASAC), 86 Fed. Reg. 17,146 (Apr. 1, 2021).  Plaintiff Dr. Young was nominated to be a member of the reconstituted Committee.  Young Decl. ¶ 13. Just a few weeks later, EPA announced the selection of the new Committee members,

which did not include Dr. Young.  Shumate Decl., Ex. J, EPA, EPA Announces Selections of Charter Members to the Clean Air Scientific Advisory Committee (June 17, 2021) (Appointment Announcement).  None of the new Committee members represent industries affected by EPA's regulation of air pollution." Young Decl. ¶ 21. Six of the members (including the current chair, Dr. Elizabeth Sheppard) currently work as university professors, and the final member, Dr. James Boylan, works for the State of Georgia in its Environmental Protection Division.  Shumate Decl., Ex. J, Appointment Announcement.   Five of the seven new Committee members are principal investigators on EPA grants, and three of those five are principal investigators on multi-million dollar EPA research grants.  *See id.*; Shumate Decl., Exs. K–O, EPA, Grantee Research Project Search – Committee Members.   For example, Dr. Sheppard is associated as a principal investigator with "at least $60,031,882 in EPA funding."   Enstrom Decl. ¶ 7; Shumate Decl., Ex. K, EPA, Grantee Research Project Search – Committee Members, "Sheppard, Lianne (Elizabeth) A."  The full membership and their associated EPA grant amounts are:

| Name | Affiliation | Associated Grant Amounts |
|------|-------------|--------------------------|
| Elizabeth Sheppard (Chair) | Professor, University of Washington | $60,031,882 |
| Michelle Bell | Professor, Yale University | $29,214,550 |
| James Boylan | Environmental Protection Division, Georgia Department of Natural Resources | $229,770 |
| Judith Chow | Professor, Desert Research Institute of the Nevada System of Higher Education | $449,456 |
| Mark Frampton | Professor emeritus, University of Rochester Medical Center | $36,197,566 |
| Christina Fuller | Associate professor, Georgia State University | N/A |
| Alexandro Ponette-González | Associate professor, University of North Texas | N/A |

*See* Shumate Decl., Ex. J, Appointment Announcement; Shumate Decl., Exs. K–O,

Grantee Research Project Search – Committee Members.

## VI.   The Committee's Imminent Reconsideration Of National Ambient Air Quality Standards For Particulate Matter

In tandem with appointing the new Committee members, EPA announced its

plan to "expeditiously" reconsider the air-quality standards for particulate matter,

which EPA had determined to retain in December 2020.  Shumate Decl., Ex. P, EPA,

EPA to Reexamine Health Standards for Harmful Soot that Previous Administration

Left Unchanged (June 10, 2021) (Reconsideration Announcement); *see* 85 Fed. Reg.

82,684.  EPA tasked the new Committee with advising on this reconsideration by

reviewing updates to science and policy assessments concerning these standards.

Shumate Decl., Ex. P, Reconsideration Announcement.  The Agency announced that

it intends to issue a proposed rulemaking on these standards in summer 2022 and a

final rule in spring 2023.  *Id.*

Earlier this month, EPA staff recommended that the Agency adopt stricter air-

quality standards for particulate matter.  Shumate Decl., Ex. G, Draft Policy

Assessment.  To assist the Committee in reviewing EPA's recommendations, the

Committee's Particulate Matter Panel—which, again, consists of all seven members

of the Committee, among others—hosted a public meeting on October 14, 2021, to

receive a briefing from EPA on updates to the science and policy assessments that

support the Agency's reconsideration of the 2020 particulate-matter standards.  *See*

Notification of Public Meetings of the Clean Air Scientific Advisory Committee

12

Particulate Matter Panel, 86 Fed. Reg. 52,673 (Sept. 22, 2021).  The Particulate Matter Panel will host another public meeting on November 17–19, 2021, and December 1–2, 2021, to peer-review EPA's science and policy assessment updates. *Id.*  Since EPA intends to issue a notice of proposed rulemaking on the particulate-matter standards in the summer 2022, *see* Shumate Decl., Ex. P, Reconsideration Announcement, the full Committee will not meet to review the Agency's reconsideration of the 2020 particulate-matter standards until January or February 2022, Dkt. No. 6, at 2, ¶¶ 3, 5.

## VII.  Plaintiff Dr. S. Stanley Young

Plaintiff S. Stanley Young, Ph.D., previously served as a member of EPA's Science Advisory Board.  Young Decl. ¶¶ 9–10.  EPA appointed Dr. Young to a 3-year term in 2018 and another 3-year term in 2020, but that term was cut short when Administrator Regan abruptly fired him along with every other member of the Board and the Committee in March 2021.  *Id.* ¶¶ 9–11; Shumate Decl., Ex. I, Termination Announcement.  When EPA reconstituted the Board and the Committee later in 2021, Dr. Young was nominated to both committees.  Young Decl. ¶¶ 12–13.  But the Agency did not select Dr. Young to serve on either.  *Id.* ¶ 16.

Dr. Young wants to serve on the Committee because he wants to provide input and advice to EPA on how its policies impact regulated industries, particularly the air-quality standards for particulate matter.  *Id.* ¶ 14.  Dr. Young has particular expertise in air pollution, including co-authoring a 2017 study "Air Quality and Acute Deaths in California, 2000–2012" published in the scientific journal *Regulatory*

*Toxicology and Pharmacology*.  *Id*. ¶ 8.  He believes that current air quality is safe and not hurting anyone and that there is little evidence that improved air quality led to improved health effects.  *Id*. ¶¶ 23–25.  Other respected scientists share this view. Cox. Decl. ¶¶ 9–10; Enstrom Decl. ¶¶ 11–18; Paustenbach Decl. ¶¶ 18–20.  Dr. Young believes that he would provide an important industry perspective to the Committee. Young Decl. ¶ 26.  Unlike the current members of the Committee, Dr. Young has extensive experience working in industry and has never received any EPA research grants.  *Id*. ¶¶ 20, 22.

## LEGAL STANDARDS

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest."  *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008)).  "The last two factors 'merge when the Government is the opposing party.'"  *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 10 (D.C. Cir. 2019).  The standard for obtaining a permanent injunction "is essentially the same" as that for a preliminary injunction, "with the exception that the plaintiff must show … actual success" on the merits as opposed to a likelihood of success.  *Winter*, 555 U.S. at 32 (quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 546 n.12 (1987)).

Under Federal Rule of Civil Procedure 65(a)(2), a court may consolidate a preliminary-injunction motion into a summary-judgment motion and proceed to a

determination on the merits.  *See, e.g.*, *NAACP v. DeVos*, 485 F. Supp. 3d 136, 140 (D.D.C. 2020).  Summary judgment is proper if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory … limitations," or "without observance of procedure required by law."  5 U.S.C. § 706(2)(A), (C), (D). "The entire case ... is a question of law," and the district court "sits as an appellate tribunal."  *Am. Bioscience., Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (cleaned up).  Summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action" comports with the APA.  *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006).

