# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DR. S. STANLEY YOUNG,<br>3401 Caldwell Drive<br>Raleigh, NC 27607,<br><br>DR. LOUIS ANTHONY COX, JR.,<br>503 N. Franklin Street<br>Denver, CO 80218,<br><br>       *Plaintiffs,*<br><br>  *v.*<br><br>UNITED STATES ENVIRONMENTAL<br>PROTECTION AGENCY,<br>1200 Pennsylvania Avenue, NW<br>Washington, DC 20460,<br><br>MICHAEL S. REGAN, in his official capacity as<br>Administrator of the EPA,<br>1200 Pennsylvania Avenue, NW<br>Washington, DC 20460,<br><br>SCIENCE ADVISORY BOARD,<br>1200 Pennsylvania Avenue, NW<br>Washington, DC 20460,<br><br>ALISON C. CULLEN, in her official capacity as<br>Chair of the Science Advisory Board,<br>1200 Pennsylvania Avenue, NW<br>Washington, DC 20460,<br><br>CLEAN AIR SCIENTIFIC ADVISORY<br>COMMITTEE,<br>1200 Pennsylvania Avenue, NW<br>Washington, DC 20460, and<br><br>ELIZABETH A. SHEPPARD, in her official<br>capacity as Chair of the Clean Air Scientific<br>Advisory Committee,<br>1200 Pennsylvania Avenue, NW<br>Washington, DC 20460,<br><br>       *Defendants.* | Civil Action No. 1:21-cv-2623<br><br><br>**AMENDED COMPLAINT<br>FOR DECLARATORY,<br>INJUNCTIVE, AND<br>MANDAMUS RELIEF** |

Plaintiffs Dr. S. Stanley Young and Dr. Louis Anthony Cox, Jr., by and through their undersigned attorneys, allege as follows:

## INTRODUCTION

1.     The Environmental Protection Agency ("EPA") has a problem with dissent. In an unprecedented move, EPA purged all industry representatives from two important advisory committees and proceeded to stack those committees with academics who are financially beholden to EPA for multi-million dollar research grants.  Through this mass dismissal, EPA guaranteed that the committees will rubber stamp the new administration's regulations without the inconvenience of an objecting voice from industries targeted by those regulations, knowledgeable about their real-world impacts, and bearing billions of dollars of their costs each year. These newly constituted, industry-free advisory committees are neither fairly balanced nor protected from inappropriate influence in violation of the Federal Advisory Committee Act ("FACA").  Further, EPA has never attempted to explain how the composition of these new committees could possibly comply with FACA, nor has the EPA acknowledged—much less justified—its departure from its longstanding, bipartisan practice of ensuring industry representation on these two advisory committees.  EPA also abandoned—again without acknowledgment or explanation—its policy of addressing grant-based conflicts of interests on an individual appointment-by-appointment basis.  In its haste to eliminate all traces of industry from its advisory committees, EPA ran roughshod over FACA and its obligation to engage in reasoned decision-making.

2.      Numerous advisory committees provide input and recommendations to EPA on a wide range of environmental policies that impact industries across America.  This case involves two such committees: the 40- to 50-member Science Advisory Board ("Board" or "SAB"), which reviews the scientific and technical bases for EPA regulations and provides scientific and policy advice at the agency's request on any issue, and the 7-member Clean Air Scientific Advisory Committee ("Committee" or "CASAC"), which performs a critical role advising EPA on air quality standards, as well as the energy and economic impact of those standards. Despite the "advisory" label, EPA engagement with these committees is, in fact, mandatory:  "The statute creating the SAB, for example, requires that [EPA] 'shall make available' to the Board 'any proposed criteria document, standard, limitation, or regulation' created under numerous environmental statutes and shared with any other agency, and the Clean Air Act requires that when issuing notice of certain proposed rules, EPA must 'set forth or summarize' the findings and recommendations of CASAC and, 'if the proposal differs in any important respect from any of these recommendations,' EPA must provide 'an explanation of the reasons for such differences." *Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 639 (D.C. Cir. 2020) (quoting 42 U.S.C. §§ 4365(c), 7607(d)(3)).  Both committees are subject to FACA.

3.      FACA imposes two fundamental requirements on agencies that form advisory committees: (1) the membership of each committee must be "fairly balanced in terms of the points of view represented and the functions to be

performed by the advisory committee," and (2) the agency must adopt "appropriate provisions to assure that the advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority or by any special interest, but will instead be the result of the advisory committee's independent judgment."  5 U.S.C. app. 2 § 5(b)(2), (b)(3), (c).

4. Consistent with these requirements, EPA has long taken steps to ensure that its advisory committees are fairly balanced and free of inappropriate influence.  For instance, across administrations over the last two decades, the Board has consisted of a mix of members affiliated with universities, non-profits, state and tribal governments, consulting organizations, and (particularly relevant here) regulated industries.  The Committee, too, has included industry-affiliated members.  Industry representation is essential because industry inputs inform the advice of both the Board and the Committee, and the committees' advice and the resulting EPA actions significantly affect numerous regulated industries.  Indeed, EPA estimates that its air quality standards impose billions of dollars in compliance costs on regulated industry every year, which explains why EPA previously took steps to include representatives of regulated industry on its advisory committees.

5. In addition, to further safeguard the independence of these committees, members are usually appointed for and complete multi-year terms.  Indeed, during three prior presidential administrations dating back to 2000, individual members of the Board and Committee were rarely fired, and none of the administrations terminated the entire membership of the committees *en masse*.

6.      All of this changed during the opening months of the current administration.  In March 2021, only twenty days after being sworn, new EPA Administrator Michael S. Regan (the "Administrator") abruptly fired all members of the Board and the Committee, including Plaintiff Dr. S. Stanley Young, a former Board member and an accomplished statistician, and Plaintiff Dr. Louis Anthony Cox, Jr., the former Chair of the Committee and a Board member with expertise in all aspects of health risk analysis and over 40 years of experience in industry and academia.  In doing so, the Administrator did not claim that any former member had been unqualified to serve on the committees or had rendered unsatisfactory service.  Nor did the Administrator claim that his decision was supported by prior agency practice.  Unsurprisingly, his decision was immediately and widely recognized as an "unusual," "ham-handed" "purge," described as "designed to shrink the influence of industry on" the committees.[1]  Over these objections, the Administrator rapidly proceeded to pack the new committees with academics receiving multi-million dollar research grants from EPA, appointing a full slate of 47 members to the Board and 7 members to the Committee (while rejecting Dr.

_____

[1] Dino Grandoni, *EPA dismisses dozens of key science advisers picked under Trump*, Wash. Post (Mar. 31, 2021), https://www.washingtonpost.com/climate-environment/2021/03/31/epa-advisory-panels; Kristen Holmes, *EPA removes dozens of Trump-appointed advisers from two advisory panels*, CNN (Mar. 31, 2021), https://www.cnn.com/2021/03/31/politics/environmental-protection-agency-trump-appointees/index.html; Jennifer Dlouhy & Stephen Lee, *Biden Purges Science Adviser Panels Trump Tilted Toward Industry*, Bloomberg (Mar. 31, 2021), https://www.bloomberg.com/news/articles/2021-03-31/biden-purges-science-adviser-panels-tilted-toward-industry.

Young's and Dr. Cox's nominations to both committees).  But not one of these 54 new members is affiliated with regulated industries.

7.     This "purge" and the subsequent reconstitution of the Board and the Committee violated FACA and its implementing regulations.  The committees are now unfairly balanced—both in terms of points of view, technical competence, and the functions the committees are required to perform—due to their lack of members affiliated with regulated industries.  EPA also failed to adopt appropriate measures to ensure that the committees are protected from inappropriate influence.  The new committees are subject to inappropriate influence because they are stacked with academics who are financially beholden to EPA through multi-million dollar research grants.

8.     On top of these FACA violations, EPA's reconstitution of the two committees violated the Administrative Procedure Act ("APA") in several respects.  First, EPA failed to comply with FACA's implementing regulations.  Second, EPA failed to reasonably explain how the two committees—packed with academics dependent on EPA's financial support but lacking any industry representation—could possibly be considered fairly balanced or free from inappropriate influence.  Third, EPA failed to acknowledge or explain the reversal of (a) its longstanding policy of including representatives of regulated industry on its advisory committees and (b) its more recent policy of policing grant-based conflicts on an appointment-by-appointment basis.  Fourth, EPA failed to consider important aspects of the problem in reconstituting the two committees, including the regulatory factors that

must be considered to achieve a "balanced" advisory committee and the extent to which EPA grants could affect the members' ability to provide independent advice to EPA.

9.      For these reasons, Plaintiffs request that the Court (a) declare that EPA violated the APA, FACA, and its implementing regulations in reconstituting the Board and the Committee, and that the committees are not lawfully constituted, (b) issue mandamus relief barring the Board, the Committee, and their respective Chairs from conducting any committee activities until the relevant committee is lawfully constituted, (c) enjoin EPA from receiving, relying on, or otherwise using any report or other action of each committee until the committee is lawfully constituted, (d) set aside the appointments of the current members of the Board and the Committee, and (e) enjoin EPA to reconstitute the committees with fairly balanced membership and adequate protections against inappropriate influence.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction over this case under 28 U.S.C. §§ 1331 and 1361.