## ARGUMENT

### I.    The Court Should Preliminarily Enjoin the Committee's Activities.

Dr. Young is entitled to a preliminary injunction because: (a) EPA's reconstitution of the Committee violates the APA; (2) Dr. Young will be irreparably harmed if the Committee completes its deliberations and provides its advice to EPA regarding the air-quality standards for particulate matter; and (3) the balance of the equities weighs in favor of pausing the Committee's activities until it is lawfully constituted.  Courts in this circuit have awarded equitable relief in cases where, as

15

here, agencies have violated FACA, including as recently as last year by Senior Judge Bates and in 2017 by Judge Kollar-Kotelly. *See, e.g.*, *NAACP*, 496 F. Supp. 3d at 145; *Dunlap v. Presidential Advisory Comm'n on Election Integrity*, 286 F. Supp. 3d 96, 107, 109–11 (D.D.C. 2017); *see also Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*, 813 F. Supp. 82, 93–95 (D.D.C. 1993), *rev'd on other grounds*, 997 F.2d 898 (D.C. Cir. 1993); *Pub. Citizen v. Nat'l Econ. Comm'n*, 703 F. Supp. 113, 129–30 (D.D.C. 1989); *Gates v. Schlesinger*, 366 F. Supp. 797, 800–01 (D.D.C. 1973).  And at least one court of appeals has affirmed a district court order granting preliminary injunctive relief for violating FACA.  *See Alabama-Tombigbee Rivers Coal.*, 26 F.3d at 1106–07.

### A.    EPA's Reconstitution of the Committee Is Unlawful.

EPA violated the APA in multiple respects when it purged the Committee of any representatives of industry and packed it with academics who are dependent on the Agency's financial support. *Substantively*, this reconstitution contravenes FACA and its implementing regulations by creating a Committee that is neither "fairly balanced" nor shielded from "inappropriate[] influence[]." 5 U.S.C. app. 2 § 5(b)(2), (b)(3); *see id.* app. 2 § 5(c); *id.* § 706(2)(A), (C). *Procedurally*, the reconstitution is arbitrary and capricious due to EPA's failure to engage in the reasoned decisionmaking that the APA requires. *See* 5 U.S.C. § 706(2)(A). While EPA is likely to respond that the reconstitution is unreviewable under 5 U.S.C. § 701(a)(2), that argument is foreclosed by D.C. Circuit precedent and incorrect regardless.

### 1. *The reconstitution is substantively unlawful.*

EPA violated FACA and its implementing regulations in at least two ways.

**a.** First, EPA contravened the Act's command that the Agency "shall" "require the membership" of the Committee "to be fairly balanced in terms of the points of view represented and the functions to be performed." 5 U.S.C. app. 2 § 5(b)(2), (c). This "requirement was designed to ensure that persons or groups directly affected by the work of a particular advisory committee would have some representation on the committee," *Nat'l Anti-Hunger Coal. v. Exec. Comm. of President's Priv. Sector Surv. on Cost Control*, 711 F.2d 1071, 1074 n.2 (D.C. Cir. 1983), and that there would "be fair representation of different points of view" so that committee members, for example, "'will not all be educators on committees in the Department of Education and will not be all scientists, physicians, or medical men on commissions relating to the Institutes of Health,'" *Pub. Citizen v. Nat'l Advisory Comm. on Microbiological Criteria for Foods*, 886 F.2d 419, 437 (D.C. Cir. 1989) (*Microbiological*).

To effectuate this fair-balance requirement, FACA's implementing regulations require EPA and other agencies selecting committee members to consider, among other things, the "mission" of the committee; the "economic … impact of the advisory committee's recommendations"; "[t]he types of specific perspectives required," including those of "business"; and the "need to obtain divergent points of view on the issues before" the committee. 41 C.F.R. pt. 102-3, subpt. B, app. A. And EPA's own handbook directs the agency to consider "[g]roups that have been involved or have a

17

particular interest in the subject matter of the committee" as well as "a cross-section of stakeholders directly affected/interested and qualified when selecting … members" for its advisory committees.  Shumate Decl., Ex. S, EPA Handbook §§ 4.3.2, 5.2.1.

Consistent with this background, Senior Judge Bates recently held that the Justice Department violated FACA's fair-balance requirement by staffing a commission tasked with improving law enforcement entirely with "law enforcement officials." *NAACP*, 496 F. Supp. 3d at 144.  As the court explained, even though various civil-rights organizations were "'directly affected, interested, and qualified' with respect to the Commission's function of improving policing," the Justice Department failed to include a single member from those groups or anyone else "who represents elements of those communities" protected by the police as opposed to law enforcement itself.  *Id.*

EPA made precisely the same error here by reconstituting the Committee without any industry representatives.   Young Decl. ¶ 21; Cox Decl. ¶¶ 4–6; Paustenbach Decl. ¶¶ 11–13, 16.  If EPA had "announced that only persons paid by a regulated interested business could serve on" the Committee (aside from the statutorily required state official), that would plainly fail the fair-balance requirement.  *Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 19 (1st Cir. 2020).  The Agency veered to the opposite extreme here, but its error is the same.  By purging the Committee of every industry-affiliated member and replacing them with EPA-funded academics, the Agency has ensured that the Committee is no more "fairly balanced" than one composed entirely of energy companies' in-house scientists.

18

That imbalance matters.  Regulated industries provide a critical "business" perspective on the "economic … impact of the advisory committee's recommendations," and they are "directly affected[,] interested[,] and qualified" when it comes to the work of the Committee.  41 C.F.R. pt. 102-3, subpt. B, app. A; Shumate Decl., Ex. S, EPA Handbook §§ 3.3.2, 4.3.2.  Under the Clean Air Act, the Committee is required to advise EPA on, among other things, the "economic[] or energy effects" of proposed air-quality standards, 42 U.S.C. § 7409(d)(2)(C)—standards that can impose billions of dollars in costs on regulated industries.  *See, e.g.*, National Ambient Air Quality Standards for Particulate Matter, 78 Fed. Reg. 3086, 3089, 3265 (Jan. 15, 2013).  Without any industry representatives on the Committee, EPA's only perspective on the effects of its proposed standards on the energy sector or the economy as a whole will come from the faculty lounge (and a single state official).  *See* Young Decl. ¶ 18 (explaining that "scientists with industry experience like me have different perspectives and points of view compared to scientists with university experience and perspectives"); Cox Decl. ¶ 8 (explaining that "greater diversity among [Committee] members is critically needed if the Administrator is to receive technically sound advice and critical thinking"); Paustenbach Decl. ¶ 13 (explaining that "there are no members of the regulated community on the panel; yet … they are certainly the most knowledgeable of all the various topics that need to be understood in order to reach a reasonable decision").