11.      This Court has the authority to grant declaratory, injunctive, and mandamus relief and set aside unlawful agency action under the Declaratory Judgment Act, the Mandamus Act, the APA, and this Court's inherent equitable powers.  *See* 28 U.S.C. §§ 1361, 2201, 2202; 5 U.S.C. §§ 702–704, 706.

12.      Venue is proper in this district under 28 U.S.C. § 1391(e)(1)(A), (B) and 5 U.S.C. § 703.

## PARTIES

13.     Plaintiff S. Stanley Young, Ph.D, is a resident of North Carolina and currently the CEO of CGStat.  Dr. Young previously served as a member of the Board.  He was appointed to a 3-year term in 2018 and was reappointed for another 3-year term in 2020, but that term was cut short when the new EPA Administrator abruptly fired him along with every other member in March 2021.  When EPA reconstituted the Board and the Committee later in 2021, Dr. Young was nominated to serve on both committees, but EPA did not select Dr. Young to serve on either committee.

14.     Dr. Young previously worked at Eli Lilly, GlaxoSmithKline, and the National Institute of Statistical Sciences on questions of applied statistics, and he worked in the pharmaceutical industry on all phases of pre-clinical research.  He authored or co-authored over 60 papers, including six "best paper" awards and a frequently cited book, *Resampling-Based Multiple Testing* (John Wiley & Sons, Inc., 1993), and he has three issued patents.  Dr. Young is a Fellow of the American Statistical Association and the American Association for the Advancement of Science, as well as the Director of the National Association of Scholars' Shifting Sands Project and an adjunct professor of statistics at North Carolina State University, the University of Waterloo, the University of British Columbia, and Georgia Southern University.  Dr. Young is a graduate of North Carolina State University, B.S., M.E.S., and a Ph.D in Statistics and Genetics.

15.     Dr. Young has experience and affiliations with industries regulated by EPA.  For fifteen years, he served as the chief statistician for the Toxicology Division of Eli Lilly and Company.  In that capacity, he supervised and advised Eli Lilly on matters related to EPA regulatory efforts, such as the statistical methods utilized by Eli Lilly in its submissions to EPA.  In addition, Dr. Young has published multiple studies on issues implicating regulated industries.  *See, e.g.*, Young et al., *Time Series Smoother for Effect Detection*, PLOS One (2018); Young et al., *Local Control Strategy: Simple Analyses of Air Pollution Data Can Reveal Heterogeneity in Longevity Outcomes*, 37 Risk Analysis 1742 (2017).

16.     Dr. Young also has particular expertise in air quality.  In 2017, for example, he and two co-authors published the study "Air Quality and Acute Deaths in California, 2000–2012" in the scientific journal *Regulatory Toxicology and Pharmacology*.  The study generated and examined datasets concerning air quality levels for ozone and particulate matter and daily deaths in California over a span of more than a decade.  Using time series analysis and sensitivity analysis, the study concluded that the data did not support that the air quality levels were causally related to acute deaths.

17.     Dr. Young sought nominations to both committees because he wants to provide input and advice to EPA on how its policies impact regulated industries.

18.     In addition, Dr. Young sought nominations to the committees because serving on EPA advisory committees is a valuable and prestigious credential.  As EPA has explained, "[m]embers of the CASAC constitute a distinguished body of

8

non-EPA scientists and engineers who are nationally and internationally recognized experts in their respective fields."  Request for Nominations of Candidates to the EPA's CASAC, 86 Fed. Reg. 17,146, 17,146 (Apr. 1, 2021).  Likewise, "[m]embers of the SAB constitute a distinguished body of non-EPA scientists, engineers, and economists who are nationally and internationally recognized experts in their respective fields."  Request for Nominations of Candidates to the EPA's SAB, 86 Fed. Reg. 17,148, 17,148 (Apr. 1, 2021).  Being terminated from the Board and not selected for the reconstituted committees has deprived Dr. Young of this prestigious credential and the opportunity to share his input and advice to EPA as a member of the committees.

19.    Plaintiff Louis Anthony "Tony" Cox, Jr., Ph.D, is a resident of Colorado and currently the President of Cox Associates, an analytics consulting company that specializes in epidemiology, computational toxicology, policy analytics, and public and occupational health, safety, and environmental risk analysis.  Dr. Cox previously served on both the Committee and the Board.  He was appointed to 3-year terms as Chair of the Committee and member of the Board in 2017 and was reappointed to 3-year terms in 2020.  But Dr. Cox's terms were cut short when the Administrator fired all members of the Committee and the Board in March 2021. When EPA reconstituted these committees, Dr. Cox was nominated to return to service on both of them, but EPA did not select Dr. Cox to serve on either committee.

20.     Dr. Cox has extensive experience in health, safety, and environmental risk analysis and related methods of statistical forecasting and causal analysis.  He is a current member of the Board of Scientific Counselors, a federal advisory committee that advises the National Institute for Occupational Safety & Health on issues related to its research programs, and he has served as a risk analysis expert for many other governmental and non-governmental projects and committees.  Dr. Cox is also a lifetime Fellow of the Society for Risk Analysis, a member of the National Academy of Engineering and the American Statistical Association, Editor-in-Chief of *Risk Analysis: An International Journal*, and author of numerous publications, including the book *Quantitative Risk Analysis of Air Pollution Health Effects* and hundreds of peer-reviewed scientific papers related to health risk assessment.  In addition, Dr. Cox is an associate professor of business analytics at the University of Colorado, where he also has served as an honorary full professor of mathematics and as clinical professor of biostatistics and informatics.  Dr. Cox holds the world's first Ph.D in Risk Analysis and an S.M. in Operations Research, both from the Massachusetts Institute of Technology, and an A.B. from Harvard University.

21.     In addition to his academic work, Dr. Cox has particular experience and affiliations with industries regulated by EPA.  Among other engagements, Dr. Cox has assessed health risks, prepared simulation models, and/or analyzed clinical and laboratory data for the American Petroleum Institute, Western States Petroleum Association, National Mining Association, American Chemistry Council,

10

American Industrial Health Council, Philip Morris International, Exxon Biomedical Sciences, and Mobil Oil, and he has reviewed epidemiological studies for various clients, including studies concerning diesel exhaust and human lung cancer risk for the Engine Manufacturers Association.

22.     Dr. Cox sought renomination to the Committee and the Board because he wants to continue to provide input and advice to EPA on, among other things, the analytic bases for its scientific determinations and policies and on the impacts of those policies on populations affected by regulated industries.  Dr. Cox also wants to advise EPA on matters on which he developed further expertise and experience while serving as Committee Chair, such as the air quality standards that are currently under review by the Committee and EPA.  In addition, serving on EPA advisory committees is a valuable and prestigious credential and provides a valuable opportunity to help meet the nation's need for applications of better, more trustworthy scientific risk analysis in the public interest.  Being abruptly terminated from both committees and not selected for the reconstituted committees has deprived Dr. Cox of this prestigious credential and the opportunity to share his technical perspective and advice with EPA, a perspective that is presently lacking on the Committee and the Board.

23.     Defendant EPA is an agency of the United States government.

24.     Defendant Michael S. Regan is the Administrator of the EPA and is sued in his official capacity.

25.     Defendant Science Advisory Board is an EPA advisory committee.

26.     Defendant Alison C. Cullen is the Chair of the Science Advisory Board and is sued in her official capacity.

27.     Defendant Clean Air Scientific Advisory Committee is an EPA advisory committee.

28.     Defendant Elizabeth A. Sheppard is the Chair of the Clean Air Scientific Advisory Committee and is sued in her official capacity.

## STATEMENT OF FACTS

### I.     The Federal Advisory Committee Act Requires Advisory Committees To Be Fairly Balanced And Protected From Inappropriate Influence

29.     Both the Board and the Committee are subject to FACA, a statute enacted in 1972 that aims to enhance "the public accountability of advisory committees established by the Executive Branch," *Pub. Citizen v. U.S. Dep't of Just.*, 491 U.S. 440, 459 (1989), and "ensure that persons or groups directly affected by the work of a particular advisory committee would have some representation on the committee," *Nat'l Anti-Hunger Coal. v. Exec. Comm. of President's Priv. Sector Surv. on Cost Control*, 711 F.2d 1071, 1074 n.2 (D.C. Cir. 1983).

30.     FACA imposes a number of requirements on advisory committees and the agencies that form such committees.  It mandates that the "membership" of an advisory committee must be "fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee."  5 U.S.C. app. 2 § 5(b)(2), (c).  FACA also requires an agency forming an advisory committee to make "appropriate provisions to assure that the advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing

authority or by any special interest, but will instead be the result of the advisory committee's independent judgment." *Id.* § 5(b)(3), (c).

31.     These "important" requirements are designed to ensure "fair representation of different points of view," so that (for example) committee members "will not all be educators on committees in the Department of Education and will not be all scientists, physicians, or medical men on commissions relating to the Institutes of Health." *Pub. Citizen v. Nat'l Advisory Comm. on Microbiological Criteria for Foods*, 886 F.2d 419, 437 (D.C. Cir. 1989) (Edwards, J., concurring in part and dissenting in part) (quoting 118 Cong. Rec. 16,296 (1972)).