The echo chamber that EPA has created not only excludes the perspective of those who must abide by its rules—it ensures that there will not be "divergent points

of view on the issues before" the Committee.  41 C.F.R. pt. 102-3, subpt. B, app. A.
As the Committee's former Chair explains, by replacing "industry experts" with
"EPA-funded academics," the Agency has "guarantee[d]" that it will receive a
recommendation "that more regulation is needed, even if there is no sound evidence
that it benefits health."  Cox Decl. ¶ 6; *see id.* ¶¶ 4–8; Young Decl. ¶¶ 18–20.  For
example, one of the central issues in EPA's ongoing reconsideration of the current
air-quality standards is whether exposure to particulate matter at the levels
currently permitted leads to premature death.  *See* Shumate Decl., Ex. P,
Reconsideration Announcement.  Even though EPA itself recently determined that
this question is subject to "continuing uncertainty," 85 Fed. Reg. at 82,707, the
Agency has purged the Committee of experts who hold that such exposure has not
been shown to cause premature death.  Young Decl. ¶¶ 20–21, 27; *see* Cox. Decl. ¶¶ 9–
10; Enstrom Decl. ¶¶ 11–18.  In their place, EPA has packed the Committee with
members who have already taken the contrary view.  Young Decl. ¶ 20.  In particular,
the current Chair and another member (Judith Chow) unequivocally concluded last
year that exposure under the current standards is responsible for thousands of
premature deaths each year.  *See* Independent Particulate Matter Review Board, *The
Need for a Tighter Particulate-Matter Air-Quality Standard*, 383 New Eng. J. Med.
680 (2020).  Hand selecting scientists who all share the same view is the antithesis
of the sort of scientific debate the Committee is statutorily required to foster.  *See*
Young Decl. ¶ 20.

20

Accordingly, EPA's reconstitution has ensured that the Committee is no more "fairly balanced in terms of the points of view represented," 5 U.S.C. app. 2 § 5(b)(2), than is a policing commission consisting entirely of police officers (or public defenders), *see NAACP*, 496 F. Supp. 3d at 143–44.  The EPA's "'deliberate and explicit effort to avoid the representation of any competing viewpoints on the subject matter of an advisory committee'" is unlawful.  *Id.* at 134; *see Nw. Ecosystem All. v. Off. of U.S. Trade Representative*, No. C99-1165R, 1999 WL 33526001, at *7–8 (W.D. Wash. Nov. 9, 1999) (Rothstein, J.) (holding that forest products advisory committees lacked fair balance because they consisted entirely of industry representatives without any environmental representatives).

**b.**    Second, EPA violated FACA by failing to implement "appropriate provisions to assure that the advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority or by any special interest, but will instead be the result of the advisory committee's independent judgment."   5 U.S.C. app. 2 § 5(b)(3); *see id.* app. 2 § 5(c).   Like the fair-balance requirement, this mandate is "designed to counter the belief that … advisory committees do not adequately and fairly represent the public interest or that they may be biased toward one point of view or interest."  *Microbiological*, 886 F.2d at 423 (Friedman, J., concurring in the judgment) (cleaned up).  The inappropriate-influence provision "clearly requires agency heads at least to consider whether" new policies affecting "committee membership might inappropriately enhance special interest influence and to eschew" them "when they do so."  *Union of Concerned Scientists*, 954

21

F.3d at 19.  And at the least, it prohibits agencies from failing to "establish[] *any* provisions relating to the decisional independence of an advisory committee." *NAACP*, 496 F. Supp. 3d at 137 (citation omitted).

EPA's reconstitution of the Committee flunks these standards, too.  The risk that the current Committee's "advice and recommendations" will "be inappropriately influenced by the appointing authority or by any special interest" is undeniable.  5 U.S.C. app. 2 § 5(b)(3).  Five of the seven members of the reconstituted Committee are principal investigators on EPA grants, and three of those five are principal investigators on multi-million dollar EPA research grants, including the Chair who is associated with over $60 million in EPA grants.  *See supra* at 11.  These extraordinary sums pose a significant threat that the Committee's advice will be inappropriately influenced by EPA or the special interests of its grant-affiliated members.  In particular, EPA's control over grant awards threatens to incentivize members to rubberstamp the Agency's preferred agenda or otherwise provide advice that advances its policy goals in order to maintain current grants or obtain access to future ones.  *See* Young Decl. ¶¶ 21, 23; *see also* Paustenbach Decl. ¶ 17.  In addition, Committee members may provide self-interested advice that EPA should expand opportunities for additional research grants that redound to their benefit.  As the government has explained elsewhere, it is entirely reasonable "to be concerned that a committee member's financial involvement with EPA could potentially color their advice about," among other things, "whether existing scientific knowledge is adequate or whether EPA instead ought to pursue additional research on some particular

question, which could conceivably affect the availability of grant funding for which a particular expert would be likely to compete or is currently receiving."  Final Br. for Appellee at 46, *Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634 (D.C. Cir. 2020) (No. 19-5104), 2019 WL 6895452 (19-5104 Gov't C.A. Br.).

Nor are these concerns new ones for EPA.  In 2013, EPA's Inspector General recognized that a Committee member's "receipt of grant funds from the EPA … could raise concerns of independence" if the Committee "plans to address work performed under the research grant."  Off. of Inspector Gen., EPA, *EPA Can Better Document Resolution of Ethics and Partiality Concerns in Managing Clean Air Federal Advisory Committees*, Report No. 13-P-0387, at 10 (2013) (2013 Report), https://bit.ly/3aEbnZe. A few years later, Congress reached a similar conclusion.  The official explanatory statement accompanying the 2016 Consolidated Appropriations Act observed that EPA "has not yet resolved long-standing questions regarding conflicts of interest" among advisory committee members and asked the Agency to develop a policy statement evaluating "potential bias based on," among other things, "receipt of former and current Federal grants."  161 Cong. Rec. H10,161, H10,220 (daily ed. Dec. 17, 2015).

Against this "backdrop of well-known public disagreement regarding whether the existing regime was adequate," 19-5104 Gov't C.A. Br. 46, EPA issued a directive in 2017 designed to effectuate FACA and its implementing regulations by ensuring that the Committee operates in a "balanced" and "independent" manner.  Shumate Decl., Ex. Q, EPA, Strengthening and Improving Membership on EPA Federal

Advisory Committees at 2–3 (Oct. 31, 2017) (2017 Ethics Directive).  Among other things, the 2017 directive categorically prohibited non-governmental EPA-grant recipients from serving on the Committee.  *Id.* at 3, 6.  Although multiple courts held that this blanket prohibition was procedurally unlawful under the APA, *Physicians for Soc. Resp.*, 956 F.3d at 644–50; *NRDC, Inc. v. EPA*, 438 F. Supp. 3d 220, 231–34 (S.D.N.Y. 2020), EPA subsequently adopted a different "Conflict of Interest Policy" in 2020 that addresses these sorts of grant-based conflicts on an appointment-by-appointment basis, *see* Shumate Decl., Ex. R, EPA, EPA Will Not Appeal Adverse SDNY Decision Regarding October 31, 2017 Federal Advisory Committee Directive (June 24, 2020) (Conflict of Interest Policy).