32.     FACA further directs the General Services Administration ("GSA") to develop government-wide standards and controls applicable to advisory committees. 5 U.S.C. app. 2 § 7(c).  Accordingly, the GSA has promulgated regulations expounding on the various FACA requirements.  *See* Federal Advisory Committee Management, 41 C.F.R. pt. 102-3 (the "FACA Implementing Regulations").

33.     The FACA Implementing Regulations reiterate that an advisory committee "must be fairly balanced in its membership in terms of the points of view represented and the functions to be performed." *Id.* § 102-3.30(c).  The regulations further specify factors that should be considered to achieve a "balanced" advisory committee, including:

> (i) The advisory committee's mission;
>
> (ii) The geographic, ethnic, social, economic, or scientific impact of the advisory committee's recommendations;

13

(iii) The types of specific perspectives required, for example, such as those of consumers, technical experts, the public at-large, academia, business, or other sectors;

(iv) The need to obtain divergent points of view on the issues before the advisory committee; and

(v) The relevance of State, local, or tribal governments to the development of the advisory committee's recommendations.

*Id.* pt. 102-3, subpt. B, app. A.  EPA's own handbook on advisory committees reiterates these factors and also directs the agency to consider "[g]roups that have been involved or have a particular interest in the subject matter of the committee." EPA, FACA Advisory Committee Handbook § 5.2.1 (2003) ("EPA Handbook").

34.     In addition, the GSA "strongly recommend[s]" that agencies forming non-discretionary committees (such as the committees at issue here) "ensure 'that, in the selection of members for the advisory committee, the agency will consider a cross-section of those directly affected, interested, and qualified, as appropriate to the nature and functions of the advisory committee.'"  GSA Office of Governmentwide Policy, Federal Advisory Committee Membership Balance Plan (Jan. 2011), https://www.gsa.gov/cdnstatic/MembershipBalancePlanGuidance-November_2011.pdf (quoting 41 C.F.R. § 102-3.60(b)(3)).  As encouraged by the GSA, EPA adopted a policy requiring the "consider[ation]" of "a cross-section of stakeholders directly affected/interested and qualified when selecting … members" for its advisory committees (including the Board and the Committee).  EPA Handbook §§ 3.3.2, 4.3.2.

35.     To further the aims of FACA, the then-Administrator of the EPA issued a directive in 2017 titled "Strengthening and Improving Membership on EPA Federal Advisory Committees."  Ex. 1.  Among other things, the directive announced a blanket rule providing that committee members could not be in receipt of EPA grants or hold positions that otherwise reaped substantial benefits from EPA grants.  *Id.* at 3.  The Administrator explained that this rule sought to safeguard the independence of advisory committees, prevent financial entanglements between committee members and the agency, and avoid the appearance or reality of political interference with committee work.  *Id.*

36.     These concerns were longstanding ones.  In 2013, EPA's Inspector General recognized that a Committee member's "receipt of grant funds from the EPA … could raise concerns of independence" if the Committee "plans to address work performed under the research grant."  Off. of Inspector Gen., EPA, *EPA Can Better Document Resolution of Ethics and Partiality Concerns in Managing Clean Air Federal Advisory Committees*, Report No. 13-P-0387, at 10 (2013) ("2013 Report"), https://bit.ly/3aEbnZe.  A few years later, Congress reached a similar conclusion.  The official explanatory statement accompanying the 2016 Consolidated Appropriations Act observed that EPA "has not yet resolved long-standing questions regarding conflicts of interest" among advisory committee members and asked the agency to develop a policy statement evaluating "potential bias based on," among other things, "receipt of former and current Federal grants."  161 Cong. Rec. H10,161, H10,220 (daily ed. Dec. 17, 2015).

15

37.     In 2020, several courts held that the 2017 directive was unlawful.  *See*

*Physicians for Soc. Resp.*, 956 F.3d at 650; *Nat. Res. Def. Council, Inc. v. EPA*, 438

F. Supp. 3d 220, 235 (S.D.N.Y. 2020).  In acquiescing to these rulings, EPA

explained that it would adhere to a different "Conflict of Interest Policy" addressing

grant-based conflicts of interest on an appointment-by-appointment basis.  *See*

Ex. 2, EPA, EPA Will Not Appeal Adverse SDNY Decision Regarding October 31,

2017 Federal Advisory Committee Directive (June 24, 2020) ("Conflict of Interest

Policy").  EPA explained that the unfavorable rulings invalidated the directive's

"blanket prohibition," but they "d[id] not prevent future actions by EPA to regulate

the composition of its advisory committees, including policies or regulations

governing the participation of committee members who receive grants from EPA,"

nor did they "call into question EPA's responsibility to ensure the independence of

its committee members."  *Id.*

## II.     The Board Advises EPA On Scientific Matters

38.     The Board is an EPA advisory committee subject to FACA.  It typically

consists of 40 to 50 members appointed by the Administrator as special government

employees, and it has a broad range of responsibilities.

39.     As a general matter, the Board is charged with providing "such

scientific advice as may be requested" by the Administrator or various congressional

committees.  42 U.S.C. § 4365(a).  The Board also must review a wide variety of

proposed EPA actions, including any "standard, limitation, or regulation" to be

issued under the authority of the Administrator, and provide "advice and comments

on the adequacy of the scientific and technical basis of the proposed [action]."  *Id.*
§ 4365(c).

40.     In addition, the Board reviews EPA research programs and plans,
organizes issue-specific subcommittees and panels consisting of both members and
non-members, and advises the agency on "standards for protection of human health
and the environment" and "[t]he relative importance of various natural and
anthropogenic pollution sources."  Ex. 3, SAB Charter (2021); *see* EPA, About the
Science Advisory Board, https://sab.epa.gov/ords/sab/f?p=100:2:5521619835417 (last
visited Oct. 4, 2021).  The Board also maintains "standing committees" made up of
approximately five to ten members of the Board.  These standing committees
provide advice and recommendations on specific matters, such as "economic
analysis of EPA programs" (Economic Analysis Committee), "climate change science
and the effects of climate change" (Climate Science Committee), and matters with
"significant direct impact[s] on farming and agriculture-related industries"
(Agricultural Science Committee).  *See* EPA, SAB Current Committees and Panels,
https://sab.epa.gov/ords/sab/f?p=100:3:5521619835417 (last visited Oct. 4, 2021).

41.     In light of these and other responsibilities, it is not surprising that the
Board plays a significant role in EPA policymaking, including with respect to
policies that implicate regulated industries.  This is evident in the advisory reports
issued by the Board and its standing committees, which commonly review EPA
actions and give policy recommendations that affect regulated industries.  *See* EPA,
SAB Advisory Reports, https://sab.epa.gov/ords/sab/f?p=100:12:13896840066909

17

(last visited Oct. 4, 2021) (compiling the reports below); *see also, e.g.*, SAB, EPA-SAB-20-004, Consideration of the Scientific and Technical Basis of EPA's Proposed Mercury and Air Toxics Standards for Power Plants Residual Risk and Technology Review and Cost Review (Apr. 9, 2020) ("Mercury Standards Review"); SAB, EPA-SAB-20-003, Consideration of the Scientific and Technical Basis of the EPA's Proposed SAFE Vehicles Rule for Model Years 2021–2026 Passenger Cars and Light Trucks (Feb. 27, 2020); SAB, EPA-SAB-17-012, Advice on the Use of Economy-Wide Models in Evaluating the Social Costs, Benefits, and Economic Impacts of Air Regulations (Sept. 29, 2017).

42.     For instance, the Board has given advice on which policies EPA should pursue.  In 2015, the Board voiced strong support for the Climate Action Plan, a sweeping regulatory effort to restrict industrial emissions and form international agreements to address climate change, urging EPA to "declar[e]" that its "transformational" "new vision" and "new role in greenhouse gas emissions" "can inform major advances for air, climate, and energy both nationally and internationally."  SAB & Board of Scientific Counselors, EPA-SAB-15-004, Strategic Research Planning for 2016–2019, at 12 (Jan. 27, 2015) ("Strategic Research Planning").  Conversely, the Board has objected to EPA rules on policy grounds (including potentially-self-interested grounds).  Reviewing a proposed rule requiring the publication of studies and data underlying regulatory decision-making, the Board recommended over several dissents that EPA take a different course, contending that existing norms adequately promoted transparency and that the

proposed rule imposed undue costs on researchers.  The Board further advised that, if the proposed rule were nonetheless adopted, EPA should establish a new office to handle data access and consider "creative ways" to offset researchers' costs.  *See* SAB, EPA-SAB-20-005, Consideration of the Scientific and Technical Basis of EPA's Proposed Rule Titled Strengthening Transparency in Regulatory Science, at 11–17 (Apr. 24, 2020).

43.    The Board has also given policy advice on how EPA should evaluate the economic impacts of its regulations, recommending that "equity in welfare … should guide the EPA's thinking about distributional effects" and that EPA should give "[m]ore consideration" to certain impacts, such as those affecting "property owners," "social programs," and "communities, especially declining communities." SAB, EPA-SAB-21-002, Peer Review of the EPA's Revised Guidelines for Preparing Economic Analysis, at 62, 65–67 (Jan. 6, 2021).  Other examples of the Board's policy advice include recommendations that EPA transfer federal technologies into the marketplace, maintain a fellowship program for environmental scientists, and even "encourage consumption of a variety of fish."  Strategic Research Planning at 9; SAB, EPA-SAB-14-004, Concern about the Future of the STAR Fellowship Program, at 1 (Jan. 30, 2014); Mercury Standards Review at 11.