Yet, despite this longstanding concern with grant-based influence, EPA made no attempt—let alone an "appropriate" one—to guard against inappropriate influence here.  EPA did not even *attempt* to prohibit Committee members from providing advice related to work performed under their associated research grants, which EPA's Inspector General has already explained could "present an independence concern." 2013 Report 10.  At most, EPA punted by stating that it would consider questions about "financial conflicts of interest" and the "appearance of a loss of impartiality" at some point in the future "[a]s the committee undertakes specific advisory activities." 86 Fed. Reg. at 17,147.  That is insufficient to comply with FACA now.  If it does not violate the inappropriate-influence rule to pack a committee with financially captured academics without any measures to address financial conflicts, it is hard to imagine what would.

2. *The reconstitution is procedurally unlawful.*

Even if EPA had substantively complied with FACA in reconstituting the Committee, its failure "to engage in 'reasoned decisionmaking'" would still violate the APA. *Michigan v. EPA*, 576 U.S. 743, 750 (2015). EPA's reconstitution of the Committee fell short of this bedrock requirement in multiple respects.

a.   To start, in reconstituting the Committee, EPA failed to "articulate a satisfactory explanation for its action," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), a requirement that "is especially important where, as here, an agency changes course," *Physicians for Soc. Resp.*, 956 F.3d at 644. Although Administrator Regan's announcement of the reconstitution may have been "sufficient to *acknowledge* EPA's change in policy," *id.* at 646— through his assertion that he "reset" the Committee "to reverse deficiencies caused by decisions" of the prior Administration, Shumate Decl., Ex. I, Termination Announcement—Administrator Regan "failed to 'provide a reasoned explanation for the change,'" *Physicians for Soc. Resp.*, 956 F.3d at 646. That is clear on at least two different fronts.

i.   *First*, the Administrator's justification for reconstituting the Committee made no effort to address "an important aspect of the problem" before him, *State Farm*, 463 U.S. at 43—namely, whether and how the reconstituted Committee is fairly balanced and free of inappropriate influence as required by FACA, its implementing regulations, and EPA's Handbook. *See supra* pt. I.A.1; 5 U.S.C. app. 2 § 5(b)(2), (3), (c); 41 C.F.R. § 102-3.60(b)(3); *id.* pt. 102-3, subpt. B, app. A; Shumate

25

Decl., Ex. S, EPA Handbook §§ 4.3.2, 5.2.1. Even if packing the Committee with financially beholden academics and purging it of representatives of different viewpoints did not violate FACA's provisions or implementing regulations, the Agency at least had the duty to consider and address whether it might. *See Union of Concerned Scientists*, 954 F.3d at 20 ("FACA's standards tell us what Congress intended the EPA to consider, and the APA's reasoned decision-making standards tell us how the EPA is to go about making and explaining that consideration.").

Yet nothing in EPA's announcement of the purge of the Committee, request for nominations of new members, or revelation of its newly appointed members even mentions this issue, FACA, or the Act's implementing regulations—much less explains how the reconstitution complies with these rules. *See* 86 Fed. Reg. at 17,146–47; Shumate Decl., Ex. I, Termination Announcement; Shumate Decl., Ex. J, Appointment Announcement. Instead, the Agency was focused on factors Congress did "not intend[] it to consider," *State Farm*, 463 U.S. at 43—specifically, the race and sex of appointees. *See* Shumate Decl., Ex. J, Appointment Announcement (leading the announcement of the new Committee members with the observation that the reconstituted "committee will be comprised of five women and two men, including three people of color, making it the most diverse panel since the committee was established"). This failure "to grapple with … an important aspect of the problem" confirms that EPA has not "given an adequate *explanation*" for its reconstitution of the Committee. *Physicians for Soc. Resp.*, 956 F.3d at 647 (cleaned up). Even if FACA

26

and its implementing regulations permit the arrangement here, EPA has not yet done what the APA requires to adopt it.

**ii.**     *Second*, in reconstituting the Committee, the Agency failed to offer a reasonable explanation for abandoning any restrictions on the ability of grant-affiliated individuals to serve on the Committee.  As discussed, the Agency (and Congress) have previously been concerned about such individuals serving on the Committee in, even issuing a blanket prohibition in 2017.  *See supra* pt. I.A.1.b. While Administrator Regan briefly criticized this categorical prohibition as "significantly restrict[ing] member eligibility" and noted that it had been "vacated" in 2020, he offered no explanation for ignoring EPA's prior concerns about—and limitations on—grant-based influence.  Nor did he explain how these concerns are satisfied by a Committee stocked with academics beholden to significant research grants.  Shumate Decl., Ex. I, Termination Announcement.

That glaring omission requires that EPA redo its work.  When an agency changes course, "a reasoned explanation is needed for disregarding facts and circumstances that underlay … the prior policy."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009).  Here, EPA never addressed its Inspector General's 2013 finding that a Committee member's "research or grant is a potential area of concern" if the Committee "plans to address work performed under the research grant," 2013 Report 10; the Agency's 2017 finding that service on the Committee by investigators on EPA grant projects "can create the appearance or reality of potential interference with their ability to independently and objectively serve," Shumate Decl., Ex. Q, 2017

27

Ethics Directive at 3; or the Agency's 2020 commitment to address grant-based conflicts on an appointment-by-appointment basis, Shumate Decl., Ex. R, Conflict of Interest Policy.  That error is the mirror image of the one that the D.C. Circuit identified with respect to the 2017 prohibition.  *See Physicians for Soc. Resp.*, 956 F.3d at 644–48.  As the D.C. Circuit explained, even if EPA had "*acknowledge[d]*" its "change in policy," its shift was arbitrary and capricious because in identifying an ethical risk with grantees serving on the Committee, the Agency never mentioned that it "had previously reached exactly the opposite conclusion: that grantees could, in fact, ethically serve."  *Id.* at 646–47.  Here, too, the APA required the Agency to at least explain why its concerns about grant-based influence were no longer relevant.

**b.**    In addition to skipping over this basic analysis, EPA failed to "consider the alternatives that are within the ambit of the existing policy."  *DHS v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020) (cleaned up).  While EPA believed its prior approach had resulted in "deficiencies" in the Committee by "significantly restricting member eligibility" and deviating from "the standard process" for appointments— nothing about its reasoning suggests that firing the existing Committee *en masse* and replacing it with a slate of EPA-funded academics was the only solution.  Shumate Decl., Ex. I, Termination Announcement.  After all, EPA's justifications for the purge did not call into question the quality of the Committee's entire membership.  To the contrary, the Agency not only "encourage[d]" the fired members "to reapply for consideration," *id.*; *see* Grandoni, *supra* at 2 n.1, it reappointed two of them (Frampton and Boyle), Shumate Decl., Ex. J, Appointment Announcement.