44.    In addition, the Board influences policies that affect regulated industries by recommending subjects that should be researched and the resources that should be allocated to such research.  The Board commonly advises EPA to "expand" research in certain areas, such as sources of air pollutants, "problematic"

19

cumulative effects that arise from "the chain of energy development," mitigation of climate change impacts, and "environmental justice" for "marginalized stakeholders and communities." Strategic Research Planning at 13, 21–23, 26–27. By shaping EPA's research agenda in such ways, the Board influences the policies that are subsequently developed.

45.     The Board's policy role was recently illustrated by its involvement in the federal government's response to the COVID-19 pandemic. Weighing in on the organization of the Executive Branch, the Board recommended that EPA "lead" research efforts concerning the environmental and health factors that affect the transmission and severity of COVID-19, despite acknowledging that other agencies such as the Center for Disease Control have "overlap[ping]" mandates. SAB, EPA-SAB-20-006, Scientific and Technical Review of EPA's Identification of Research Needs to Address the Environmental and Human Health Impacts of COVID-19, at 31–32 (June 2, 2020). The Board also identified numerous subjects for further research and urged EPA to partner with academic institutions to conduct the research. *Id.* at 31–33, 36. And the Board offered policy advice, emphasizing that personal protective "is imperative to community protection in varied settings that range from occupational to the general community," recommending that EPA consider conducting initial equipment studies with surrogate viruses in order to avoid delays caused by the approvals necessary to perform actual studies, and advising EPA to conduct research that "provide[s] reassurance that compliance with existing regulations is sufficient and beneficial." *Id.* at 32, 35–36.

20

### III.    The Committee Advises EPA On Air Pollution

46.    The Committee is also an advisory committee subject to FACA.  It consists of seven members appointed by the Administrator as special government employees, and it advises EPA on air quality standards pursuant to the Clean Air Act.

47.    Under the Clean Air Act, the Administrator is required to publish and periodically update a list of "air pollutant[s]" that result from various "mobile or stationary sources" and contribute, in his judgment, to "air pollution which may reasonably be anticipated to endanger public health or welfare."  42 U.S.C. § 7408(a), (c).  For each listed pollutant, the Administrator must promulgate "air quality criteria" indicating the "identifiable effects on public health or welfare which may be expected from the presence of such pollutant in the ambient air."  *Id.* § 7408(a)(2).  In addition, for each listed pollutant, the Administrator must promulgate "national primary and secondary ambient air quality standards."  *Id.* § 7409(a).  These air quality standards, also known as NAAQS, are based on the Administrator's judgment regarding what is "requisite" to "protect the public health" (for the primary standards) and to "protect the public welfare" from "any known or anticipated adverse effects associated with the presence of such air pollutant in the ambient air" (for the secondary standards).  *Id.* § 7409(b).  Every five years, the Administrator is required to complete a "thorough review" of the air quality criteria and the air quality standards and "make such revisions" as may be

21

appropriate.  *Id.* § 7409(d)(1).  The Administrator may perform this review and
revision "more frequently" if he wishes.  *Id.*

48.     To aid the Administrator in these responsibilities, the Clean Air Act
directs the Administrator to establish the Committee, an "independent scientific
review committee composed of seven members including at least one member of the
National Academy of Sciences, one physician, and one person representing State air
pollution control agencies."  *Id.* § 7409(d)(2)(A).  The Committee is charged with
reviewing the air quality criteria and air quality standards every five years and
"recommend[ing] to the Administrator any new [air quality standards] and
revisions of existing criteria and standards as may be appropriate."  *Id.*
§ 7409(d)(2)(B).  In addition, the Committee must advise the Administrator on the
"relative contribution" of "natural" and "anthropogenic activity" to air pollution;
areas in which additional knowledge or research is needed "to appraise the
adequacy and basis of existing, new, or revised [air quality standards];" and "any
adverse public health, welfare, social, economic, or energy effects which may result
from various strategies for attainment and maintenance of such [air quality
standards]."  *Id.* § 7409(d)(2)(C).

49.     The Committee's recommendations play a significant role in EPA
rulemaking.  When EPA publishes a notice of proposed rulemaking establishing or
revising any air quality standards, the agency must "set forth or summarize" the
Committee's "pertinent findings, recommendations, and comments."  *Id.*
§ 7607(d)(3).  And if the proposed rulemaking "differs in any important respect"

from any of the Committee's recommendations, EPA must provide an "explanation of the reasons for such differences." *Id.*

50.     Advised by the Committee, EPA has established air quality standards for six types of pollutants, one of which is particulate matter (*e.g.*, dust and soot). There are four air quality standards for particulate matter, including one primary annual standard for fine inhalable particles—referred to as PM2.5—that was last updated in 2012.  In 2018, during Dr. Cox's tenure as Chair of the Committee, the former EPA Administrator announced the agency's intention to review the standards for particulate matter.  Ex. 8, EPA, Policy Assessment for the Reconsideration of the National Ambient Air Quality Standards for Particulate Matter, External Review Draft 1-13 (Oct. 2021) ("Draft Policy Assessment").  As part of the review process, EPA staff released a draft policy assessment in September 2019, which the Committee reviewed.  *Id.* at 1-13 to 1-14.  In that review, the Committee did not recommend strengthening the air quality standards for particulate matter.  *See id.*  Indeed, Dr. Cox and the other Committee members (with one exception) concluded that the September 2019 draft policy assessment did not provide valid scientific evidence and data that reasonably called into question the public-health protection afforded by the current annual primary standard for particulate matter.  In turn, EPA published a final rule in December 2020 that retained all of the primary and secondary standards for particulate matter without revision.  *See* Review of the National Ambient Air Quality Standards for Particulate Matter, 85 Fed. Reg. 82,684 (Dec. 18, 2020).

## IV.    EPA Purges The Membership Of The Board And The Committee

51.    In 2021, EPA abruptly attempted to change course by replacing the entire membership of the Board and the Committee.  Since these committees were initially established in the late 1970s, EPA has usually appointed committee members for two- or three-year terms and has "frequently reappointed" members for additional terms.  *Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 14 (1st Cir. 2020).  As EPA continues to recognize even today, members of the Board and the Committee are appointed "to serve for a term (typically up to three years), which may be renewable for an additional term."  EPA, SAB Membership and Nomination Process ("SAB Membership"), https://sab.epa.gov/ords/sab/ f?p=100:7:5521619835417 (last visited Oct. 4, 2021); EPA, CASAC Membership and Nomination Process ("CASAC Membership"), https://casac.epa.gov/ords/sab/ f?p=105:7:2826170208 (last visited Oct. 4, 2021).

52.    The members of the Board and the Committee generally complete their entire terms.  Members of the Board and the Committee were rarely if ever fired before the completion of their terms by the administrations of Presidents George W. Bush or Barack Obama.  During the prior administration, EPA's 2017 directive concerning grant-holders (*see supra* ¶ 35) resulted in several members stepping aside or being removed because they chose to maintain their grants and were thus unable to continue their committee service consistent with the directive.  But aside from such members, on information and belief, no committee members were removed before the completion of their terms during the prior administration.  And

24

certainly the entire membership of the Board or the Committee was never fired *en masse* throughout the two decades spanning the prior three presidential administrations.

53.     EPA sharply departed from these longstanding practices in the opening months of the current administration.  On March 31, 2021, only twenty days after being sworn in, new EPA Administrator Michael Regan abruptly terminated all current members of the Board and the Committee and announced that he would "reset" and "reestablish" the committees' membership.  Ex. 4, EPA, Administrator Regan Directs EPA to Reset Critical Science-Focused Federal Advisory Committees (Mar. 31, 2021) ("Termination Announcement").  This decision was immediately and widely recognized as an "unusual" "purge" (*supra* at 4 n.1), but the Administrator asserted that it was necessary to ensure that the committees consist of a "balanced group of experts" and "reverse deficiencies caused by decisions made in recent years," specifically the 2017 directive on grant-holders, a decision to eliminate air pollution review panels that had augmented the Committee, and certain failures to follow the standard appointment process as described in a 2019 GAO report.  Ex. 4, Termination Announcement.

54.     On the day after this purge, EPA solicited nominations for a new Board and a new Committee via notices in the Federal Register.  The notice regarding the Board explained that nominees should be capable of carrying out the Board's functions and that EPA would consider the "collective breadth and depth of scientific expertise" of each nominee and the committee as a whole.  86 Fed. Reg. at

17,148.  Also, acknowledging the significance of balanced membership, the notice stated that EPA would select individuals who would "contribute to the diversity of perspectives on the committee, *e.g.*, geographical, social, cultural, educational backgrounds, professional affiliations; and other considerations."  *Id.*  Similarly, the notice regarding the Committee sought nominees capable of carrying out the Committee's functions, including advising the Administrator on "any adverse public health, welfare, social, economic, or energy effects which may result from various [air quality standards] strategies."  *Id.* at 17,146.  And the notice reiterated that EPA would select individuals who would contribute diverse perspectives, including perspectives on economic considerations, and emphasized that "a balance of scientific perspectives is important."  *Id.* at 17,147.