28

Accordingly, if EPA had wanted to immediately make room for new appointees, it could have terminated one or two members.  Or if it had truly wanted a fresh start, the Agency could have ensured there would be at least *one* different perspective on the Committee and taken care to ensure that its members would be subject to *some* grant-based ethical restriction.  Yet the Agency apparently ignored these less drastic alternatives.  Indeed, it considered no alternative at all.

In doing so, EPA committed an error that the Supreme Court has repeatedly condemned.  In both *State Farm* and *Regents*, the Court faulted an agency that reversed course for failing to consider alternatives.  In each instance, the agency's justification for reversal "did 'not cast doubt'" on a narrower solution: in *State Farm*, the agency could have adopted an airbags-only requirement rather than no passive-restraint requirement at all; in *Regents*, the agency could have eliminated solely the employment benefits associated with DACA rather than do away with DACA altogether.  *Regents*, 140 S. Ct. at 1912 (quoting *State Farm*, 463 U.S. at 47); *see id.* at 1910–13.  And in each instance, the Court made clear that the agency could not abandon course "without any consideration whatsoever" of less drastic alternatives.  *Id.* at 1912 (quoting *State Farm*, 463 U.S. at 51).  So too here:  Nothing in EPA's justifications for reconstituting the Committee "cast doubt" on the option of merely terminating one or two members or reconstituting a Committee with at least one dissenter or some grant-based ethical restrictions.  Yet the Agency engaged in its firing spree "without any consideration" of these narrower solutions.  *Id.*  In doing so, EPA "entirely failed to consider that important aspect of the problem."  *Id.* at 1913

(cleaned up); *see State v. Biden*, 10 F.4th 538, 555 (5th Cir. 2021) ("[T]he problem is that the Secretary failed to mention *any* modification to [the Migrant Protection Protocols] as a possible alternative, even though the alternatives are within the ambit of the existing policy." (cleaned up)); *stay pending appeal denied sub. nom. Biden v. Texas*, No. 21A21, 2021 WL 3732667, at *1 (U.S. Aug. 24, 2021).

### 3.     *The reconstitution is reviewable.*

In the face of all this, the government will almost certainly contend, consistent with the position it has taken before, that the Committee's reconstitution is unreviewable under 5 U.S.C. § 701(a)(2), which precludes judicial review of "agency action … committed to agency discretion by law." 5 U.S.C. § 701(a)(2); *see, e.g.*, *Physicians for Soc. Resp.*, 956 F.3d at 642–55; *NAACP*, 496 F. Supp. 3d at 132–37. D.C. Circuit precedent forecloses that argument, and it is meritless regardless. EPA was not acting in a law-free zone here.

**a.**     To honor the APA's "presumption of judicial review," the Supreme Court has "read the § 701(a)(2) exception for action committed to agency discretion 'quite narrowly, restricting it to those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2568 (2019) (cleaned up). And those unusual statutes concern "certain categories of administrative decisions that courts traditionally have regarded as committed to agency discretion, such as a decision not to institute enforcement proceedings, or a decision by an intelligence agency to terminate an employee in the interest of national

30

security." *Id.* (cleaned up); *see Regents*, 140 S. Ct. at 1905 (noting that the § 701(a)(2) exception is "confin[ed] … to those rare administrative decisions traditionally left to agency discretion") (cleaned up).

There is "nary a case that would suggest" that "the make-up of agency advisory committees is an area traditionally left to agency discretion." *Union of Concerned Scientists*, 954 F.3d at 18.  And, as Senior Judge Bates recently recognized, the D.C. Circuit held in *Microbiological* that "FACA's 'fair balance' and 'inappropriate influence' requirements" provide "judicially manageable standards" for purposes of § 701(a)(2).  *NAACP*, 496 F. Supp. 3d at 132; *see id.* at 132–37.  *But see Physicians for Soc. Resp. v. Wheeler*, 359 F. Supp. 3d 27, 44 (D.D.C. 2019) (asserting that "*Microbiological* does not require finding" these provisions to offer "meaningful standard[s]" and noting division on this question among decisions by this Court), *rev'd and remanded*, 956 F.3d 634 (D.C. Cir. 2020).

The three-judge panel in *Microbiological* reached three separate views of the appropriate disposition of challenges under FACA's fair-balance and inappropriate-influence provisions: (1) "Judge Silberman conclude[d] that" the "claims are not justiciable," (2) "Judge Friedman [wa]s of the view that the district court correctly rejected the challenges," and (3) "Judge Edwards conclude[d] that the appellants … raise justiciable claims" and "have shown that the composition of the advisory committee violates the Act."  886 F.2d at 419–20.  While the panel was obviously fractured, "it is clear that two of the three judges" (Judges Edward and Friedman) concluded that both FACA provisions provided meaningful (and thus reviewable)

31

standards for purposes of § 701(a)(2).  *NAACP*, 496 F. Supp. 3d at 132; *see id.* at 136.

Judge Edwards was explicit: "The question of justiciability of claims under section 5

of FACA"—which contains both the fair-balance and inappropriate-influence

provisions—is "not an open issue."  *Microbiological*, 886 F.2d at 433 (Edwards, J.,

concurring in part and dissenting in part); *see id.* at 432–34; *NAACP*, 496 F. Supp. 3d

at 132–33, 136.  And by adjudicating the merits of the fair-balance and inappropriate-

influence claims, Judge Friedman also concluded that they were justiciable.  *See*

*Microbiological*, 886 F.2d at 424 (Friedman, J., concurring in the judgment) ("In my

view, the membership of the Committee … did not violate the 'fairly balanced'

requirement of the Act"); *id.* at 425 ("The appellants have not shown that the original

Committee was dominated or 'inappropriately influenced' by food industry

representatives.").  As Senior Judge Bates recently observed with respect to Judge

Friedman, he "necessarily" deemed these requirements "justiciable … because he

judged" them.  *NAACP*, 496 F. Supp. 3d at 132; *see id.* at 136.

*Microbiological* thus stands for the proposition that challenges under FACA's

fair-balance and inappropriate-influence requirements are justiciable for purposes of

§ 701(a)(2).  Indeed, that is precisely how other courts of appeals have understood the

D.C. Circuit's decision.  *See Union of Concerned Scientists*, 954 F.3d at 20 & n.6

(treating *Microbiological* as representing "the majority view" in the circuits that

"FACA's fair balance and inappropriate influence provisions are reviewable"); *Colo.*

*Env't Coal. v. Wenker*, 353 F.3d 1221, 1232 (10th Cir. 2004) (citing *Microbiological* for

the proposition that the "D.C. Circuit[] [has] held that the fair balance requirement

… is justiciable"); *Cargill, Inc. v. United States*, 173 F.3d 323, 335 n.23 (5th Cir. 1999) (criticizing earlier decisions from this Court for having "strayed from the *Microbiological Criteria* panel's apparent holding" and for failing to account for "Judge Friedman's tie-breaking conclusion that the fair balance requirement is justiciable").  There is no reason for this Court to take a different view.