55.     In firing the committee members and soliciting nominees for the "reestablished" Board and Committee, EPA did not claim that any former member had been unqualified to serve on the committee.  Nor did EPA claim that any former member's service had been deficient or unsatisfactory.  To the contrary, an EPA spokesman stated that the fired members were "eligible and encouraged to reapply."  Dino Grandoni, *EPA dismisses dozens of key science advisers picked under Trump*, Wash. Post (Mar. 31, 2021), https://www.washingtonpost.com/climate-environment/2021/03/31/epa-advisory-panels.

56.     In 2021, Dr. Young was renominated to serve as a member of the Board and nominated to serve as a member of the Committee, and Dr. Cox was renominated to serve as a member of the Committee and the Board.

## V.    EPA Packs The Board And The Committee With Academics Receiving EPA Grants, But Not A Single Industry Representative

57.    On June 17, 2021, EPA announced the selection of the new Committee members chosen from among 100 nominees, but EPA did not select Dr. Young or Dr. Cox to serve as a member of the new Committee.  Ex. 5, EPA, EPA Announces Selections of Charter Members to the Clean Air Scientific Advisory Committee (June 17, 2021) ("CASAC Appointment Announcement").  Nor did EPA explain how, if at all, the new Committee is "fairly balanced in its membership" or protected from "inappropriate influence," as required by FACA and its Implementing Regulations. Instead, EPA merely asserted that the new members are "well-qualified experts with a cross-section of [the necessary] scientific disciplines and experience" and that the new Committee is "the most diverse panel since the committee was established" because it consists of "five women and two men, including three people of color."  *Id.* As to inappropriate influence, EPA did not even attempt to prohibit Committee members from providing advice related to work performed under associated research grants.  At most, EPA stated that it would consider questions about "financial conflicts of interest" and the "appearance of a loss of impartiality" at some point in the future "[a]s the committee undertakes specific advisory activities"—a punt that did nothing to address the present risk of inappropriate influence.  86 Fed. Reg. at 17,147.

58.    Six of the seven members appointed by the Administrator are university professors; the seventh is a state official as required by the Clean Air

Act.  The members, the affiliations and expertise highlighted by EPA in announcing

the selections, and the EPA grant amounts with which they have been associated as

principal investigators are:

| Name | Affiliation | Expertise | Grant Amounts |
|---|---|---|---|
| Elizabeth Sheppard (Chair) | Professor, University of Washington | epidemiology, biostatistics, and exposure assessment | $60,031,882 |
| Michelle Bell | Professor, Yale University | epidemiology, biostatistics, and environmental engineering | $29,214,550 |
| James Boylan | Environmental Protection Division, Georgia Department of Natural Resources | air quality modeling and monitoring | $229,770 |
| Judith Chow | Professor, Desert Research Institute of the Nevada System of Higher Education | air quality, air quality monitoring, and environmental engineering | $449,456 |
| Mark Frampton | Professor emeritus, University of Rochester Medical Center | respiratory medicine and inhalation toxicology | $36,197,566 |
| Christina Fuller | Associate professor, Georgia State University | respiratory medicine and inhalation toxicology | N/A |
| Alexandro Ponette-González | Associate professor, University of North Texas | epidemiology, exposure assessment, and health disparities | N/A |

*See* Ex. 5, CASAC Appointment Announcement; EPA, Grantee Research Project

Search ("EPA Grantee Search"), https://cfpub.epa.gov/ncer_abstracts/

index.cfm/fuseaction/search.welcome  (last visited Oct. 4, 2021).

59.     In tandem with these appointments, EPA announced its plan to

"expeditiously" reconsider the particulate matter air quality standards, which EPA

had recently chosen to retain in December 2020.  Ex. 6, EPA, EPA to Reexamine

Health Standards for Harmful Soot that Previous Administration Left Unchanged

(June 10, 2021) ("Reconsideration Announcement"); *see supra* ¶ 50.  EPA tasked the

28

new Committee with advising on this reconsideration by reviewing updates to science and policy assessments concerning the particulate matter air quality standards.  Ex. 6, Reconsideration Announcement.  The agency intends to issue a proposed rulemaking on these standards in summer 2022 and a final rule in spring 2023.  *Id.*

60.     Shortly after installing the new Committee, EPA announced the selection of the new Board members chosen from among 352 nominees and designated which new members would serve on the Board's standing committees. Ex. 7, EPA, EPA Announces Selections of Charter Members to the Science Advisory Board (Aug. 2, 2021) ("SAB Appointment Announcement").  EPA did not select Dr. Young or Dr. Cox to serve as a member of the new Board.  And again, EPA did not ensure that or explain how, if at all, the new Board is fairly balanced or protected from inappropriate influence.  Instead, the agency merely recited its earlier formula that the 47 new members are "well-qualified experts with a cross-section of [the necessary] scientific disciplines and experience" and that the new committee is "the most diverse SAB since the committee was established" because it consists of "22 women and 25 men, including 16 people of color."  *Id.*  The new members of the Board, their respective affiliations as identified by EPA, and the EPA grant amounts with which they have been associated as principal investigators are:

| Name | Affiliation | Grant Amounts |
|---|---|---|
| Alison Cullen (Chair) | University of Washington | N/A |
| Marjorie Aelion | University of Massachusetts Amherst | N/A |
| David Allen | University of Texas | $18,552,200 |
| Susan Anenberg | George Washington University | N/A |
| Florence Anoruo | South Carolina State University | N/A |

29

| | | |
|---|---|---|
| Joseph Arvai | University of Southern California | $228,463 |
| Barbara Beck | Gradient (consulting) | N/A |
| Roland Benke | Renaissance Code Development (consulting) | N/A |
| Tami Bond | Colorado State University | $5,657,600 |
| Mark Borsuk | Duke University | $3,009,840 |
| Sylvie Brouder | Purdue University | N/A |
| Jayajit Chakraborty | University of Texas at El Paso | N/A |
| Aimin Chen | University of Pennsylvania | N/A |
| Amy Childress | University of Southern California | $499,743 |
| Weihsueh Chiu | Texas A&M University | $3,599,921 |
| Ryan Emanuel | North Carolina State University; Lumbee Tribe | N/A |
| Earl Fordham | Washington Department of Health | N/A |
| John Guckenheimer | Cornell University | N/A |
| Steven Hamburg | Environmental Defense Fund (nongovernment organization) | N/A |
| Marccus Hendricks | University of Maryland-College Park | N/A |
| Selene Hernandez-Ruiz | Colorado Department of Health and Environment | N/A |
| Elena Irwin | Ohio State University | N/A |
| David Keiser | University of Massachusetts Amherst | $800,000 |
| Mark LeChevallier | Dr. Water Consulting (consulting) | $536,316 |
| Angela Leung | University of California Los Angeles | N/A |
| Lisa Lone Fight | Three Affiliated Tribes | N/A |
| Lala Ma | University of Kentucky | N/A |
| John Morris | University of Connecticut | N/A |
| Enid Neptune | Johns Hopkins University | N/A |
| Sheila Olmstead | University of Texas at Austin | $3,123,375 |
| Austin Omer | Illinois Farm Bureau (nongovernment organization) | N/A |
| Gloria Post | New Jersey Dept. of Environmental Protection | N/A |
| Kristi Pullen-Fedinick | Natural Resources Defense Council (nongovernment organization) | N/A |
| Amanda Rodewald | Cornell University | N/A |
| Emma Rosi | Cary Institute of Ecosystem Studies (nongovernment organization) | N/A |
| Jonathan Samet | Colorado School of Public Health | $28,276,921 |
| Elizabeth Sheppard | University of Washington | $60,031,882 |
| Drew Shindell | Duke University | N/A |
| Genee Smith | Johns Hopkins University | N/A |
| Richard Smith | University of North Carolina, Chapel Hill | $350,000 |
| Daniel Stram | University of Southern California | $16,715,577 |
| Peter Thorne | University of Iowa | $335,000 |
| Godfrey Uzochukwu | North Carolina A&T State University | N/A |
| Wei-Hsung Wang | Louisiana State University | N/A |
| June Weintraub | San Francisco Department of Public Health | N/A |
| Sacoby Wilson | University of Maryland-College Park | $2,211,715 |
| Dominique van der Mensbrugghe | Purdue University | N/A |

*See* Ex. 7, SAB Appointment Announcement; EPA, Chartered SAB Members, https://sab.epa.gov/ords/sab/f?p=100:29:12590422127721:::RP,29:P29_COMMITTEE ON:Board (last visited Oct. 5, 2021); EPA Grantee Search.

## VI.    EPA's Failure To Ensure The New Committees Are Fairly Balanced

61.    As a result of EPA's unprecedented purge of the two committees, the newly constituted Board and Committee are not fairly balanced in terms of the points of view represented or the functions to be performed by the advisory committees.