  **b.** Even if D.C. Circuit precedent were not binding, though, the issues discussed above are plainly reviewable.  The § 701(a)(2) exception is narrow and the Supreme Court has declined to apply it even when a statute "confers broad authority" on an agency and "leave[s] much to [its] discretion" (such as in the Census Act).  *Dep't of Com.*, 139 S. Ct. at 2568; *see Cody v. Cox*, 509 F.3d 606, 610 (D.C. Cir. 2007) (the "difficulty of defining the boundaries" of a statutory standard does not render an agency decision unreviewable).  This exception is reserved for truly extreme provisions that "foreclose the application of any meaningful judicial standard of review," such as a provision of the National Security Act allowing the CIA Director to terminate an employee whenever he " 'shall *deem* such termination necessary or advisable in the interests of the United States.' "  *Webster v. Doe*, 486 U.S. 592, 600 (1988); *see Dep't of Com.*, 139 S. Ct. at 2568.

  FACA's fair-balance and inappropriate-influence provisions are specific, they are clear, and they are "at least as manageable as the requirements set out in the Census Act," *Union of Concerned Scientists*, 954 F.3d at 19.  FACA provides that an agency "shall"—a word that limits discretion from the outset—"require the membership of the advisory committee to be fairly balanced in terms of the points of

view represented and the functions to be performed" and implement "appropriate provisions to assure that the advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority or by any special interest." 5 U.S.C. app. 2 § 5(b)(2)–(3), (c). Courts are "well equipped to enforce" these commands—or at least patrol their "outer boundaries." *Union of Concerned Scientists*, 954 F.3d at 18. For example, if an "agency announced that only persons paid by a regulated interested business could serve on a committee," it seems obvious that "FACA's fair balance and inappropriate influence standards would supply a meaningful tool for reviewing such a new policy." *Id.* at 19. And "[i]f a statute provides a meaningful standard for review even in extreme cases, it is justiciable." *NAACP*, 496 F. Supp. 3d at 134; *see, e.g.*, *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 486, 488 (2015) (holding that a statute providing that an agency "shall endeavor" to attempt conciliation before initiating a lawsuit offers "a perfectly serviceable standard for judicial review" because it would at least apply to cases where the agency "declined to make any attempt to conciliate"). In any event, there is no need to speculate about whether courts *can* apply these provisions in specific cases; they *have*. *See supra* pt. I.A.1; *see, e.g.*, *NAACP*, 496 F. Supp. 3d at 143–44; *cf. Dep't of Com.*, 139 S. Ct. at 2568 (rejecting government's nonreviewability argument because "[w]e and other courts have entertained … statutory challenges to census-related decisionmaking").

Indeed, FACA is a particularly poor candidate for the narrow exception in § 701(a)(2) because the entire point of enacting it was to constrain agency

appointments to their advisory committees.  Unlike in the context of "agency decisions that courts have traditionally regarded as unreviewable," *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018), there is no indication that Congress wanted to give agencies free reign over their appointments to advisory committees.  To the contrary, even if "agency discretion in handling advisory committees may have been unfettered prior to 1972, FACA itself was the result of Congress's determination that some fetters were needed." *Union for Concerned Scientists*, 954 F.3d at 18.  It is "'implausible to conclude that Congress simultaneously passed a law designed to constrain executive discretion and ensure Executive Branch accountability, while also wholly precluding judicial review of advisory committee design decisions.'" *NAACP*, 496 F. Supp. 3d at 135.

It is thus unsurprising that in addition to the D.C. Circuit, the majority of Circuits to have considered the question—the First, Fifth, Tenth and Eleventh—have held or strongly suggested that one or both of FACA's fair-balance and inappropriate-influence provisions provide meaningful standards for review.  *See Union of Concerned Scientists*, 954 F.3d at 18–20 (holding that both provisions permit reviewable); *Colo. Env't Coal.*, 353 F.3d at 1231–34 (holding that the fair-balance requirement permits review, but that the inappropriate-influence provision does not); *Cargill*, 173 F.3d at 334–41 (holding that both provisions permit review); *Alabama-Tombigbee Rivers Coal.*, 26 F.3d at 1106–07 (adjudicating claim under the fair-balance provision without addressing § 701(a)(2)).  Only the Ninth Circuit, addressing the question prior to the Supreme Court's more recent decisions on

§ 701(a)(2), has held FACA's fair-balance requirement to provide no meaningful standard, and even then only in particular circumstances. *See Ctr. for Pol'y Analysis on Trade & Health v. Off. of U.S. Trade Representative*, 540 F.3d 940, 944–47 (9th Cir. 2008)*; see also Union of Concerned Scientists*, 954 F.3d at 20 & n.6 (discussing circuit split); *NAACP*, 496 F. Supp. 3d at 135 (same).

Finally, even if FACA somehow did not satisfy § 701(a)(2), "FACA's implementing regulations" and EPA's Handbook would "provide further law to apply." *NAACP*, 496 F. Supp. 3d at 134; *see Physicians for Soc. Resp.*, 956 F.3d at 643 (emphasizing that "judicially manageable standards may be found in formal and informal policy statements and regulations" and holding that the "regulations implementing FACA provide just such standards" (cleaned up)).  Those detailed provisions, *see supra* at 5–6, "are far more precise than other standards, like 'in the interest of justice,' that the D.C. Circuit has deemed reviewable." *NAACP*, 496 F. Supp. 3d at 134 (quoting *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1398 (D.C. Cir. 1995)); *see Physicians for Soc. Resp.*, 956 F.3d at 643 (collecting cases where the D.C. Circuit "has found meaningful standards to apply 'under far more permissive and indeterminate language'").

### B.   Dr. Young Will Suffer Irreparable Harm If The Unlawfully Reconstituted Committee Completes Its Work.

Dr. Young faces irreparable harm if he is excluded from the Committee's imminent deliberations regarding the air-quality standards for particulate matter.  A preliminary injunction is necessary because, in the very near future, Dr. Young will

forever lose the opportunity to influence EPA as a member of the Committee on this matter of significant national importance.  Absent immediate relief, the unlawfully reconstituted Committee will complete its deliberations and provide its recommendation to EPA on this important issue without Dr. Young's input—a recommendation that EPA will then use as the basis for a proposed rule amending the air-quality standards.  Dr. Young's injuries cannot be adequately remedied after this process is complete and are thus irreparable.