62.    Most prominently, the committees lack fair balance because they do not include any members representing regulated industries.  Indeed, the 47-member Board and the 7-member Committee *do not include a single industry-affiliated member.*  Instead, the Board consists of 35 members affiliated with academic institutions, 5 members affiliated with state or tribal governments, 4 members affiliated with non-governmental organizations, and 3 members affiliated with consulting organizations.  *See supra* ¶ 60.[2]  And the Committee consists of 6

---

[2] Barbara Beck (Gradient), Roland Benke (Renaissance Code Development), and Mark LeChevallier (Dr. Water Consulting) are not industry-affiliated members; they are consulting-affiliated members.  Nor is Austin Omer (Illinois Farm Bureau) an industry-affiliated member; he is a nongovernment organization-affiliated member.  *See, e.g.*, GAO, GAO-19-280, EPA Advisory Committees: Improvements Needed for the Member Appointment Process, at 42 (2019), https://www.gao.gov/assets/gao-19-280.pdf (classifying advisory committee members in six categories: academic, consultant, government, industry, nongovernment organization, or other).

members affiliated with academic institutions and a single member affiliated with a state government.  *See supra* ¶ 58.

63.    EPA's own prior actions demonstrate that this exclusion of industry-affiliated members has resulted in unfairly balanced committees.  During prior administrations dating back to 2000, even though the Board often had fewer members than it does today, the committee consistently included *at least 3 to 5 industry-affiliated members* (6–10% of the total membership) *in addition to* any members affiliated with consulting organizations and non-governmental organizations.  *See* GAO, GAO-19-280, EPA Advisory Committees: Improvements Needed for the Member Appointment Process, at 24 fig. 3 (2019), https://www.gao.gov/assets/gao-19-280.pdf.  Industry-affiliated members have also served on the Committee.  And even today, EPA maintains that members of the Board and the Committee "come from academia, *industry*, federal, state, and tribal governments, research institutes and non-governmental organizations."  SAB Membership (emphasis added); CASAC Membership (emphasis added).  Yet the current committees do not include *any* such industry-affiliated members.

64.    Industry-affiliated members are critical to fair balance on these advisory committees because the committees' work is informed by—and significantly affects— the broad spectrum of industries regulated by EPA.  For instance, the Board provides advice on the scientific and technical bases of an exceedingly wide variety of agency actions involving numerous industries, including any regulation issued under the Water Pollution Control Act, Resource

Conservation and Recovery Act, Toxic Substances Control Act, Safe Drinking Water Act, Clean Air Act, and "any other authority of the Administrator." 42 U.S.C. § 4365(c). In doing so, the Board plays a significant role in EPA policymaking, including with respect to policies that affect regulated industries. *See supra* ¶¶ 41–45. For instance, the Board advises EPA on the economic impacts of regulations, the "relative importance" of "anthropogenic pollution sources," and the agency's research agenda and thus its policy options. Ex. 3, SAB Charter; *see supra* ¶¶ 41–45. And the regulatory efforts advised by the Board can subject regulated industries to costs totaling millions or even billions of dollars. *See, e.g.*, National Emission Standards for Hazardous Air Pollutants from Coal- and Oil-Fired Electric Utility Steam Generating Units, 77 Fed. Reg. 9304, 9306 (Feb. 16, 2012); National Emission Standards for Hazardous Air Pollutants for Reciprocating Internal Combustion Engines, 75 Fed. Reg. 51,570, 51,583 (Aug. 20, 2010). In light of these functions, among others, the input and views of industry-affiliated members on the Board are essential.

65. The same goes for the Committee, which is required to advise EPA on the "public health, welfare, social, *economic*, or *energy* effects" of proposed air quality standards and often contributes to the agency's policy assessments concerning such standards. 42 U.S.C. § 7409(d)(2)(C) (emphasis added). In fact, the newly constituted Committee is presently tasked with reviewing the policy assessment concerning particulate matter air quality standards. *See* Ex. 6, Reconsideration Announcement. The air quality standards advised by the

Committee can subject regulated industries to costs totaling billions of dollars.  *See, e.g.*, EPA, National Ambient Air Quality Standards for Particulate Matter, 78 Fed. Reg. 3086, 3089, 3265 (Jan. 15, 2013); EPA, Regulatory Impact Analysis of the Final Revisions to the National Ambient Air Quality Standards for Ground-Level Ozone, at ES-15, 8-4 to 8-5 (Sept. 2015), https://www3.epa.gov/ttnecas1/docs/20151001ria.pdf. Industry representatives are uniquely and exclusively positioned to assess policy implications for industry and the economic impacts that air quality standards may have on industry, as well as the subsequent health, welfare, economic, and social impacts that may follow.  And energy industry representatives are uniquely and exclusively positioned to provide advice on energy impacts.  Without industry representatives, the stacked Committee is able to give only one-sided advice on these critical issues, providing an academic viewpoint on the economic effects of air quality standards to the exclusion of any industry viewpoint—the epitome of unfair balance.

66.     The Committee also lacks fair balance because it does not include a balance of viewpoints on other critical issues, such as whether exposure to ambient particulate matter at the levels set by current air quality standards causes premature death—an issue that will be central to the reconsideration of the current standards that EPA ordered when installing the new Committee.  *See supra* ¶ 59. EPA ensured that one view—that exposure causes premature death—is well represented on the new Committee:  The Chair and another member have unequivocally concluded that exposure is responsible for thousands of premature

deaths each year.  *See* Independent Particulate Matter Review Board, *The Need for a Tighter Particulate-Matter Air-Quality Standard*, 383 New Eng. J. Med. 680 (2020).  But the contrary view—that exposure has not been shown to cause premature death—has no such representation on the Committee, even though the view has been advanced by Dr. Young, Dr. Cox, and others in various publications, and EPA itself previously determined that the issue is subject to "continuing uncertainty."  85 Fed. Reg. at 82,707; *see, e.g.*, *supra* ¶ 16.  By excluding this view, EPA has failed to ensure that the Committee is fairly balanced on a critical pending issue.

## VII.  EPA's Failure To Protect The New Committees From Inappropriate Influence

67.    EPA also failed to properly assure that the reconstituted committees' advice and recommendations will be the result of the committees' independent judgment and will not be inappropriately influenced by EPA or the special interests of committee members from institutions that are financially beholden to EPA due to multi-million dollar research grants.  As noted, numerous current members of the Board and the Committee have been associated with millions of dollars in research grants.  *See supra* ¶¶ 58, 60.  These extraordinary sums raise a significant risk that the committees' advice will not be independent and will be inappropriately influenced by EPA or the special interests of grant-holding committee members.  In particular, there is a risk that EPA's control over grant awards will incentivize or pressure, whether actively or passively, committee members to rubber stamp the

administration's agenda or otherwise provide advice that advances EPA's policy goals rather than reflecting impartial analysis. In addition, as a result of such incentives, there is a risk that grant-holding committee members will provide advice that does not reflect their independent judgment in order to maintain current grants and continue receiving additional grants. And there is a risk that committee members will provide self-interested advice that EPA should expand opportunities for additional research grants that redound to their benefit. *See supra* ¶¶ 42, 44.

68. Despite these significant risks, EPA did not establish appropriate provisions—or any provisions—protecting the Board and the Committee against inappropriate influence and assuring their independence. For example, ignoring its Conflict of Interest Policy purporting to address grant-based conflicts of interest on an appointee-by-appointee basis, EPA did not account for the danger of inappropriate influence in selecting the new committee members, suggesting instead that conflicts of interest would be ameliorated at some point in the future "[a]s the committee[s] undertake[] specific advisory activities." 86 Fed. Reg. at 17,147; *see id.* at 17,148. Nor did EPA establish rules governing the new grant-holding committee members or delineating when they are disqualified from participating in advisory activities. At minimum, EPA was required to prohibit committee members from providing advice related to work performed under their own research grants. After all, EPA's own Inspector General has recognized that

such advice presents a "potential area" of "independence concern." 2013 Report 10. Yet EPA wholly declined to adopt such measures.

## STANDING

69.    Dr. Young and Dr. Cox have standing to challenge EPA's reconstitution of the Board and the Committee because each Plaintiff has suffered injuries that are fairly traceable to the agency's actions and are redressable by a favorable ruling.

70.    Dr. Young was injured by: (a) his termination from the Board in 2021 before the expiration of his three-year term, (b) the rejection of his renomination and nomination to serve on the Board and the Committee, (c) the denial of fair opportunities to compete for appointment and be considered for appointment to these prestigious advisory committees in accordance with lawful processes; (d) the denial of opportunities to serve on and have a voice on committees in which he has a direct interest; and (e) the denial of opportunities to provide input and advice to EPA through the committees on the impact of environmental policies on regulated industries.

71.    Dr. Young's injuries are fairly traceable to EPA's decisions to (a) terminate his appointment to the Board before the expiration of his three-year term and (b) reconstitute the Board and the Committee because the agency's actions in that regard resulted in the denial of his nominations and opportunities to the detriment of Dr. Young.

72.     Dr. Young's injuries are redressable because a favorable ruling would provide him with fair opportunities to compete for appointment and be considered for appointment to the Board and the Committee in accordance with lawful processes, as well as opportunities to serve on and have a voice on committees in which he has a direct interest and to provide input and advice to EPA on the impact of environmental policies on regulated industries.