As a threshold matter, EPA's reconstitution of the Committee injured Dr. Young by denying him "a fair opportunity to be appointed to" the Committee.  *Colo. Env't Coal.*, 353 F.3d at 1235.  As Dr. Young explains, serving on the Committee is a valuable and prestigious professional credential, and he wants to participate in the Committee's work.  Young Decl. ¶¶ 15–17.  His "loss of the opportunity to compete" for a position on the Committee is an actionable injury, even if Dr. Young is not "certain to receive" the position.  *CC Distribs., Inc. v. United States*, 883 F.2d 146, 149–50 (D.C. Cir. 1989) (citation omitted).  In other words, he was harmed not because he "is entitled to a seat on an advisory committee, but rather because [he] is entitled to a fair adjudication of [his] application for membership."  *NRDC v. Dep't of Interior*, 410 F. Supp. 3d 582, 602 (S.D.N.Y. 2019).  "[P]otential" relief under FACA is "undoubtedly sufficient" to redress his injury.  *Pub. Citizen v. U.S. Dep't of Just.*, 491 U.S. 440, 451 (1989).

"In the FACA context," there is "a big difference between relief now and later."  *Animal Legal Def. Fund v. Shalala*, 53 F.3d 363, 368 (D.C. Cir. 1995) (Wald, J.,

concurring in the result).  When an advisory committee acts in violation of FACA's "fairly balanced" requirement, there is "no adequate remedy at law" for the "improper exclusion" of representatives.  *Nw. Ecosystem All.*, 1999 WL 33526001, at *7.  Such an injury is "irreparable," as "the inability to influence decisionmakers … cannot be remedied" later.  *Id.*  When the government conducts proceedings in violation of FACA, it denies plaintiffs, "perhaps for all time, but at a minimum during the ongoing course, that which Congress expressly protected through FACA."  *Nat'l Econ. Comm'n*, 703 F. Supp. at 129.  Absent injunctive relief, the right to participate in "the decision-making process as it occurs" is "obviated."  *Id.*  Because FACA entitles committee members to "contribute along the way in shaping the [committee's] ultimate recommendations," a plaintiff "need not wait to assert his rights … until after the fact—when a breach of his right to fully participate could not truly be redressed."  *Dunlap*, 286 F. Supp. 3d at 107.

Here, EPA's refusal to fairly adjudicate Dr. Young's nomination to the Committee will cause him to suffer *irreparable* harm because it necessarily precluded him from participating in the Committee's imminent deliberations regarding the air-quality standards for particulate matter.  *See* Young Decl. ¶¶ 14, 17.  EPA's unlawful reconstitution of the Committee also deprives Dr. Young of the opportunity "to provide decisionmakers with contrary viewpoints" and "influence decisionmakers" as a member of the Committee.  *Nw. Ecosystem All.*, 1999 WL 33526001, at *3, *7.  Dr. Young has particular expertise in air-quality issues and in the field of statistical analysis, which are "directly relevant" to the Committee's current work, and he is

eager to participate in the Committee's deliberations.  Young Decl. ¶¶ 14, 17.  Dr. Young's "perspective would provide a critical counterbalance to the current homogenous perspective on the Committee." *Id.* ¶ 14.  As Dr. Young explains, the current members of the Committee all have the same view that poor air quality and health effects are highly correlated, a critical issue in EPA's reconsideration of its particulate-matter standards.  *Id.* ¶ 20.  The Committee's former Chair shares that assessment.  Cox Decl. ¶¶ 4–6.  As a member of the Committee, Dr. Young would bring his "industry experience" and "very different perspective" to the Committee's proceedings, Young Decl. ¶ 20, including his views on why current particulate-matter standards are sufficient, *id.* ¶ 23.  Depriving Dr. Young of this opportunity is an injury that "cannot be remedied" in the future and is thus "irreparable." *Nw. Ecosystem All.*, 1999 WL 33526001, at *7.

Dr. Young's faces *imminent* irreparable harm because he will soon *forever* lose the opportunity to provide advice and input on EPA's reconsideration of the air-quality standards for particulate matter.  *See* Young Decl. ¶ 17.  EPA has announced that it intends to issue a notice of proposed rulemaking on these standards next summer.  *See supra* at 12.  Before EPA does so, it must receive and consider the recommendation of the Committee and include that recommendation in the notice (along with an explanation of any differences between the EPA proposal and the Committee's recommendations).  42 U.S.C. § 7607(d)(3).  This will likely occur early next year, shortly after the full Committee formally reviews the Particulate Matter Panel's reports.  *See supra* at 4, 12–13.  If the Committee, as expected, deliberates in

January or February 2022 and provides its recommendation to EPA, then Dr. Young will have "permanently los[t] th[e] opportunity," *Filazapovich v. Dep't of State*, No. 21-CV-00943, 2021 WL 4127726, at *24 (D.D.C. Sept. 9, 2021), to influence EPA as a member of the Committee on matters "highly relevant to an ongoing public debate," *Dunlap*, 286 F. Supp. 3d at 110. "[T]hat permanent loss is irreparable." *Filazapovich*, 2021 WL 4127726, at *24.

Prompt judicial intervention is thus essential. "FACA can and should be enforced by injunctive relief *during the process … .*" *Seattle Audubon Soc'y v. Lyons*, 871 F. Supp. 1291, 1309 (W.D. Wash. 1994), *aff'd*, 80 F.3d 1401 (9th Cir. 1996) (emphasis added); *see Dunlap*, 286 F. Supp. 3d at 110. The Eleventh Circuit, for example, affirmed the grant of preliminary injunctive relief *before* an advisory committee report was distributed and used by the government. *See Alabama-Tombigbee Rivers Coal.*, 26 F.3d at 1106–07. Granting similar relief now—*before* the Committee provides its recommendation to EPA—avoids the needs to enjoin the Agency's use of the Committee's advice in the forthcoming rulemaking *after* the Committee completes its work or otherwise interfere in the EPA's rulemaking process. *See, e.g.*, *NRDC v. Pena*, 147 F.3d 1012, 1025–26 (D.C. Cir. 1998) (an injunction on the use of a completed committee report is "the remedy of last resort" for FACA violations). In short, granting prompt relief will protect Dr. Young from suffering irreparable harm, while giving EPA maximum time and flexibility to correct its errors.

In sum, Dr. Young needs a preliminary injunction now to preserve his ability to participate in a lawfully reconstituted Committee's deliberations regarding the air-quality standards for particulate matter.  Dr. Young is not asking for an injunction appointing him to the Committee.  Rather, Dr. Young requests an injunction suspending the Committee's activities and precluding EPA from receiving any advice from the Committee until the Committee is lawfully reconstituted.  Only after the Committee is lawfully reconstituted should the Committee begin its deliberations regarding the air-quality standards for particulate matter.  If EPA chooses to appoint Dr. Young to the lawfully reconstituted Committee, the Court's preliminary injunction will have salvaged Dr. Young's ability to participate in the Committee's deliberations regarding the air-quality standards and his ability to share his advice to EPA as a member of the Committee.

## C.   The Balance of the Equities Weighs in Favor of Pausing the Committee's Activities.

The balance of the equities decidedly favor pausing the unlawfully constituted Committee's activities.