73.     Dr. Cox was injured by: (a) his terminations as Chair of the Committee and member of the Board in 2021 before the expiration of his three-year terms, (b) the rejection of his renominations to serve on these committees, (c) the denial of fair opportunities to compete for appointment and be considered for appointment to these prestigious advisory committees in accordance with lawful processes; (d) the denial of opportunities to serve on and have a voice on committees in which he has a direct interest; and (e) the denial of opportunities to provide input and advice to EPA through the committees on the scientific bases for environmental policies and the impact of those policies on regulated industries.  Additionally, Dr. Cox was injured because, acting in reliance on his reappointment as the Chair of the Committee, he devoted substantial personal resources to uncompensated research and publishing efforts related to Committee matters that he would not have undertaken had he expected to be terminated before the expiration of his three-year term.

74.     Dr. Cox's injuries are fairly traceable to EPA's decisions to (a) terminate his appointments as Chair of the Committee and member of the Board

before the expiration of his three-year terms and (b) reconstitute the Committee and the Board because the agency's actions in that regard resulted in the denial of his nominations and opportunities to the detriment of Dr. Cox.

75.     Dr. Cox's injuries are redressable because a favorable ruling would provide him with fair opportunities to compete for appointment and be considered for appointment to the Board and the Committee in accordance with lawful processes, as well as opportunities to serve on and have a voice on committees in which he has a direct interest, to provide input and advice to EPA on the scientific bases of environmental policies and the impact of those policies on regulated industries, and to prevent the waste of the substantial personal resources that he devoted to Committee matters in reliance on his terminated appointment.

## CLAIMS FOR RELIEF RELATED TO THE BOARD

### Count I—Violation of Administrative Procedure Act
### EPA Acted Contrary to Law by Reconstituting the Board Without Fair Balance

76.     Plaintiffs incorporate by reference the allegations contained in the previous paragraphs as though set forth fully herein.

77.     A court must "hold unlawful and set aside agency action … found to be … not in accordance with law" as well as agency action "in excess of statutory jurisdiction, authority, or limitations."  5 U.S.C. § 706(2)(A), (C).

78.     FACA provides that the "membership" of an advisory committee must be "fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee."  *Id.* app. 2 § 5(b)(2), (c).

79.     The Board is an advisory committee subject to FACA.

80.     EPA reconstituted the Board in violation of FACA because the membership of the committee is not fairly balanced in terms of the points of view represented and the functions to be performed.  Most prominently, the Board lacks fair viewpoint balance because it does not include any industry-affiliated members.  *See, e.g.*, *supra* ¶¶ 61–64.  Further, the Board lacks fair functional balance because it does not include members enabling the Board to adequately advise EPA on matters implicating regulated industries.  *See, e.g.*, *id.*

81.     The agency actions reconstituting the Board, including the appointments of the current Board members following the termination of the former members, are final agency action subject to review under the APA.  5 U.S.C. § 704.

82.     This Court should hold unlawful and set aside the agency actions reconstituting the Board because they violated FACA.  *Id.* § 706(2)(A), (C).

### Count II—Violation of Administrative Procedure Act
### EPA Acted Contrary to Law by Reconstituting the Board Without Adequate Protections Against Inappropriate Influence

83.     Plaintiffs incorporate by reference the allegations contained in the previous paragraphs as though set forth fully herein.

84.     A court must "hold unlawful and set aside agency action … found to be … not in accordance with law" as well as agency action "in excess of statutory jurisdiction, authority, or limitations."  5 U.S.C. § 706(2)(A), (C).

85.     FACA provides that an agency forming an advisory committee must implement "appropriate provisions to assure that the advice and recommendations

of the advisory committee will not be inappropriately influenced by the appointing authority or by any special interest, but will instead be the result of the advisory committee's independent judgment." *Id.* app. 2 § 5(b)(3), (c).

86.     The Board is an advisory committee subject to FACA.

87.     EPA reconstituted the Board in violation of FACA by failing to adopt appropriate provisions assuring that the committee's advice will be the result of independent judgment and will not be inappropriately influenced by EPA or the special interests of grant-holding committee members.  There are significant risks that the Board's judgment will be inappropriately influenced by EPA's control over grant awards or by committee members' interests in maintaining their grants and receiving additional grants. *See, e.g.*, *supra* ¶¶ 67–68.  Yet EPA declined to adopt appropriate provisions protecting against such influence and assuring the committee's independence.  *Id.*

88.     The agency actions reconstituting the Board, including the appointments of the current Board members following the termination of the former members, are final agency action subject to review under the APA.  5 U.S.C. § 704.

89.     This Court should hold unlawful and set aside the agency actions reconstituting the Board because they violated FACA.  *Id.* § 706(2)(A), (C).

### Count III—Violation of Administrative Procedure Act
### EPA Acted Arbitrarily and Capriciously in Reconstituting the Board

90.     Plaintiffs incorporate by reference the allegations contained in the previous paragraphs as though set forth fully herein.

91.     A court must "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

92.     In reconstituting the Board, EPA acted arbitrarily and capriciously by failing to follow governing regulations and policies.  EPA did not follow the FACA Implementing Regulations' requirement that an advisory committee "must be fairly balanced in its membership in terms of the points of view represented and the functions to be performed."  41 C.F.R. § 102-3.30(c).  Nor did EPA follow the Implementing Regulations' requirement that agencies constituting advisory committees should consider certain enumerated factors, including the "economic … impact" of the committee's recommendations and the "business" perspectives necessary to the committee.  *Id.* pt. 102-3, subpt. B, app. A.  In addition, EPA did not comply with its own policy and the GSA's recommendation directing the agency to "consider" a "cross-section of stakeholders directly affected/interested and qualified when selecting advisory committee members," such as industry stakeholders implicated by the Board's work.  EPA Handbook §§ 3.3.2, 4.3.2; *see id.* § 5.21.

93.     EPA acted arbitrarily and capriciously because it did not reasonably explain how the new membership of the Board—lacking industry representation and highly dependent on EPA grants—is fairly balanced or free from inappropriate influence.

94.     EPA acted arbitrarily and capriciously by failing to acknowledge or explain the reversal of (a) its longstanding policy of including representatives of regulated industry on its advisory committees, (b) its policy of considering a cross-section of stakeholders directly affected by and interested in the committee when selecting members, and (c) its Conflict of Interest Policy policing grant-based conflicts on an appointment-by-appointment basis.  Indeed, EPA offered no explanation for ignoring its prior concerns about—and limitations on—grant-based influence.

95.     EPA acted arbitrarily and capriciously by failing to adequately consider relevant or important aspects of the problem, including those specifically identified by FACA, the Implementing Regulations, and agency policies.  In particular, EPA did not adequately consider (a) the balance of the Board's membership in terms of the points of view represented and the functions to be performed by the advisory committee, (b) regulatory factors that should be considered to achieve a balanced advisory committee, including the economic impact of the committee's recommendations, business perspectives necessary to the committee, or stakeholders directly affected by, involved in, or interested in the subject matter of the committee, (c) protections to prevent inappropriate influence and assure independent judgment, and (d) the extent to which EPA grants could affect committee members' ability to provide independent advice to EPA.  *See* 41 C.F.R. § 102-3.30(c); *id.* pt. 102-3, subpt. B, app. A; EPA Handbook §§ 3.3.2, 4.3.2, 5.2.1.  These errors are compounded by the fact that EPA apparently did consider

43

and weight heavily factors that are not identified as relevant by FACA or the Implementing Regulations, specifically the race and gender of appointees.  *See* Ex. 7, SAB Appointment Announcement.

96.    EPA acted arbitrarily and capriciously by failing to consider alternatives that were within the ambit of the existing policy.  Rather than firing the entire Board, EPA could have pursued less drastic alternatives, such as terminating fewer members or reconstituting the Board with at least one dissenter and some grant-based ethical restrictions in place.  Yet nothing in EPA's justifications for reconstituting the Board indicates that it considered these narrower alternatives.  In doing so, EPA failed to consider an important aspect of the problem.

97.    The agency actions reconstituting the Board, including the appointments of the current Board members following the termination of the former members, are final agency action subject to review under the APA.  5 U.S.C. § 704.

98.    This Court should hold unlawful and set aside the agency actions reconstituting the Board because they were arbitrary and capricious.  *Id.* § 706(2)(A).

### Count IV—Mandamus
### The Board and its Chair Are Subject to Mandamus

99.    Plaintiffs incorporate by reference the allegations contained in the previous paragraphs as though set forth fully herein.

100.    The Court has authority over "any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361.

101.    The Board is clearly obligated to comply with, and to be constituted in accordance with, federal law, including FACA and the Implementing Regulations.

102.    As set forth above, the Board is clearly not in compliance with law because it lacks fair balance, it is not adequately protected from inappropriate influence, and/or its reconstitution was arbitrary and capricious.

103.    Plaintiffs have no adequate alternative remedy against the Board and its Chair because the Board is not an agency subject to the APA, and FACA provides no private right of action.

104.    The Board and its Chair are therefore subject to mandamus.

### CLAIMS FOR RELIEF RELATED TO THE COMMITTEE

### Count V—Violation of Administrative Procedure Act
### EPA Acted Contrary to Law by Reconstituting the Committee Without Fair Balance

105.    Plaintiffs incorporate by reference the allegations contained in the previous paragraphs as though set forth fully herein.