*First*, absent a preliminary injunction, the Committee will complete its work and provide its recommendation to EPA without ever being lawfully constituted.  An injunction is appropriate "if the unavailability of an injunctive remedy would effectively render FACA a nullity."  *Cal. Forestry Ass'n v. U.S. Forest Serv.*, 102 F.3d 609, 614 (D.C. Cir. 1996).  If the unlawfully constituted Committee completes its work and provides its recommendation to EPA on the air-quality standards for particulate

matter, the Agency will have entirely evaded FACA.   "[T]o allow the government to use the product of a tainted procedure would circumvent the very policy that serves as the foundation" of FACA.  *Alabama-Tomigbee Rivers Coal.*, 26 F.3d at 1107.

*Second*, granting a preliminary injunction now—before the Committee holds its first meeting in January or February 2022—would not be disruptive because it would "avoid[] … wasteful expenditures."  *Pena*, 147 F.3d at 1026.  If the Committee is allowed to complete its work, and the Court later issues an injunction preventing EPA from using the Committee's advice and recommendation in next year's rulemaking, the time and resources devoted to the Committee's deliberations and finalizing its recommendation will be wasted.  *Cf. NAACP Legal Def. & Educ. Fund, Inc. v. Barr*, No. 20-CV-1132, 2020 WL 6392777, at *5 (D.D.C. Nov. 2, 2020) (noting government's argument that plaintiffs could have sought emergency relief to halt committee proceedings).  The Court can head off this problem now by immediately pausing the Committee's activities and requiring the Agency "to ensure the [Committee] has a fairly balanced membership" free from inappropriate influence, *NAACP*, 496 F. Supp. 3d at 145, before the Committee completes its work.

*Third*, a preliminary injunction would serve the interest of "public accountability," which is one of "FACA's principal purposes."  *Id.*  The Committee's recommendations will play an essential role in EPA's revision of the particulate-matter standards.  EPA cannot take action without the Committee's advice and input, and the Committee's recommendation must be included on the notice of proposed rulemaking, thus partly setting the terms of the rulemaking itself.   42 U.S.C.

§ 7607(d)(3).   Allowing EPA to evade FACA's requirements—by stifling other viewpoints and packing the Committee with members beholden to EPA in order to rubberstamp a pre-determined outcome—would severely undermine FACA's fundamental purpose of promoting "public accountability."  *Pena*, 147 F.3d at 1026.

*Fourth*, a preliminary injunction would actually help prevent injury to the government.  The D.C. Circuit has noted that "the benefits" of advisory committee membership "flow both ways."  *Cummock*, 180 F.3d at 292.  In addition to the benefits Dr. Young would gain from serving on the Committee, "the Government obtains valuable advice and political legitimacy with respect to its policy decisions."  *Id.*  Here, that would mean EPA has the benefit of advice from a lawfully constituted Committee that is "balanced in terms of viewpoint."  *Ass'n of Am. Physicians & Surgeons*, 997 F.2d at 914.

Finally, Dr. Young's likelihood of success on the merits "'is a strong indicator that a preliminary injunction would serve the public interest' because '[t]here is generally no public interest in the perpetuation of unlawful agency action.'"  *Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 102 (D.C. Cir. 2021) (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)).  Even where the public might have an interest in the agency's action, "our system does not permit agencies to act unlawfully even in pursuit of desirable ends."  *Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2490 (2021).   "[A]n agency's compliance with a mandatory statutory regime," like FACA, "is presumably always in the public interest."  *Protect Democracy Project, Inc. v. U.S. Dep't of Def.*, 263 F. Supp. 3d 293, 301 (D.D.C. 2017).  "[I]gnor[ing]

the strictures imposed by FACA to prevent unbalanced commissions … leav[es] the public to pay any concomitant price." *Dunlap*, 286 F. Supp. 3d at 111.

## II.   In the Alternative, the Court Should Grant Expedited Partial Summary Judgment on Counts V–VIII and Award Declaratory and Injunctive Relief.

As an alternative to a preliminary injunction, the Court should enter expedited partial summary judgment for Dr. Young on his claims related to the Committee. Compl. ¶¶ 95–122 (Counts V–VIII).  Rule 65(a)(2) authorizes the Court to convert Dr. Young's motion for a preliminary injunction into a motion for summary judgment, and doing so is common in this Court.  *See, e.g.*, *DeVos*, 485 F. Supp. 3d at 138; *Cap. Area Immigrants' Rts. Coal. v. Trump*, 471 F. Supp. 3d 25, 31 (D.D.C. 2020).

Partial summary judgment is appropriate here because Dr. Young is entitled to judgment as a matter of law for the reasons explained above, and there are no genuine disputes as to any material fact.  *See, e.g.*, *NAACP*, 496 F. Supp. 3d at 126. Granting expedited summary judgment on Dr. Young's claims related to the Committee will conserve resources, avoid duplicative proceedings, and guide (if not resolve) subsequent litigation on Dr. Young's related claims regarding the Science Advisory Board.  *See* Compl. ¶¶ 67–94 (Counts I–IV).

Should the Court take this course, it should also enter a declaratory judgment that EPA violated FACA and the APA in reconstituting the Committee and that the Committee is not lawfully constituted.  *See* 28 U.S.C. §§ 2201, 2202; Fed. R. Civ. P. 57; *NAACP*, 496 F. Supp. 3d at 146.  It should also "hold unlawful and set aside" EPA's reconstitution of the Committee under the APA.  5 U.S.C. § 706(2).  And for all

44

the reasons that a preliminary injunction is appropriate, so too is a permanent injunction against all Defendants.   *Winter*, 555 U.S. at 20, 32.   The Court has jurisdiction to enter injunctive relief against the non-agency defendants—*i.e.*, the Committee and its Chair, Dr. Sheppard—under the Mandamus Act.   *NAACP*, 496 F. Supp. 3d at 145; *Elec. Privacy Info. Ctr. v. Nat'l Sec. Comm'n on Artificial Intelligence*, 466 F. Supp. 3d 100, 122 (D.D.C. 2020).

## CONCLUSION

The Court should preliminarily enjoin the Committee from conducting any further activity—and EPA from receiving any recommendation or advice from the Committee—until the Committee is lawfully reconstituted.   In the alternative, the Court should grant expedited partial summary judgment to Dr. Young on Counts V–VIII of the Complaint, issue a declaratory judgment that EPA violated the APA and FACA in reconstituting the Committee and that the Committee is not lawfully constituted, set aside the Committee's reconstitution, and award permanent injunctive relief.

45

Dated: October 21, 2021                    Respectfully submitted,

                                           *s/ Brett A. Shumate*

                                           Brett A. Shumate (D.C. Bar No. 974673)
                                           Stephen J. Kenny (D.C. Bar No. 1027711)
                                           Joseph P. Falvey (D.C. Bar No. 241247)
                                           JONES DAY
                                           51 Louisiana Avenue, N.W.
                                           Washington, D.C. 20001
                                           Telephone:  (202) 879-3939
                                           Facsimile:  (202) 626-1700

                                           *Counsel for Plaintiff*
                                           *Dr. S. Stanley Young*