106.    A court must "hold unlawful and set aside agency action … found to be … not in accordance with law" as well as agency action "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C).

107.    FACA provides that the "membership" of an advisory committee must be "fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee." *Id.* app. 2 § 5(b)(2), (c).

108.    The Committee is an advisory committee subject to FACA.

109.    EPA reconstituted the Committee in violation of FACA because the membership of the Committee is not fairly balanced in terms of the points of view represented and the functions to be performed.  Most prominently, the Committee lacks fair viewpoint balance because it does not include any industry-affiliated members. *See, e.g.*, *supra* ¶¶ 61–66.  Further, the Committee lacks fair functional balance because it does not include members enabling the Committee to adequately advise EPA on the economic or energy effects of the air quality standards, as required by the Clean Air Act and the Committee's charter. *See, e.g.*, *id.*

110.    The agency actions reconstituting the Committee, including the appointments of the current Committee members following the termination of the former members, are final agency action subject to review under the APA.  5 U.S.C. § 704.

111.    This Court should hold unlawful and set aside the agency actions reconstituting the Committee because they violated FACA. *Id.* § 706(2)(A), (C).

### Count VI—Violation of Administrative Procedure Act
### EPA Acted Contrary to Law by Reconstituting the Committee Without Adequate Protections Against Inappropriate Influence

112.    Plaintiffs incorporate by reference the allegations contained in the previous paragraphs as though set forth fully herein.

113.    A court must "hold unlawful and set aside agency action … found to be … not in accordance with law" as well as agency action "in excess of statutory jurisdiction, authority, or limitations."  5 U.S.C. § 706(2)(A), (C).

114.    FACA provides that an agency forming an advisory committee must implement "appropriate provisions to assure that the advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority or by any special interest, but will instead be the result of the advisory committee's independent judgment."  *Id.* app. 2 § 5(b)(3), (c).

115.    The Committee is an advisory committee subject to FACA.

116.    EPA reconstituted the Committee in violation of FACA by failing to adopt appropriate provisions assuring that the Committee's advice will be the result of independent judgment and will not be inappropriately influenced by EPA or the special interests of grant-holding committee members.  There are significant risks that the Committee's judgment will be inappropriately influenced by EPA's control over grant awards or by committee members' interests in maintaining their grants and receiving additional grants.  *See, e.g.*, *supra* ¶¶ 67–68.  Yet EPA declined to adopt appropriate provisions protecting against such influence and assuring the committee's independence.  *Id.*

117.    The agency actions reconstituting the Committee, including the appointments of the current Committee members following the termination of the former members, are final agency action subject to review under the APA.  5 U.S.C. § 704.

118.   This Court should hold unlawful and set aside the agency actions reconstituting the Committee because they violated FACA.  *Id.* § 706(2)(A), (C).

### Count VII—Violation of Administrative Procedure Act
### EPA Acted Arbitrarily and Capriciously in Reconstituting the Committee

119.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as though set forth fully herein.

120.   A court must "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

121.   In reconstituting the Committee, EPA acted arbitrarily and capriciously by failing to follow governing regulations and policies.  EPA did not follow the FACA Implementing Regulations' requirement that an advisory committee "must be fairly balanced in its membership in terms of the points of view represented and the functions to be performed."  41 C.F.R. § 102-3.30(c).  Nor did EPA follow the Implementing Regulations' requirement that agencies constituting advisory committees should consider certain enumerated factors, including the "economic … impact" of the committee's recommendations and the "business" perspectives necessary to the committee.  *Id.* pt. 102-3, subpt. B, app. A.  In addition, EPA did not comply with its own policy and the GSA's recommendation directing the agency to "consider" a "cross-section of stakeholders directly affected/interested and qualified when selecting advisory committee members," such

as industry stakeholders implicated by the Committee's work.  EPA Handbook §§ 3.3.2, 4.3.2; *see id.* § 5.21.

122.   EPA acted arbitrarily and capriciously because it did not reasonably explain how the new membership of the Committee—lacking industry representation and highly dependent on EPA grants—is fairly balanced or free from inappropriate influence.

123.   EPA acted arbitrarily and capriciously by failing to acknowledge or explain the reversal of (a) its longstanding policy of including representatives of regulated industry on its advisory committees, (b) its policy of considering a cross-section of stakeholders directly affected by and interested in the committee when selecting members, and (c) its Conflict of Interest Policy policing grant-based conflicts on an appointment-by-appointment basis.  Indeed, EPA offered no explanation for ignoring its prior concerns about—and limitations on—grant-based influence.

124.   EPA acted arbitrarily and capriciously by failing to adequately consider relevant or important aspects of the problem, including those specifically identified by FACA, the Implementing Regulations, and agency policies.  In particular, EPA did not adequately consider (a) the balance of the Committee's membership in terms of the points of view represented and the functions to be performed by the advisory committee, (b) regulatory factors that should be considered to achieve a balanced advisory committee, including the economic impact of the committee's recommendations, business perspectives necessary to the

committee, or stakeholders directly affected by, involved in, or interested in the subject matter of the committee, (c) protections to prevent inappropriate influence and assure independent judgment, and (d) the extent to which EPA grants could affect committee members' ability to provide independent advice to EPA. *See* 41 C.F.R. § 102-3.30(c); *id.* pt. 102-3, subpt. B, app. A; EPA Handbook §§ 3.3.2, 4.3.2, 5.2.1. These errors are compounded by the fact that EPA apparently did consider and weight heavily factors that are not identified as relevant by FACA or the Implementing Regulations, specifically the race and gender of appointees. *See* Ex. 5, CASAC Appointment Announcement.

125.   EPA acted arbitrarily and capriciously by failing to consider alternatives that were within the ambit of the existing policy. Rather than firing the entire Committee, EPA could have pursued less drastic alternatives, such as terminating fewer members or reconstituting the Committee with at least one dissenter and some grant-based ethical restrictions in place. Yet nothing in EPA's justifications for reconstituting the Committee indicates that it considered these narrower solutions. In doing so, EPA entirely failed to consider that important aspect of the problem.

126.   The agency actions reconstituting the Committee, including the appointments of the current Committee members following the termination of the former members, are final agency action subject to review under the APA. 5 U.S.C. § 704.

127.    This Court should hold unlawful and set aside the agency actions reconstituting the Committee because they were arbitrary and capricious.  *Id.* § 706(2)(A).

**Count VIII—Mandamus**
**The Committee and its Chair Are Subject to Mandamus Because the Committee Is Not in Compliance with Law**

128.    Plaintiffs incorporate by reference the allegations contained in the previous paragraphs as though set forth fully herein.

129.    The Court has authority over "any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."  28 U.S.C. § 1361.

130.    The Committee is clearly obligated to comply with, and to be constituted in accordance with, federal law, including FACA and the Implementing Regulations.

131.    As set forth above, the Committee is clearly not in compliance with law because it lacks fair balance, it is not adequately protected from inappropriate influence, and/or its reconstitution was arbitrary and capricious.

132.    Plaintiffs have no adequate alternative remedy against the Committee and its Chair because the Committee is not an agency subject to the APA, and FACA provides no private right of action.

133.    The Committee and its Chair are therefore subject to mandamus.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for the following relief:

1.      A declaration, order, and judgment holding that EPA and the Administrator violated the APA, FACA, and the Implementing Regulations in reconstituting the Board and the Committee, that the committees are not lawfully constituted, and that any report, recommendation, or other action of the committees does not reflect the views of a lawfully constituted committee;

2.      A preliminary and permanent injunction and writs of mandamus barring the Board, the Committee, and their respective Chairs from conducting any committee activities until the relevant committee is lawfully constituted;

3.      A preliminary and permanent injunction barring EPA and the Administrator from receiving, relying on, or otherwise using any report, advice, or other action of the Board, the Committee, or any of their members until the relevant committee is lawfully constituted;

4.      A declaration, order, and judgment holding unlawful, enjoining, and setting aside the appointments of the current members of the Board and the Committee;

5.      A preliminary and permanent injunction requiring EPA and the Administrator to reconstitute the Board and the Committee with fairly balanced membership and adequate protections against inappropriate influence;

6.      An award of all costs and attorneys' fees pursuant to any applicable statute or authority; and

7.      Any other relief this Court deems just and proper.


Dated: October 28, 2021                    Respectfully submitted,


                                           */s/ Brett A. Shumate*
                                           Brett A. Shumate
                                               (D.C. Bar No. 974673)
                                           Stephen J. Kenny
                                               (D.C. Bar No. 1027711)
                                           Joseph P. Falvey
                                               (D.C. Bar No. 241247)
                                           JONES DAY
                                           51 Louisiana Avenue, N.W.
                                           Washington, D.C. 20001
                                           Telephone:  (202) 879-3939
                                           Facsimile:  (202) 626-1700

                                           *Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on October 28, 2021, a true and correct copy of the foregoing Amended Complaint for Declaratory, Injunctive, and Mandamus Relief, the accompanying Exhibits, and the Redline Comparison was filed using the Court's CM/ECF system, which will serve all counsel of record.

*/s/ Brett A. Shumate*
Brett A. Shumate

*Counsel for Plaintiffs*