# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

DR. S. STANLEY YOUNG, *et al.*,

                  Plaintiffs,

    v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, *et al.*,

                  Defendants.

Civil Docket No. 21-cv-2623-TJK

## MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION OR FOR PARTIAL SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

BACKGROUND ....................................................................................................................3

A.    The Federal Advisory Committee Act ...................................................................3

B.    The Clean Air Scientific Advisory Committee .....................................................5

C.    EPA's Rules Designed to Guard Against Inappropriate Influence .......................6

D.    The Administrator's Decision to Reestablish the Committee ...............................8

E.    Procedural History ..............................................................................................10

LEGAL STANDARD ..........................................................................................................11

ARGUMENT .......................................................................................................................12

I.      THIS COURT LACKS JURISDICTION ..............................................................12

II.     PLAINTIFFS' CLAIMS ARE NONJUSTICIBIABLE .........................................13

      A.    Plaintiffs' FACA-Based APA Claims Are Nonjusticiable ................13

      B.    Plaintiffs' Arbitrary-and-Capricious Claim Is Nonjusticiable..........23

III.    PLAINTIFFS' CLAIMS FAIL ON THE MERITS ................................................24

      A.    The Committee Is Fairly Balanced ....................................................24

      B.    EPA Has Established Provisions Protecting the Committee From Inappropriate Influence ....................................................................29

      C.    EPA's Decision Was Not Arbitrary and Capricious .........................35

IV.    PLAINTIFFS' REQUESTED REMEDIES ARE INAPPROPRIATE................................40

V.     PLAINTIFFS CANNOT SATISFY ANY OF THE REQUIREMENTS FOR A PRELIMINARY INJUNCTION ...........................................................................42

      A.    Plaintiffs Are Not Likely to Succeed on the Merits...........................42

      B.    Plaintiffs Cannot Demonstrate Irreparable Harm .............................42

      C.    The Balance of Harms and the Public Interest Weigh Against Injunctive Relief. ..................................................................................................45

CONCLUSION ....................................................................................................................45

# TABLE OF AUTHORITIES

## CASES

*Alabama-Tombigbee Rivers Coal. v. Dep't of Interior,*
    26 F.3d 1103 (11th Cir. 1994) ................................................................................................ 21

*Camp v. Pitts,*
    411 U.S. 138 (1973) ............................................................................................................... 36

\*Cargill, Inc. v. United States,*
    173 F.3d 323 (5th Cir. 1999) ........................................................................................... *passim*

*Chaplaincy of Full Gospel Churches v. England,*
    454 F.3d 290 (D.C. Cir. 2006) .............................................................................................. 43

*Citizens for Responsibility & Ethics in Wash. v. FEC,*
    892 F.3d 434 (D.C. Cir. 2017) .............................................................................................. 24

*CityFed Fin. Corp. v. Office of Thrift Supervision,*
    58 F.3d 738 (D.C. Cir. 1995) ................................................................................................ 12

*Claybrook v. Slater,*
    111 F.3d 904 (D.C. Cir. 1997) .............................................................................................. 21

*Cobell v. Norton,*
    391 F.3d 251 (D.C. Cir. 2004) .............................................................................................. 11

*Colorado Env't Coal. v. Wenker,*
    353 F.3d 1221 (10th Cir. 2004) ....................................................................................... 19, 20

*ConverDyn v. Moniz,*
    68 F. Supp. 3d 34 (D.D.C. 2014) .......................................................................................... 43

*Ctr. for Biological Diversity v. Tidwell,*
    239 F. Supp. 3d 213 (D.D.C. 2017) ...................................................................................... 13

*Ctr. for Policy Analysis on Trade & Health v. Office of U.S. Trade Representative,*
    540 F.3d 940 (9th Cir. 2008) ...................................................................................... 16, 17, 20

*Dallas Safari Club v. Bernhardt,*
    453 F. Supp. 3d 391 (D.D.C. 2020) ................................................................................. 12, 44

*DHS v. Regents of Univ. of Cal.*,
   140 S. Ct. 1891 (2020)..................................................................................................39

*Doe v. Shalala*,
   862 F. Supp. 1421 (D. Md. 1994)................................................................................18

*Elec. Priv. Info Ctr. v. Dep't of Justice*,
   15 F. Supp. 3d 32 (D.D.C. 2014) ................................................................................11

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009)....................................................................................................37

*Fertilizer Inst. v. EPA*,
   938 F. Supp. 52 (D.D.C. 1996)............................................................................ 17, 21

*Fund for Animals v. Frizzell*,
   530 F. 2d 982 (D.C. Cir. 1975) ..................................................................................43

*Harrison v. PPG Indus., Inc.*,
   446 U.S. 578 (1980)....................................................................................................13

*Heckler v. Chaney*,
   470 U.S. 821 (1985) ................................................................................ 13, 14, 16, 22

*Jack's Canoes & Kayaks, LLC v. Nat'l Park Serv.*,
   933 F. Supp. 2d 58 (D.D.C. 2013) ..................................................................11, 12, 42

*Kondapally v. U.S. Citizenship & Immigr. Servs.*,
   No. CV 20-00920 (BAH), 2020 WL 5061735 (D.D.C. Aug. 27, 2020)......................11

*Lincoln v. Vigil*,
   508 U.S. 182 (1993) ................................................................................ 14, 15, 16, 22

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins. Co.*,
   462 U.S. 29 (1983) ............................................................................................... 36, 37

*N.W. Forest Res. Council v. Espy*,
   846 F. Supp. 1009 (D.D.C. 1994) ..............................................................................40

*NAACP v. Wilkson*,
   496 F. Supp. 3d 116 (D.D.C. 2020) .....................................................................21, 29

*NAACP v. Barr*,
   No. 20-1132, 2020 WL 6392777 (D.D.C. Nov. 2, 2020) ............................40, 41, 42, 45

iv

*NAACP v. Wilkinson,*
No. 20-1132, 2021 WL 723993 (D.D.C. Feb. 24, 2021)......................................................... 30, 32

*Nat. Res. Def. Council v. Abraham,*
223 F. Supp. 2d 162 (D.D.C. 2002) ...................................................................................41

*Nat. Res. Def. Council v. Pena,*
147 F.3d 1012 (D.C. Cir. 1998) .................................................................................. 40, 41

*Nat. Res. Def. Council, Inc. v. EPA,*
438 F. Supp. 3d 220 (S.D.N.Y. 2020)................................................................................8

*Nat'l Anti-Hunger Coalition v. Exec. Comm. of the President's Private Sector Survey on Cost Control,*
711 F.2d 1071 (D.C. Cir. 1983) ................................................................................. 25, 44

*Nat'l Ass'n of Home Builders v. EPA,*
682 F.3d 1032 (D.C. Cir. 2012) ........................................................................................37

*Nat'l Mining Ass'n v. Jackson,*
768 F. Supp. 2d 34 (D.D.C. 2011) ...................................................................................43

*Newdow v. Bush,*
355 F. Supp. 2d 265 (D.D.C. 2005) .................................................................................43

*Nken v. Holder,*
556 U.S. 418 (2009) ..........................................................................................................12

*Physicians for Soc. Resp. v. Wheeler,*
359 F. Supp. 3d 27 (D.D.C. 2019) ...........................................................................*passim*

*Physicians for Soc. Resp. v. Wheeler,*
956 F.3d 634 (D.C. Cir. 2020) ..................................................................................*passim*

*Pub. Citizen Health Rsch. Grp. v. Acosta,*
363 F. Supp. 3d 1 (D.D.C. 2018) .....................................................................................43

*Pub. Citizen v. HHS,*
795 F. Supp. 1212 (D.D.C. 1992) ............................................................................... 18, 21

*\*Pub. Citizen v. Nat'l Advisory Comm. on Microbiological Criteria for Foods,*
886 F.2d 419 (D.C. Cir. 1989) ..................................................................................*passim*

*Royster-Clark Agribusiness, Inc. v. Johnson,*
391 F. Supp. 2d 21 (D.D.C. 2005) ...................................................................................12

*Sierra Club v. Jackson,*
   648 F.3d 848 (D.C. Cir. 2011) ...................................................................14

*Singh v. Carter,*
   185 F. Supp. 3d 11 (D.D.C. 2016) ...................................................... 11, 12

*Spokeo, Inc. v. Robins,*
   578 U.S. 330 (2016) ...................................................................................44

*Steenholdt v. FAA,*
   314 F.3d 633 (D.C. Cir. 2003) ...................................................................24

*TransUnion LLC v. Ramirez,*
   141 S. Ct. 2190 (2021) ...............................................................................44

*Union of Concerned Scientists v. Wheeler,*
   954 F.3d 11 (1st Cir. 2020) ..........................................................21, 30, 35

*Webster v. Doe,*
   486 U.S. 592 (1988) ...................................................................................14

*Whitman v. Am. Trucking Ass'ns,*
   531 U.S. 457 (2001) ...................................................................................13

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ............................................................................... 11, 42

*Wis. Gas. Co. v. FERC,*
   758 F.2d 669 (D.C. Cir. 1985) ............................................................ 43, 44

**STATUTES**

5 U.S.C. App. II § 1 .........................................................................................3

5 U.S.C. App. II § 2 .........................................................................................3

5 U.S.C. App. II § 3 ...................................................................................... 3, 4

5 U.S.C. App. II § 5 ................................................................................*passim*

5 U.S.C. App. II § 8 .................................................................................... 4, 15

5 U.S.C. App. II § 9 .......................................................................................35

5 U.S.C. App. II § 10 .......................................................................................4

5 U.S.C. § 701 ................................................................................................................*passim*

5 U.S.C. § 704 ...............................................................................................................................13

5 U.S.C. § 706 .......................................................................................................................... 23, 35

5 U.S.C. §§ 701-706 ....................................................................................................................23

7 U.S.C. § 136w(d)(1) ...............................................................................................................19

18 U.S.C. § 202(a) ................................................................................................................... 7, 30

18 U.S.C. § 208(a) ................................................................................................................... 7, 30

20 U.S.C. § 5508(b)(2) ..................................................................................................... 5, 19, 26

42 U.S.C. § 7409 ............................................................................................................... *passim*

42 USC § 7607(b)(1) ............................................................................................................. 12, 13

Clean Air Amendments of 1970,
    Pub. L. No. 91-604, 84 Stat. 1676, (1970) .................................................................. 5, 26

Clean Air Act Amendments of 1977,
    Pub. L. No. 95-95, 91 Stat. 685 (1977) ...................................................................... 6, 26

## OTHER AUTHORITIES

5 C.F.R. § 2635.402 ................................................................................................................ 7, 30

5 C.F.R. § 2640.203 ................................................................................................................ 7, 32

41 C.F.R. § 102-3.130 ............................................................................................................. 4, 15

41 C.F.R. § 102-3.30 .................................................................................................................21

41 C.F.R. § 102-3.105 ...............................................................................................................30

EPA, CAAAC Charter,
    https://perma.cc/8X83-4F6P .................................................................................................6

EPA, CAAAC Membership,
    https://perma.cc/YR3E-FJU3 ...............................................................................................6

EPA, Confidential Financial Disclosure Form for EPA Special Government
    Employees (EPA Form 3110-48)

https://perma.cc/C6R4-RUTK ...............................................................................................7

EPA, *Ethics Requirements for Advisors*
   https://perma.cc/FVU8-6Y82 .............................................................................................7

*Request for Nominations of Candidates to the EPA's Clean Air Scientific Advisory Committee,*
   86 Fed. Reg. 17,146 (Apr. 1, 2021) ............................................................................9, 10, 31

Sean Reilly, *EPA Unveils New Industry-Friendlier Science Advisory Boards*, Science, Nov. 3, 2017,
   https://perma.cc/JA5B-92NU. ...........................................................................................9

## INTRODUCTION

The Clean Air Scientific Advisory Committee ("CASAC" or "the Committee") furthers the mission of the Environmental Protection Agency ("EPA") by providing independent, expert advice on the scientific and technical bases for the agency's national air-quality standards.  In June 2021, the EPA Administrator appointed seven well-qualified experts with a cross-section of scientific disciplines and experience to the Committee, including four prior members of the Committee and two members selected by the previous administration.  The Administrator selected these members after a careful solicitation, evaluation, and selection process in which EPA's Scientific Advisory Board Staff Office considered 115 nominations and 88 public comments before recommending the seven members that the Administrator ultimately appointed.

Two of the nominees who were not selected to serve on the Committee—Dr. S. Stanley Young and Dr. Louis Anthony Cox, Jr.—now challenge the composition of the Committee under the Federal Advisory Committee Act ("FACA").  That statute provides that Congress, in crafting legislation creating federal advisory committees, must include provisions ensuring that advisory committees are "fairly balanced" and free of "inappropriate influence."  5 U.S.C. App. II § 5(b)(2)– (3).  Congress, when it created the Committee, required that EPA appoint one physician, one representative of State air pollution control agencies, and one member of the National Academy of Sciences.  42 U.S.C. § 7409(d)(2).  But aside from these requirements, Congress did not otherwise limit the agency's considerable discretion in deciding who to appoint to the Committee.

Plaintiffs nonetheless maintain that the Committee as presently constituted violates FACA because it does not contain any "industry representative[s]" and instead consists primarily of scientists working for academic institutions that receive EPA grants.  Pls.' Mot. ("Mot.") 3, ECF No. 8-1.  On this basis, Plaintiffs seek the extraordinary remedy of a preliminary and permanent injunction

enjoining the Committee from conducting "any committee or subcommittee activities" and barring EPA from "receiving any recommendation or advice from the Committee." Mot. Proposed Order, ECF No. 8-26. But there is no legal basis for the extraordinary relief that Plaintiffs seek or any of their claims, all of which fail for multiple, independent reasons.

*First*, as a threshold matter, this Court lacks jurisdiction over Plaintiffs' claims. In the Clean Air Act, Congress specified that any challenge to a "nationally applicable" "final action taken" by the EPA Administrator under the Clean Air Act must be filed in the D.C. Circuit, not in federal district court. That is exactly what Plaintiffs challenge here. Accordingly, the Court lacks jurisdiction, and Plaintiffs' claims should be dismissed.

*Second*, even if Plaintiffs were not required to pursue their claims in the D.C. Circuit, none of Plaintiffs' claims is justiciable. FACA provides no meaningful standards against which to judge whether an advisory committee is "fairly balanced" or free from "inappropriate influence." Instead, it vests discretion in agency heads to select committee members based on factors that are uniquely within the agency's expertise and tied to the needs and objectives of the committee. There is simply "no principled basis for a federal court to determine which among the myriad points of view deserve representation on particular advisory committees." *Pub. Citizen v. Nat'l Advisory Comm. on Microbiological Criteria for Foods*, 886 F.2d 419, 426–27 (D.C. Cir. 1989) ("*Microbiological*") (Silberman, J., concurring). For that reason, the majority of judges to consider the question in this district have concluded that FACA claims such as Plaintiffs' are nonjusticiable.

*Third*, even if their claims were justiciable, Plaintiffs do not come close to establishing that EPA abused its discretion in selecting members of the Committee. There is no dispute that EPA complied with the membership requirements of 42 U.S.C. § 7409(d)(2)(A), which is the only substantive constraint that Congress placed on the agency. And even if FACA imposed independent "fair balance" and "inappropriate influence" requirements, the Committee easily satisfies them.

Courts have sensibly recognized that committees involving highly technical scientific studies and recommendations such as the Committee can achieve a fair balance of viewpoints without having members who are representatives from every possible special-interest group. And they have likewise held that there is nothing inappropriate or unethical about a scientist who works for an institution that receives an agency grant serving on an agency advisory committee.

*Fourth*, even if Plaintiffs could clear all of the threshold hurdles identified above, their requested remedy—that the Court enjoin the Committee from meeting and the agency from relying on the Committee's advice—is overbroad and unwarranted. Courts faced with similar allegations have cautioned that such injunctions should only be issued as a last resort in light of the serious First Amendment and separation-of-powers implications of such injunctions. Instead, if the Court were to find that there were some violation, it should at most enter declaratory relief and a "limited use injunction." But, as explained below, there is no reason for the Court to reach the question of remedy at all because all of Plaintiffs' claims fail as a matter of law.

## BACKGROUND

### A.    The Federal Advisory Committee Act

Congress enacted FACA, 5 U.S.C. App. II § 1 *et seq.*, because it found that although advisory committees are "frequently a useful and beneficial means of furnishing expert advice, ideas, and diverse opinions to the Federal Government," *id.* § 2(a), many such committees had become unnecessary, *see id.* § 2(b). Congress designed FACA to keep itself, and the public, better informed about the "number, purpose, membership, activities, and cost of advisory committees"; to discontinue committees that have outgrown their usefulness; and to reaffirm that "the function of advisory committees should be advisory only." *Id.* § 2(b)(1)–(6).

FACA permits Congress, the President, or an agency to create a federal advisory committee to provide "advice or recommendations" to an agency on matters relevant to its responsibilities. *Id.*

§ 3(2). FACA imposes various procedural requirements, including that advisory committees give advance notice of any meetings; hold their meetings "open to the public"; allow "[i]nterested persons" to "attend, appear before, or file statements" with the committee; keep minutes of each meeting and copies of all reports received, issued, or approved by the committee; and make their records available to the public. *Id.* § 10(a)-(c).

FACA also sets forth certain "guidelines" for Congress, the President, and agencies to follow in creating advisory committees. *Id.* § 5(b)–(c). As relevant here, Section 5(b)(2) provides that "any . . . legislation" establishing an advisory committee shall "require the membership of the advisory committee to be fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee." *Id.* § 5(b)(2). Section 5(b)(3) provides that such legislation shall "contain appropriate provisions to assure that the [committee's] advice and recommendations . . . will not be inappropriately influenced by the appointing authority or by any special interest, but will instead be the result of the advisory committee's independent judgment." *Id.* § 5(b)(3). FACA then provides that those same "guidelines," "[t]o the extent they are applicable," "shall be followed by the President, agency heads, or other Federal officials" in creating other advisory committees. *Id.* § 5(c).

Aside from those provisions, FACA is silent about the background, qualifications, or expertise that advisory committee members should possess. Rather, FACA vests agency heads with the responsibility to "establish uniform administrative guidelines and management controls" to govern their agencies' respective advisory committees. *Id.* § 8(a). And FACA's government-wide implementing regulations, promulgated by the General Services Administration, establish that "[u]nless otherwise provided by statute, Presidential directive, or other establishment authority," the members of an advisory committee "serve at the pleasure of the appointing or inviting authority," and their terms of membership "are at the sole discretion of the appointing or inviting authority." 41 C.F.R. § 102-3.130(a); *see also id.* pt. 102-3, subpt. C, app. A, ¶ I ("FACA does not specify the manner

4

in which advisory committee members and staff must be appointed.  Each agency head may specify those policies and procedures consistent with the Act and this part, or other specific authorizing statute, governing the appointment of advisory committee members and staff.").

**B.    The Clean Air Scientific Advisory Committee**

The Clean Air Scientific Advisory Committee provides independent advice to the EPA Administrator on the scientific and technical bases for EPA's National Ambient Air Quality Standards. A.R. 1–3; Brennan Decl. ¶¶ 5–6.  Congress directed the Administrator to create the Committee in the Clean Air Act Amendments of 1977 to, among other things, review current air-quality standards and recommend to the Administrator any new standards.  *See* 42 U.S.C. § 7409(d)(2).  Congress specifically provided that the new Committee shall include "seven members," including at least "one member of the National Academy of Sciences, one physician, and one person representing State air pollution control agencies."  *Id.*  Aside from these provisions, Congress did not limit the Administrator's discretion in selecting members to the Committee.

Unlike some other statutes, Congress did not require that the Committee include a representative from business, industry, or other special-interest groups.  *See, e.g.*, 20 U.S.C. § 5508(b)(2) (requiring that National Environmental Education Advisory Council include "two representatives . . . to represent business and industry").  In fact, in the Clean Air Amendments of 1970, Congress established an advisory committee, similar to the Committee, tasked with identifying potential pollution-control techniques, and required the committee to be comprised of  "technically qualified individual representatives of State and local governments, *industry*, and the academic community."  *See* Clean Air Amendments of 1970, Pub. L. No. 91-604, § 4, 84 Stat. 1676, 1679 (1970) (emphasis added). But in 1977, Congress changed the focus of that advisory committee to reviewing the effects of air pollution and air-quality standards to protect against those effects, and, as part of those changes, removed the requirement that there be an "industry" representative and instead required that there be

5

a "physician." *See* Clean Air Act Amendments of 1977, Pub. L. No. 95-95, § 106, 91 Stat. 685, 691 (1977) (codified at 42 U.S.C. § 7409(d)(2)) (setting out current membership requirements).

The Committee is a scientific and technical advisory committee. A.R. 1–3; Brennan Decl. ¶¶ 2–7. In addition to advising the Administrator on national air-quality standards, the Committee's other responsibilities include advising the Administrator on areas in which additional knowledge is required to appraise the adequacy of the air-quality standards and to describe the research efforts necessary to provide the required information. A.R. 1–3; *see* 42 U.S.C. § 7409(d)(2)(C). As Plaintiffs have noted, the Committee will be reviewing a draft policy assessment that spans 650 pages. *See* EPA, Policy Assessment for the Reconsideration of the National Ambient Air Quality Standards for Particulate Matter, External Review Draft (Oct. 2021), ECF No. 8-13. And as Plaintiffs' own declarations show, the Committee concerns itself with highly technical, empirical questions about the potential harms related to exposure to particulate matter at the levels currently permitted.[1]

EPA also has another committee—the Clean Air Act Advisory Committee ("CAAAC")—that advises the agency on policy issues associated with implementing the Clean Air Act. *See* CAAAC charter, https://perma.cc/8X83-4F6P. Seventeen of the forty members of the CAAAC are affiliated with industry. CAAAC Membership, https://perma.cc/YR3E-FJU3.

## C.    EPA's Rules Designed to Guard Against Inappropriate Influence

Members of EPA's advisory committees, including the Committee, are subject to various conflict-of-interest rules. Scientific advisory committee members are appointed as "special

---

[1] *See, e.g.*, Cox Decl. ¶¶ 7–10 (citing 2019 Committee discussion regarding the "types of confounding that should be addressed," such as "omitted confounders," "unmeasured (latent) confounders," and "residual confounding"); Enstrom Decl. ¶¶ 12–15 (discussing "303-page Particulate Matter Integrated Science Assessment" and other scientific literature); Paustenbach Decl. ¶ 18–20 (arguing that there were "genuine benefits from reducing PM10 and PM2.5 from the levels observed in the 1970-19990 era" but that declarant was "unconvinced" as to "claims that we need to further lower concentrations of PM10 or PM2.5"); Young Decl. ¶¶ 25–28 (providing technical critique of EPA's 2021 Draft Policy Assessment).

government employees" and are subject to regulations set out by the U.S. Office of Government Ethics. *See* 18 U.S.C. § 202(a). Those OGE regulations provide that a "special Government employee serving on an advisory committee within the meaning of [FACA] may participate in any particular matter of general applicability where the disqualifying financial interest arises from his non-Federal employment," provided that "the matter will not have a special or distinct effect on the employee or employer other than as part of a class." 5 C.F.R. § 2640.203(g). Each committee member, however, is "prohibited by criminal statute from participating personally and substantially in an official capacity in any particular matter in which, to his knowledge, he . . . has a financial interest, if the particular matter will have a direct and predictable effect on that interest." 5 C.F.R. § 2635.402(a) (citing 18 U.S.C. § 208(a)).

EPA has additional conflict-of-interest rules of its own, including internal policies for identifying potential financial conflicts of interest. *See, e.g.*, CASAC, Ethics Requirements for Advisors, https://perma.cc/FVU8-6Y82. Active committee members must file a confidential financial disclosure form when first appointed to an advisory committee, and then annually thereafter. *See id.* This form requires appointees to supply information on paid work, assets, funding, and other activities. *See* Brennan Decl. ¶ 12; Confidential Financial Disclosure Form for EPA Special Government Employees (EPA Form 3110-48), https://perma.cc/C6R4-RUTK. The forms are reviewed by an ethics officer, and if potential problems are identified, the member may be required to take action to mitigate the concern. CASAC, Ethics Requirements for Advisors.

EPA also maintains a comprehensive Federal Advisory Committee Handbook, which contains further guidance designed to prevent inappropriate influence. A.R. 996–1271. For example, the Handbook explains that "EPA's policy is that members be appointed for terms no longer than six years," in order to provide "fresh perspectives on the committee." A.R. 1090.

Consistent with these regulations and policies, EPA traditionally allowed recipients of grants to serve on its scientific advisory committees, provided they do not address matters related to their individual grants. In 2017, however, the EPA Administrator issued a directive (the "2017 Directive") addressing membership on EPA advisory committees. Shumate Decl., Ex. Q, 2017 Directive, ECF No. 8-23. The 2017 Directive stated that it was the policy of the agency that "no member of an EPA federal advisory committee currently receive EPA grants, either as principal investigator or co-investigator, or in a position that otherwise would reap substantial direct benefit from an EPA grant." *Id.* at 4.

In 2020, however, "several courts held that the 2017 directive was unlawful." Am. Compl. ("Compl.") ¶ 37; *see Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 650 (D.C. Cir. 2020); *Nat. Res. Def. Council, Inc. v. EPA*, 438 F. Supp. 3d 220, 235 (S.D.N.Y. 2020). Accordingly, on June 24, 2020, EPA announced that it would "continue to follow the relevant policies as they existed before issuance of the 2017 Directive." A.R. 1416–19.

## D.    The Administrator's Decision to Reestablish the Committee

Following the vacatur of the 2017 Directive and a change in administration, on March 31, 2021, the new EPA Administrator announced a decision to reestablish the membership of the Committee to remedy procedural irregularities that he determined had tainted the Committee's membership-selection process under the prior administration. A.R. 1420–23. The Administrator explained that the agency was returning to "a time-tested, fair, and transparent process for soliciting membership" that he had determined was necessary to "ensure the agency receives the best possible scientific insight to support [its] work to protect human health and the environment." *Id.* The Administrator explained that his decision sought to reverse deficiencies caused by decisions made in recent years, including the elimination of certain air pollution review panels that had augmented the

8

Committee and the failure to follow the standard process for appointing Committee members, as noted in a July 2019 Government Accountability Office report on EPA advisory committees. *Id.*[2]

Following the Administrator's decision, on April 1, 2021, EPA solicited nominations for new members of the Committee and invited comments from the public. Request for Nominations of Candidates to the EPA's Clean Air Scientific Advisory Committee, 86 Fed. Reg. 17,146 (Apr. 1, 2021); *see also* Brennan Decl. ¶ 11. The agency then conducted extensive outreach to over 100 organizations, including professional associations, state and tribal associations, nongovernmental associations, stakeholder (including industry) associations, and minority-serving academic institutions to solicit nominations. Brennan Decl. ¶ 11. As a result of these efforts, the agency received 115 nominations and 88 public comments. Brennan Decl. ¶ 15; A.R. 9–39, 40–328. The Scientific Advisory Board's Staff Office carefully evaluated the 100 candidates who were interested in serving based on demonstrated competence, knowledge, and expertise in scientific and technical fields of air pollution and air quality issues. Brennan Decl. ¶¶ 11, 15. Consistent with recommendations in the 2019 Government Accountability Office report, the Staff Office developed draft membership grids with staff recommendations and rationales with proposed alternates, and collected and reviewed financial-disclosure forms from candidates. *Id.* ¶ 11. The Staff Office also conferred with EPA's Federal Advisory Committee Management Division and Office of General Counsel to ensure that the proposed Committee was balanced in terms of the points of views represented and the functions to be performed by the Committee. *Id.*

---

[2] Plaintiffs allege that during the prior administration, EPA's 2017 Directive "resulted in several members stepping aside or being removed because they chose to maintain their grants," but "aside from such members, on information and belief, no committee members were removed before the completion of their terms." Compl. ¶ 52. But in 2017, two Committee members—Dr. Donna Kenski and Dr. Ronald Wyzga—were terminated before their terms expired, and Dr. Cox was appointed to fill one of the vacancies resulting from the termination. A.R. 1430–31; *see also* Sean Reilly, *EPA Unveils New Industry-Friendlier Science Advisory Boards*, Science, Nov. 3, 2017, https://perma.cc/JA5B-92NU.

After completing its review of the nominees, the Staff Office prepared a decision memo for the Administrator outlining its recommendations. Brennan Decl. ¶¶ 11, 15. The Staff Office identified seven nominees that it recommended appointing, including four nominees who had served on the Committee previously, two of whom had been selected by the previous administration. Brennan Decl. ¶ 15; A.R. 329–33. The Administrator accepted the Staff Office's recommendation and announced his appointment of the new members on June 17, 2021. Brennan Decl. ¶ 15; A.R. 329–33. In making his announcement, the Administrator noted that all seven members were well-qualified experts with a cross-section of scientific disciplines and experience. A.R. 329–33. For example, Dr. Frampton, who was originally selected by the previous administration, has expertise in respiratory medicine, inhalation toxicology, health effects of air pollution, and air criteria pollutants. A.R. 16, 329–33. Dr. Bell, by contrast, has expertise in epidemiology, biostatistics, and environmental engineering, among other topics. A.R. 3, 329–33. Dr. Boylan, who was also selected by the previous administration, has expertise in air quality modeling and monitoring. A.R. 4, 329–33. Other members have expertise in other areas, such as exposure assessment (Drs. Sheppard and Fuller), or the ecological and ecosystem effects of air criteria pollutants (Dr. Ponette-González). A.R. 9, 22, 25, 329–33. The Committee consisted of five women and two men, including three people of color, making it the most diverse panel since the Committee was established. A.R. 329–33.

E.    **Procedural History**

On October 7, 2021, Plaintiff Dr. S. Stanley Young filed a complaint challenging EPA's reestablishment of the membership of the Committee. On October 28, 2021, Plaintiff amended his complaint to add Dr. Tony Cox as a plaintiff. Plaintiffs allege that EPA's decision violated FACA, the Administrative Procedure Act, and FACA's implementing regulations. Plaintiffs seek, among other things, a preliminary and permanent injunction and writs of mandamus barring the Board, the Committee, and their respective Chairs from conducting any committee activities "until the relevant

committee is lawfully constituted." *See id.* Prayer for Relief. Plaintiffs also seek an injunction barring EPA and the Administrator from "receiving, relying on, or otherwise using any report, advice, or other action of the . . . Committee." *Id.*

On October 18, 2021, Plaintiffs moved for a preliminary injunction or, in the alternative, for partial summary judgment on the "Committee Counts" (*i.e.*, Counts V–VIII). ECF No. 8. Defendants now oppose Plaintiffs' motion and cross-move for partial summary judgment on those same counts.

## LEGAL STANDARD

"The standard for issuance of the extraordinary and drastic remedy of a temporary restraining order or a preliminary injunction is very high." *Jack's Canoes & Kayaks, LLC v. Nat'l Park Serv.*, 933 F. Supp. 2d 58, 75 (D.D.C. 2013) (citation omitted). An interim injunction is "never awarded as of right," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), and "should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion," *Cobell v. Norton*, 391 F. 3d 251, 258 (D.C. Cir. 2004).

The movant's burden is even higher where, as here, Plaintiffs' requested "injunction is mandatory—that is, . . . its terms would alter, rather than preserve, the *status quo* by commanding some positive act." *Singh v. Carter*, 185 F. Supp. 3d 11, 17 (D.D.C. 2016) (quoting *Elec. Priv. Info Ctr. v. Dep't of Justice*, 15 F. Supp. 3d 32, 39 (D.D.C. 2014)); *see* Compl. Prayer for Relief (requesting an injunction requiring that the Administrator "reconstitute" the Committee). Such mandatory injunctions "are disfavored as an even more extraordinary remedy than the typical preliminary injunction, . . . especially when directed at the United States Government." *Kondapally v. U.S. Citizenship & Immigr. Servs.*, Civ. A. No. 20-00920 (BAH), 2020 WL 5061735, at *3 (D.D.C. Aug. 27, 2020) (citations omitted). When a mandatory preliminary injunction is requested, the district court should deny such relief unless the moving party "show[s] clearly that he or she is entitled to relief or that extreme or very serious damage

will result from the denial of the injunction." *Dallas Safari Club v. Bernhardt*, 453 F. Supp. 3d 391, 398

(D.D.C. 2020) (quoting *Singh*, 185 F. Supp. 3d at 17).

A party moving for any preliminary injunction must also demonstrate all of the traditional

preliminary injunction factors:  "(1) a substantial likelihood of success on the merits, (2) that it would

suffer irreparable injury if the injunction is not granted, (3) that an injunction would not substantially

injure other interested parties, and (4) that the public interest would be furthered by the injunction.'"

*Jack's Canoes*, 933 F. Supp. 2d at 75–76 (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d

738, 746 (D.C. Cir. 1995)).  Where, as here, the government is opposing a motion for emergency

injunctive relief, the third and fourth factors merge.  *See Nken v. Holder*, 556 U.S. 418, 435 (2009).[3]

## ARGUMENT

## I.    THIS COURT LACKS JURISDICTION

As a threshold matter, this Court lacks jurisdiction because Congress vested the D.C. Circuit

with exclusive jurisdiction over claims, such as Plaintiffs, that seek to challenge a final action taken by

the EPA Administrator pursuant to the Clean Air Act.  Specifically, Congress provided in Section

307(b)(1) of the Clean Air Act that challenges to any "nationally applicable" "final action taken, by the

Administrator under [chapter 85 of title 42 (*i.e.*, the Clean Air Act)] may be filed *only* in the United

States Court of Appeals for the District of Columbia."  42 U.S.C. § 7607(b)(1) (emphasis added).  "It

is well-settled that subsection 307(b)(1) of the [Clean Air Act] provides the exclusive means of

obtaining review of final actions by EPA under the CAA."  *Royster-Clark Agribusiness, Inc. v. Johnson*,

391 F. Supp. 2d 21, 26 (D.D.C. 2005) (collecting cases).

---

[3] Plaintiffs alternatively seek partial summary judgment on Counts V–VIII, and Defendants have cross-moved for partial summary judgment on those same counts.  Summary judgment should be granted "if the movant shoes that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

The Administrator's selection of Committee members is a "final action" mandated by the Clean Air Act. *See* 42 U.S.C. § 7409(d)(2)(A); *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001) (term "action" in section 307 is "meant to cover comprehensively every manner in which an agency may exercise its power"); *Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 587–89 (1980) (phrase "any other final action" is to be construed in accordance with its literal meaning so as to reach any action by Administrator that is final, not just final actions of Administrator similar to actions specifically enumerated in statute). And the action is "nationally applicable": the Committee advises the EPA Administrator on the scientific and technical bases for EPA's promulgation of national air-quality standards, which are specifically enumerated as nationally applicable actions under section 307(b)(1). *See* 42 USC § 7607(b)(1); *see also* 42 U.S.C. § 7409(d)(2)(B). Accordingly, the D.C. Circuit, not this Court, has jurisdiction over Plaintiff's challenge to the composition of the Committee. Plaintiffs' claims should therefore be dismissed.

## II.    PLAINTIFFS' CLAIMS ARE NONJUSTICIBIABLE

### A.    Plaintiffs' FACA-Based APA Claims Are Nonjusticiable

Even if Plaintiffs were not required to pursue their claims in the D.C. Circuit, all of Plaintiffs' claims fail as a matter of law because they are nonjusticiable. FACA does not contain any private right of action. *See, e.g.*, *Ctr. for Biological Diversity v. Tidwell*, 239 F. Supp. 3d 213, 221 (D.D.C. 2017) (collecting cases). Thus, as Plaintiffs do not dispute, judicial review of EPA's compliance with FACA is available only to the extent review is available under the Administrative Procedure Act ("APA").

The APA generally provides for review of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. "But before any review at all may be had," "a party must first clear the hurdle of § 701(a)." *Heckler v. Chaney*, 470 U.S. 821, 828 (1985). Section 701(a) provides, among other things, that review is unavailable if "agency action is committed to agency discretion by law." *Id.* § 701(a)(2).

The Supreme Court has explained that section 701(a)(2) forecloses APA review in at least two general circumstances. First, review is unavailable if the challenged agency action is of a kind "traditionally regarded as committed to agency discretion," including various categories of discretionary judgments that "require[] 'a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise.'" *Lincoln v. Vigil*, 508 U.S. 182, 192-93 (1993) (quoting *Chaney*, 470 U.S. at 831). Second, section 701(a)(2) also applies if the "relevant statute" underlying the plaintiff's APA challenge "is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Id.* at 191 (quoting *Chaney*, 470 U.S. at 830). Thus, in determining whether section 701(a)(2) forecloses review, courts must "consider both the nature of the administrative action at issue and the language and structure of the statute that supplies the applicable legal standards for reviewing that action." *Sierra Club v. Jackson*, 648 F.3d 848, 855 (D.C. Cir. 2011). Both justifications for applying section 701(a)(2) are satisfied here.

### 1.    An Agency's Choice of Advisors Is Not Subject to Judicial Review

Courts have identified various kinds of agency decisions for which review is "general[ly] unsuitab[le]," *Chaney*, 470 U.S. at 831, because they implicate judgments about policy or resource allocation within the core of an agency's discretion and expertise. For example, section 701(a)(2) generally bars review of agency decisions not to undertake enforcement, *see id.* at 831-32; an agency's decision to discharge an employee when "deemed … necessary or advisable in the interests of the United States," *Webster v. Doe*, 486 U.S. 592, 599-601 (1988); and an agency's decisions about how to allocate funds among various discretionary programs, *Lincoln*, 508 U.S. at 192-94. Despite those different contexts, in each instance, the relevant agency action involved "a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise," and "the agency [was] far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id.* at 193 (quoting *Chaney*, 470 U.S. at 831).

14

The same considerations apply with equal force here.  An agency's decision as to whom it will appoint to an advisory committee directly implicates the agency's "expert policy judgment." *Lincoln*, 508 U.S. at 193.  And, particularly insofar as Congress has counseled adherence to the "guideline[]" that a committee's membership should be "fairly balanced in terms of the points of view represented and the functions to be performed" by each committee, 5 U.S.C. App. II § 5(b)(2), (c), an agency's choices about the staffing of its advisory committees necessarily will "involve[] a complicated balancing of a number of factors."  508 U.S. at 191.  In endeavoring to strike an appropriate balance, an agency may properly consider, for example, a potential committee member's professional background and current employment, education and training, scientific and other subject-matter expertise, policy views, and professional relationships, among other potential factors.

"Of course," if Congress has meaningfully "circumscribe[d] agency discretion," "an agency is not free simply to disregard statutory responsibilities." *Lincoln*, 508 U.S. at 193.  For example, in establishing the Committee, Congress specified that the Committee have at least "one person representing State air pollution control agencies."  42 U.S.C. § 7409(2)(2)(A).  But when Congress declines to require a particular background or specific set of qualifications, and instead affords the agency broad latitude to balance numerous different policy considerations in pursuit of a general goal, "§ 701(a)(2) gives the courts no leave to intrude." *Lincoln*, 508 U.S. at 193.

Although FACA and its implementing regulations impose various procedural requirements, the statute does not meaningfully constrain an agency's substantive choices concerning its advisers.  Instead, the statute leaves it to agency heads to "establish uniform administrative guidelines and management controls for advisory committees established by that agency," 5 U.S.C. App. II § 8(a), and "advisory committee members serve at the pleasure of the appointing or inviting authority" for terms "at the [authority's] sole discretion," 41 C.F.R. § 102-3.130(a).  FACA thus leaves to the

agency—not to the courts—the responsibility to decide how to staff the agency's committees "in what it sees as the most effective or desirable way." *Lincoln*, 508 U.S. at 192.

> **2.    FACA's "Fairly Balanced" and "Inappropriate Influence" Provisions Do Not Supply Judicially Manageable Standards**

Resisting those principles, Plaintiffs assert that the composition of the Committee should be reviewable to determine whether it is consistent with Congress's goal of establishing "fairly balanced" committees that are procedurally safeguarded against "inappropriate[] influence." 5 U.S.C. App. II § 5(b)(2), (3).  That language, however, affords no basis for judicial review.

Under section 701(a)(2), "review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Chaney*, 470 U.S. at 830.  When a legislative goal is announced "in such broad terms," courts properly infer that Congress intended to "commit[]" decisionmaking to the agency's "discretion," leaving no room for judicial second- guessing.  *Id.*  That is the case here.  Congress not only declined to provide any express mechanism for judicial review under FACA; it also declined, in the text of sections 5(b)(2) and 5(b)(3), to enact any judicially manageable standards that could serve as a basis for review of substantive membership decisions under the APA.

Section 5(b)(2) of FACA provides that Congress, "[i]n considering legislation establishing[] or authorizing the establishment of any advisory committee," "shall … require the membership of the advisory committee to be fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee."  5 U.S.C. App. II § 5(b)(2).  Congress chose not to provide a meaningful legal standard for enforcing this provision.  "FACA does not define what constitutes a 'fairly balanced' committee— in terms of points of view represented or functionality— or how that balance is to be determined." *Ctr. for Policy Analysis on Trade & Health (CPATH) v. Office of U.S. Trade Representative*, 540 F.3d 940, 943 (9th Cir. 2008).  Indeed, FACA does not even "articulate what perspectives must be considered." *Id.* at 945.  Thus, "even before the points of view on an

advisory committee can be balanced at all—'fairly' or otherwise," a decisionmaker must first determine "*which* points of view should be balanced." *Microbiological*, 886 F.2d at 426 (Silberman, J., concurring). But "[t]he relevant points of view on issues to be considered by an advisory committee are virtually infinite," and the statute supplies no "principled basis for a federal court to determine which among th[ose] myriad points of view deserve representation on particular advisory committees." *Id.*

Similarly, the statute provides no standard for a court to use in determining whether a particular committee's membership is "fairly balanced" in light of the particular "*functions to be performed by th[at] . . . committee.*" 5 U.S.C. App. II § 5(b)(2) (emphasis added). Even where a statute outlines the "functions" that a given committee will "perform"—including the particular policy or scientific questions on which the committee will be asked to advise—the lack of further guidance in FACA or its implementing regulations regarding what constitutes fair balance shows that Congress expected agencies themselves to strike the appropriate balance for each individual committee without judicial superintendence.

For those reasons, the determination whether a particular committee is "fairly balanced" to achieve its purposes inherently requires a series of expert policy judgments—judgments that are "best left to the other branches of government." *CPATH*, 540 F.3d at 945; *Microbiological*, 886 F.2d at 426 (Silberman, J., concurring) (concluding that "the judgment as to what constitutes an appropriate or 'fair' balance of [committee members'] views must be a political one"). On this basis, at least three judges in this district have followed Judge Silberman's concurrence in *Microbiological* and concluded that claims alleging violations of section 5(b)(2) are nonjusticiable. *See Physicians for Soc. Resp. v. Wheeler*, 359 F. Supp. 3d 27, 44 (D.D.C. 2019) (McFadden, J.), *rev'd on other grounds*, 956 F.3d 634 (D.C. Cir. 2020); *Fertilizer Inst. v. EPA*, 938 F. Supp. 52, 54 (D.D.C. 1996) (Sporkin, J.) (same); *Pub. Citizen v.*

*HHS*, 795 F. Supp. 1212, 1220 (D.D.C. 1992) (Hogan, J.) (same); *see also Doe v. Shalala*, 862 F. Supp. 1421, 1430-31 (D. Md. 1994) (same).

Section 5(b)(3) similarly fails to provide any judicially manageable standards.  Like the prior provision, section 5(b)(3) speaks to Congress's "consider[ation]" of "legislation establishing[] or authorizing the establishment of any advisory committee," and provides that "[a]ny such legislation shall . . . contain appropriate provisions to assure that the advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority or by any special interest, but will instead be the result of the advisory committee's independent judgment."  5 U.S.C. App. II § 5(b)(3); *see id.* § 5(c) (providing that "[t]o the extent they are applicable, the guidelines set out in subsection (b) . . . shall be followed by the President, agency heads, or other Federal officials in creating an advisory committee").  As with section 5(b)(2), however, the text of section 5(b)(3) provides no basis for review with respect to Plaintiffs' claims.

At the outset, section 5(b)(3)—unlike section 5(b)(2)—does not even speak to an advisory committee's composition.  Rather, section 5(b)(3) provides that an advisory committee's organic law, if any, shall "*contain appropriate provisions* to assure that *the advice and recommendations of the advisory committee* will not be inappropriately influenced.*"  5 U.S.C. App. II § 5(b)(3) (emphasis added).  That language does not address the committee's membership, but instead seeks to ensure procedures are in place to "prevent 'inappropriate' external influences on an already constituted advisory committee" while it is formulating its advice and recommendations.  *Physicians for Soc. Resp.*, 359 F. Supp. 3d at 47 (quoting *Microbiological*, 886 F.2d at 430 (Silberman, J., concurring)); *see also Microbiological*, 886 F.2d at 425 (Friedman, J., concurring) ("Section 5(b)(3) requires that *provision be made* to assure that the advisory committee's 'advice and recommendations . . . not be inappropriately influenced.'" (emphasis added)).  Accordingly, Plaintiffs cannot rely on Section 5(b)(3) to challenge the Committee's *membership*.  *See id.*

Even "[a]ssuming *arguendo* that section 5(b)(3) is relevant to committee membership," *Microbiological*, 886 F.2d at 430 (Silberman, J., concurring), however, Plaintiffs' claim would not be actionable. As with the "fairly balanced" provision, any determination whether a committee has been subjected to "inappropriate[] influence[]" by "any special interest" or the "appointing authority" would require answering questions that are fundamentally political, not legal, in nature. 5 U.S.C. App. II § 5(b)(3). "[V]irtually anyone in the United States" could be regarded by some other observer as a "special interest with regard to some—perhaps all—advisory committees"; yet the statute provides no test for determining what counts as "influence" by a "special interest." *Microbiological*, 886 F.2d at 431 (Silberman, J., concurring).

The statute also provides no manageable standard for determining when influence has become "inappropriate[]." Congress contemplated that advisory committees would reflect at least some measure of outside influence; after all, Congress instructed that a range of "points of view" be "represented" on each committee. 5 U.S.C. App. II § 5(b)(2). Indeed, Congress requires some committees to include members that are appointed precisely to represent a particular point of view. *See* 20 U.S.C. § 5508(b)(2) (requiring that National Environmental Education Advisory Council include, among other members, "two representatives . . . to represent business and industry" and "one representative . . . to represent senior Americans"). Furthermore, some statutes and regulations expressly "call[] for various special interest groups" or other entities "to recommend candidates for appointment" to advisory committees, and "[i]t goes without saying that the special interests will recommend nominees who agree with their point of view." *Colorado Env't Coal. v. Wenker*, 353 F.3d 1221, 1231 (10th Cir. 2004); *see, e.g.*, 7 U.S.C. § 136w(d)(1) (requiring EPA Administrator to select members for the FIFRA Scientific Advisory Panel from lists of nominees submitted by the National Institutes of Health and National Science Foundation). But section 5(b)(3) does not contain any "legally discernible principles [that] could be employed to determine when a particular special interest

is overly represented" or has otherwise exercised "inappropriate" influence. *Microbiological*, 886 F.2d at 431 (Silberman, J., concurring). Congress simply did not "give[] any guidance as to when the line is crossed between appropriate and inappropriate influence," *Wenker*, 353 F.3d at 1231, thus demonstrating that it did not intend courts to police any such line.

Section 5(b)(3) also provides no standard for determining when "influence" by the "appointing authority"—*i.e.*, the agency itself—has become "inappropriate[]." By generally vesting agency leadership with the responsibility for making appointment decisions, Congress ensured that an agency would exercise not merely "influence," but control, over a committee's composition. And Congress understood that an agency's head would be "likely to select candidates that reflect his policy preferences," *i.e.*, that would have expertise relevant to the policies and programs of current leadership interest. *Physicians for Soc. Resp.*, 359 F. Supp. 3d at 47. It would be anomalous to read section 5(b)(3) as preventing the agency from exercising that prerogative, given that it is the agency itself, and not some outside actor, who is vested with responsibility for selecting the membership of the agency's advisory committees. Yet the statute provides no standard for determining when the agency's priority setting is legitimate and when it amounts to "inappropriate[] influence[]."

As Plaintiffs point out, there is some dispute among the circuits as to whether these provisions provide meaningful standards to apply. The Ninth Circuit has held that FACA provides no such meaningful standards, concluding that the question whether an advisory committee is "fairly balanced" is a "hopelessly manipulable" "political question that [was] best left to the other branches of government." *CPATH*, 540 F.3d at 945. The Tenth Circuit has held that FACA's prohibition on "inappropriate influence" is nonjusticiable, but that certain Bureau of Land Management regulations that require advisory committees to have a "fair membership balance" do provide meaningful standards for courts to apply. *Wenker*, 353 F.3d at 1232–34. The Fifth Circuit has held that both requirements are justiciable, but that agency decisions in this regard are "subject to highly deferential

review." *Cargill, Inc. v. United States*, 173 F.3d 323, 335 n.24 (5th Cir. 1999). And the First Circuit recently held that plaintiffs' FACA challenge to EPA's 2017 Directive was reviewable, though that case involved a challenge to a discrete agency policy that flatly prohibited EPA grantees from serving on advisory committees while receiving grants funds, rather than a challenge to the composition of a particular committee.[4] *Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 18–19 (1st Cir. 2020); *see also Physicians for Soc. Resp.*, 956 F.3d at 643 (holding that GSA regulations implementing FACA provided standards to apply to APA claim that 2017 Directive was arbitrary and capricious, without addressing whether FACA provides meaningful standards to apply to challenge to committee composition).[5]

The law in the D.C. Circuit is similarly unsettled. While Plaintiffs maintain that *Microbiological* "forecloses" the nonjusticiability argument, the court's judgment there rested in part on Judge Silberman's concurrence, which found FACA claims to be nonjusticiable, and in part on the separate opinion of Judge Friedman, who did not address the threshold justiciability question. *See* 886 F.2d at 420–26. Accordingly, as noted, many courts in this district have followed Judge Silberman's concurrence and concluded that FACA claims are nonjusticiable. *See Claybrook v. Slater*, 111 F.3d 904, 906 n.4 (D.C. Cir. 1997) (citing Judge Silberman's concurrence for the proposition that "fair balance" claims are not justiciable); *Physicians for Soc. Resp.*, 359 F. Supp. 3d at 44; *Fertilizer Inst.*, 938 F. Supp. at 54; *Pub. Citizen*, 795 F. Supp. at 1220. *But see NAACP v. Wilkson ("NAACP I")*, 496 F. Supp. 3d 116, 133 (D.D.C. 2020) (departing from other district courts and concluding that such claims are justiciable).

---

[4] Plaintiffs also count the Eleventh Circuit as holding that FACA's fair-balance provision provides meaningful standards of review. *See* Mot. 35 (citing *Alabama-Tombigbee Rivers Coal. v. Dep't of Interior*, 26 F.3d 1103, 1106–07 (11th Cir. 1994)). But the Eleventh Circuit did not address the justiciability question in *Alabama-Tombigbee Rivers Coalition*.

[5] *See NAACP v. Wilkson ("NAACP I")*, 496 F. Supp. 3d 116, 133 n.4 (D.D.C. 2020) ("[W]hile the district court [in *Physicians for Social Responsibility*] held that FACA's 'fair balance' requirement was not justiciable, that was not the issue on appeal.").

Finally, Plaintiffs contend that even if FACA itself does not supply judicially manageable standards, FACA's implementing regulations and EPA's FACA Handbook would provide meaningful standards. *See* Mot. 36. But the regulations on which Plaintiffs rely suffer from all the same problems discussed above. For example, Plaintiffs point to a General Services Administration regulation codified at 41 C.F.R. § 102-3.30(c), but that regulation merely restates FACA's requirement that an advisory committee be "fairly balanced in its membership in terms of the points of view represented and the functions to be performed." For the same reason that this language does not provide judicially manageable standards in FACA, it does not supply such standards in the regulation.

Similarly, Plaintiffs point to an appendix to the GSA regulation stating that the composition of an advisory committee's membership will depend upon several factors, including:

> (i) The advisory committee's mission; (ii) The geographic, ethnic, social, economic, or scientific impact of the advisory committee's recommendations; (iii) The types of specific perspectives required, for example, such as those of consumers, technical experts, the public at-large, academia, business, or other sectors; (iv) The need to obtain divergent points of view on the issues before the advisory committee; and (v) The relevance of State, local, or tribal governments to the development of the advisory committee's recommendations.

*Id.* pt. 102-3, subpt. B, app. A. But GSA also makes clear that "FACA does not specify the manner in which advisory committee members and staff must be appointed." *Id.* pt. 102-3 subpt. C, app. A. Therefore, this guidance simply confirms that an agency's decision about how to staff its advisory committees "involves a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise." *Lincoln*, 508 U.S. at 192–93 (quoting *Chaney*, 470 U.S. at 831). Significantly, nothing in the guidance explains how agencies (let alone courts) are to balance these factors, whether these are the only factors that agencies should consider, or whether each factor will apply to every advisory committee.[6] All of the other regulations on which Plaintiffs rely face the same problem. *See*

---

[6] As Plaintiffs note, the court in *Physicians for Social Responsibility* held that GSA's regulations provided meaningful standards to apply to plaintiffs' APA claim that the 2017 Directive was arbitrary and capricious because the Directive failed to address OGE's ethics rules, even though GSA regulations

Mot. 5–6 (citing EPA Handbook reiterating these factors and GSA "balance plan" that encourages committees to "consider" those "affected" by a committee, "as appropriate").

In sum, neither FACA nor its implementing regulations provides this Court with meaningful standards to determine whether the Committee is unfairly balanced or inappropriately influenced, as Plaintiffs allege. Accordingly, Plaintiffs' claims that are premised on violations of these provisions are nonjusticiable. Resort to any other authority would amount to the Court "mak[ing] a policy judgment, and an arbitrary one at that, as to the optimum character of" the Committee, *Microbiological*, 886 F.2d at 431 (Silberman, J., concurring), which is an "utterly nonjudicial task," *id.* at 427.

### B.    Plaintiffs' Arbitrary-and-Capricious Claim Is Nonjusticiable

Plaintiffs also attempt to obtain review of determinations committed to agency discretion by law by urging that EPA failed to "engage in reasoned decisionmaking" in reestablishing the Committee. *See* Mot. 25–30. Plaintiffs' attempt to recast their challenge in procedural terms does not advance their claims.

In adjudicating an APA claim, section 706 specifies the "[s]cope of review." 5 U.S.C. § 706. Section 706's standards apply, however, only if the APA makes review available. Section 701(a) dictates that "[t]his chapter [*i.e.*, 5 U.S.C. §§ 701-706] applies, according to the provisions thereof, *except to the extent that* [] statutes preclude judicial review" or "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(1), (2) (emphasis added). Thus, if review is statutorily "preclude[d]" or "committed to agency discretion," *id.*, section 706 does not provide an independent basis for judicial review.

---

required the EPA Administrator to assure conformity with the OGE rules. *See* 956 F.3d at 643, 647. But the court did not address whether FACA or its implementing regulations provide meaningful standards where, as here, Plaintiffs do not challenge a discrete agency policy as contrary to a regulation, but rather challenge the substantive composition of an advisory committee.

The D.C. Circuit has accordingly held that "if an action is committed to the agency's discretion under APA § 701(a)(2) . . . [,] there can be no judicial review for abuse of discretion, or otherwise." *Citizens for Responsibility & Ethics in Wash. v. FEC*, 892 F.3d 434, 441 (D.C. Cir. 2017); *see also  Steenholdt v. FAA*, 314 F.3d 633, 639 (D.C. Cir. 2003) (concluding that "standard of review" set forth in section 706 does not provide "law to apply," because otherwise "no agency action could ever be committed to agency discretion by law").  Accordingly, because Plaintiffs' FACA claims are committed to agency discretion, Plaintiffs cannot maintain an arbitrary-and-capricious challenge based solely on the APA.

## III.    PLAINTIFFS' CLAIMS FAIL ON THE MERITS

### A.    The Committee Is Fairly Balanced

Regardless of whether the claims are justiciable, "[t]he determination of how the 'fairly balanced' membership of an advisory committee, in terms of the points of view represented and the functions the committee is to perform, is to be achieved, necessarily lies largely within the discretion of the official who appoints the committee."  *See, e.g.*, *Microbiological*, 886 F.2d at 424 (Friedman, J., concurring); *see also id.* at 434 (Edwards, J., concurring in part and dissenting in part) ("[T]he difficulty of determining what precisely constitutes a 'fair balance' may incline courts to be deferential in reviewing the composition of advisory committees.").  Even those courts that have found "fair balance" claims to be justiciable have acknowledged that agency decisions in this regard are "subject to highly deferential review."  *Cargill*, 173 F.3d at 335 n.24; *see also id.* at 336 (agency enjoys "considerable discretion to determine whether an advisory committee is functionally balanced"); U.S. Gov't Accountability Off., EPA Advisory Committees:  Improvements Needed for the Member Appointment Process, at 5 n.13 GAO-19-280 (July 2019) (observing that courts "have either held that the balance requirements are nonjusticiable or tendered a very high degree of deference to the agency's selection of committee members").

24

In *Microbiological*, Judge Friedman rejected plaintiffs' argument that an advisory committee was unfairly balanced because it did not include any representatives for consumers or public health organizations. 886 F.2d at 423–26. As Judge Friedman explained, nothing in FACA "requires that [an advisory committee] must include individuals who work for, or are associated with, a consumer or public health organization." *Id.* at 423. Because the advisory committee's function "involve[d] highly technical and scientific studies and recommendations," a "fair balance" of viewpoints "c[ould] be achieved even though the Committee does not have any members who are consumer advocates or proponents of consumer interests." *Id.* Judge Friedman also noted that, unlike some other statutes governing advisory committees, nothing in the statutes on which plaintiffs relied specified how "fairly balanced" membership was to be achieved in terms of either the type of representatives or their number. *Id.* He noted that the members of the committee were all "highly trained and skilled in food microbiology" and concluded that the agency "did not abuse [its] discretion by failing to include on the Committee direct representatives of consumer organizations." *Id.* at 424.

Similarly, in *Cargill*, the Fifth Circuit rejected plaintiffs' argument that an advisory committee was unfairly balanced because it did not include any representatives from mining companies or labor groups that were going to be directly affected by the committee's work. 173 F.3d at 336–38. The court analyzed the committee's composition in light of the "functions to be performed," and found it significant that the committee's task was to provide "*scientific* peer review." *Id.* at 336–37 (emphasis in original). Because that task "is politically neutral and technocratic," the court held that there was "no need for representatives from the management of the subject mines to serve on the committee." *Id.* at 337. The court also rejected plaintiffs' attempt to rely on *National Anti-Hunger Coalition v. Exec. Comm. of the President's Private Sector Survey on Cost Control*, 711 F.2d 1071 (D.C. Cir. 1983), observing that the "central holding" of *National Anti-Hunger Coalition* was "precisely contrary to the position [plaintiffs] advocate[]," as the court there "held that an advisory committee with a narrow, technical

25

mandate does not have to include representatives of those who might be affected by the committee's work." *Id.* at 338. The court therefore deferred to the agency's determination as to how to constitute the committee. *Id.*

The reasons that led Judge Friedman in *Microbiological* and the Fifth Circuit in *Cargill* to reject the "fairly balanced" claims in those cases apply with even more force here. As an initial matter, section 5(b)(2) provides only that the *legislation* establishing an advisory committee shall require that the membership of the committee be "fairly balanced in terms of the points of view represented." 5 U.S.C. App. II § 5(b)(2). The legislation establishing the Committee effectuates section 5(b)(2) by requiring that the Committee include "one member of the National Academy of Sciences, one physician, and one person representing State air pollution control agencies." 42 U.S.C. § 7409(d)(2)(A). There is no dispute that EPA complied with this provision. Plaintiffs would have this Court rewrite the statute to add a requirement that the Committee include an industry representative, when Congress specifically did not include that requirement and in fact removed the requirement that the pre-1977 committee on air pollutants include an industry representative when it created the Committee. *Compare* Clean Air Amendments of 1970, Pub. L. No. 91-604, § 4, 84 Stat. 1676, 1679 (1970) *with* Clean Air Act Amendments of 1977, Pub. L. No. 95-95, § 106, 91 Stat. 685, 691 (1977). Plaintiffs' "fair balance" claim thus fails at the outset, because EPA has undoubtedly complied with the only express requirement that Congress has imposed on EPA to achieve a "fairly balanced" committee.

Even assuming *arguendo* that FACA imposes an independent requirement that advisory committees be fairly balanced, EPA easily satisfied any such requirement. As in *Microbiological* and *Cargill*, the Committee "involves highly technical and scientific studies and recommendations," and so a "fair balance" of viewpoints "can be achieved even though the Committee does not have any members who are [employed by industry]." *Microbiological*, 886 F.2d at 423 (Friedman, J., concurring);

*see also Cargill*, 173 F.3d at 337.  But nothing in FACA or the Clean Air Act requires that the Committee, which is a scientific and technical advisory committee, "must include individuals who work for, or are associated with, [industry]."  *Microbiological*, 886 F.2d at 423 (Friedman, J., concurring).  "In contrast, in other statutes governing the composition of advisory committees, Congress specified precisely which groups were to be represented."  *Id.*  For example, Congress required that the National Environmental Education Advisory Council include "two representatives . . . to represent business and industry."  20 U.S.C. § 5508(b)(2).  But Congress included no such requirement for the Committee, except to require that it include a member of the National Academy of Sciences, a physician, and a person representing State air pollution control agencies.  42 U.S.C. § 7409(d)(2)(A). And indeed, as noted above, Congress had required that the pre-1977 advisory committee on air pollutants include an industry representative, but then removed that requirement when it established the Committee.  *Compare* Clean Air Amendments of 1970, Pub. L. No. 91-604, § 4, 84 Stat. 1676, 1679 (1970) (requiring "representatives" of "industry") *with* Clean Air Act Amendments of 1977, Pub. L. No. 95-95, § 106, 91 Stat. 685, 691 (1977) (no such requirement).

Congress's decision not to require that the Committee include a representative from industry (or any other special interest group) makes sense in light of the size and functions of the Committee. The Committee has only seven members, three of which Congress specified must come from the groups specified in 42 U.S.C. § 7409(d)(2)(A).  That leaves only four other members for the Administrator to appoint.  As noted, the Committee is tasked with considering a wide array of scientific and technical issues associated with the national air-quality standards.  A.R. 1–3.  The different "points of view" that could be held about such issues are legion and not limited to the single question over which Plaintiffs contend they offer a different perspective.  *See* Mot. 20.  Ensuring that each and every potential point of view is held by one of the seven committee members would, therefore, be impossible.  And because the Committee's purpose is scientific and technical, there is

27

"no need for representatives from [industry or other special interests] to serve on the committee." *Cargill*, 173 F.3d at 337.

In any event, under any standard, the Committee is fairly balanced in terms of the points of view represented and the functions to be performed by the Committee.  The members include four prior members of the committee, two of whom (Drs. James Boylan and Mark Frampton) were selected by the previous administration.  A.R. 329–33.  All of the members of the Committee are well-qualified experts with a cross-section of scientific disciplines and scientific experience.  A.R. 9–39, 329–33.  As noted, Dr. Frampton, has expertise in respiratory medicine, inhalation toxicology, health effects of air pollution, and air criteria pollutants.  A.R. 16, 329–33.  Other members have expertise in other areas, such as exposure assessment (Drs. Sheppard and Fuller), or the ecological and ecosystem effects of air criteria pollutants (Dr. Ponette-González).  A.R. 9, 22, 25, 329–33.  As in *Cargill* and *Microbiological*, the Committee membership "includes scientists with expertise in many fields related to the subject matter of" the Committee.  *Cargill*, 173 F.3d at 337; *see also Microbiological*, 886 F.2d at 424.

Plaintiffs nonetheless criticize the Committee solely because it lacks any "industry representatives."  Mot. 18.  But, as explained above, because the Committee's function "involves highly technical and scientific studies and recommendations, a 'fair balance' of viewpoints can be achieved even though the Committee does not have any members who are [industry representatives]." *Microbiological*, 886 F.2d at 423 (Friedman, J., concurring).  Plaintiffs contend that without industry representatives, the Committee is "guarantee[d]" to provide a recommendation "that more regulation is needed."  Mot. 20 (quoting Cox Decl. ¶ 6.)  But this assertion is entirely speculative, and cynically assumes that "industry" scientists will provide different scientific advice based on the consequences of that advice for "industry."  Plaintiffs would "divide the world of those interested in [national air quality standards] into three 'classes' (government, industry, and consumers), each of which it alleges must have representation on the Committee." *Microbiological*, 886 F.2d at 427 (Silberman, J.,

concurring). But the Committee does not provide scientific advice to advance the interests of a particular special-interest group; rather it provides the best advice it can based on the scientific evidence available to it. *See, e.g.*, Brennan Decl. ¶ 6 (Committee members "are independent experts [who] do not represent the views of any organization or entity"). Plaintiffs' argument is also entirely unworkable. If "industry" is entitled to a representative, why not consumers or environmental justice groups? Why stop at "industry" broadly and not also require a representative from the coal, natural gas, and oil industries? Plaintiffs cannot point to any limiting principle that would justify why "industry"—but only industry—is entitled to a representative on the committee, especially considering that Congress specifically did not require an industry representative when it created the Committee.

Plaintiffs cite no case holding that an advisory committee was not "fairly balanced" where the government disputed that assertion. Plaintiffs cite *NAACP I*, *see* Mot. 18, but the government in that case did not contend that the committee was "fairly balanced," as it took the position that FACA did not apply to the committee at all. *See* 496 F. Supp. 3d at 143 ("The government does not contest that if FACA applies, . . . then the Commission has violated FACA."). In any event, the committee at issue in *NAACP I*—the Presidential Commission on Law Enforcement and Administration of Justice— was not concerned with scientific and technical questions *Id.* at 124. Accordingly, for all these reasons, even if it were justiciable, Plaintiffs' "fairly balanced" claim fails as a matter of law.

**B.    EPA Has Established Provisions Protecting the Committee From Inappropriate Influence**

Plaintiffs also challenge the Committee's composition under section 5(b)(3) of FACA. *See* Mot. 21–25. That section provides that Congress, in crafting legislation establishing an advisory committee, shall include in such legislation "appropriate provisions to assure that the advice and recommendations of the advisory committee will not be appropriately influenced by the appointing authority or by any special interest, but will instead be the result of the advisory committee's

independent judgment." 5 U.S.C. App. II § 5(b)(3). And section 5(c) requires federal agencies to follow those same guidelines when creating their own advisory committees. *Id.* § 5(c).

As explained above, section 5(b)(3) requires only that provisions be made to assure that a committee will not be inappropriately influenced; it does not allow Plaintiffs to challenge a committee's substantive composition. *See, e.g., Physicians for Soc. Resp.*, 359 F. Supp. 3d at 47 (quoting *Microbiological*, 886 F.2d at 430 (Silberman, J., concurring)); *NAACP v. Wilkinson ("NAACP III")*, No. 20-1132, 2021 WL 723993, at *7 (D.D.C. Feb. 24, 2021) ("The plain language of Section 5(b)(3) requires that an advisory committee's founding documents contain 'provisions' to assure that the committee will not be inappropriately influenced."). And here, there are extensive provisions in place to ensure that the Committee will not be inappropriately influenced by the appointing authority or special interests.

As noted, EPA's scientific advisory committees, including CASAC, are "subject to overlapping schemes of ethics checks." *Union of Concerned Scientists*, 954 F.3d at 14; *see generally* Background Section C. As special government employees, Committee members are subject to U.S. Office of Government Ethics regulations ("OGE"), 18 U.S.C. § 202(a), and agency heads are required to "[a]ssure that the interests and affiliations of advisory committee members are reviewed for conformance with applicable conflict of interest statutes, regulations . . . , and other Federal ethics rules." 41 C.F.R. § 102-3.105(h).

The OGE regulations provide that special government employees may generally participate in matters of general applicability, so long as the matter "will not have a special or distinct effect on the employee." Members are prohibited, however, from "participating personally and substantially in an official capacity in any particular matter in which, to his knowledge, he . . . has a financial interest, if the particular matter will have a direct and predictable effect on that interest." 5 C.F.R. § 2635.402(a) (citing 18 U.S.C. § 208(a)).

30

The OGE regulations spell out what this rule means in practice. For example, "[a] chemist employed by a major pharmaceutical company . . . developing an experimental AIDS vaccine" can ethically serve "on an advisory committee established to develop recommendations for new standards for AIDS vaccine trials, because the chemist's employer "will be affected by the new standards only as part of the class of all pharmaceutical companies and other research entities that are attempting to develop an AIDS vaccine." *Physicians for Soc. Resp.*, 956 F.3d at 640–41. By contrast, "[a]n employee of [a] university" that receives grants from the agency "may not participate in" an advisory committee that focuses on "the evaluation of th[at] university's performance," because the evaluation of that specific university's performance "is not a matter of general applicability." *Id.* "According to OGE, then, grantees may ethically serve on advisory committees that affect an otherwise disqualifying interest so long as they limit their participation to topics of broad applicability." *Physicians for Soc. Resp.*, 956 F.3d at 640–41.

EPA also has additional rules of its own that are designed to ensure that advisory committees remain independent from the agency, including requiring committee members to file financial disclosure forms and capping membership terms at six years unless the committee provides written justification for the extension. *See* Background Section C, *supra*; A.R. 996–1271. Consistent with its policies and procedures, "EPA has long allowed individual recipients of EPA grants to serve on its scientific advisory committees, provided they do not address matters related to their individual grants." *Physicians for Soc. Resp.*, 956 F.3d at 641; *see also* OIG Report at 9.

There are therefore extensive provisions in place to ensure that the Committee will not be inappropriately influenced. And EPA followed those procedures here in selecting the members of the Committee. Brennan Decl. ¶¶ 12–14; Sheppard Decl. ¶ 24. All of the Committee members were required to submit financial disclosure forms, which were reviewed by an agency ethics officer. *See* Brennan Decl. ¶ 11–14; Sheppard Decl. ¶ 24. The agency also explained in its *Federal Register* notice

31

requesting nominations to the Committee that, consistent with its longstanding policies and practices, it would continue to consider potential conflicts of interest as it undertakes specific advisory activities. 86 Fed. Reg. at 17,147.

Accordingly, because section 5(b)(3) requires only that provisions be in place to ensure that committees are not inappropriately influenced, Plaintiff's claim fails as a matter of law. This case is thus unlike *NAACP*, where it was "undisputed that the documents establishing the [committee] contained *no* provisions . . . that even purportedly would prevent inappropriate influence" because the committee "was not structured to comply with FACA." *NAACP III*, 2021 WL 723993, at *6–7 (emphasis added). Here, by contrast, there are ample such provisions in place, which is all that FACA requires.

Even assuming *arguendo* that section 5(b)(3) is relevant to the substantive composition of a committee, Plaintiffs cannot show that the committee's composition means that it will necessarily be "inappropriately influenced by the appointing authority or by any special interest." 5 U.S.C. App. II § 5(b)(3). Plaintiffs assert that the risk of inappropriate influence is "undeniable" based on the fact that five of the seven members of the Committee are principal investigators on EPA grants, three of which involve grants of over a million dollars. *See* Mot. 22; Compl. ¶ 58. But, as an initial matter, Plaintiffs' argument rests on a flawed factual premise. For example, Plaintiffs allege that the Committee's chair, Dr. Elizabeth Sheppard, is "associated as a principal investigator with 'at least $60,031,882 in EPA funding.'" Mot. 11 (quoting Enstrom Decl. ¶ 7). But as Dr. Sheppard explains in her declaration, she "do[es] not currently have *any* grant funding from the EPA." Sheppard Decl. ¶ 9 (emphasis added). Rather, the portion of her salary that funds her research activities is paid for by grants from the National Institutes of Health and the Health Effects Institute. *Id.* And while the academic institution at which Dr. Sheppard works has received EPA grants in the past, *see id.* ¶ 15, Dr.

Sheppard "ha[s] not received any funding from EPA as a Principal Investigator while serving on the [Committee]," *id.* ¶ 17.

More fundamentally, EPA awards grants to universities, not individuals. *See id.* ¶ 11. The university then designates individual faculty members as principal investigators and co-investigators on the grant. *Id.* The amount of the award consists of direct costs to cover the grant expenses, including salaries and benefits for those working on the grant, and indirect costs to cover the university's expenses. *Id.* But only about half of Dr. Sheppard's salary is covered by external sources such as grants, *id.* ¶ 7, and the funding she receives from a single grant typically ranges from only 2-20% of her salary, *id.* ¶ 13. Thus, while Plaintiffs assert that scientists such as Dr. Sheppard are "financially beholden" to EPA, Mot. 26, the truth is that grants fund only a fraction of her existing university salary. As Dr. Sheppard explains, scientists "serve on CASAC to lend their expertise to EPA, not to improperly influence the agency." *Id.* ¶ 23. Her receipt of federal grants has had "no influence over any of [her] activities on CASAC." *Id.* ¶ 22.

Indeed, federal ethics rules expressly recognize that grantees "may ethically serve on advisory committees that affect an otherwise disqualifying interest so long as they limit their participation to topics of broad applicability." *Physicians for. Soc. Resp.*, 956 F.3d at 641; *see also* 5 C.F.R. § 2640.203(g). Thus, Plaintiffs cannot maintain that the receipt of a grant itself creates an inherent conflict-of-interest. *See, e.g.*, *Cargill*, 173 F.3d at 338–39 (rejecting argument that advisory committee was subject to "inappropriate influence" because some members received grants from the agency, as "[w]orking for or receiving a grant from [the agency] . . . does not impair a scientist's ability to provide technical, scientific peer review of a study sponsored by [the agency]"); *Microbiological*, 886 F.2d at 425 (Friedman, J., concurring) (rejecting inappropriate influence claim because "[t]he mere fact that the individuals employed by independent research firms have food company clients or that the professors have

performed some consulting work for food companies in the past, does not demonstrate that they" will be inappropriately influenced).

As with their "fair balance" claim, Plaintiffs cite no case holding that an advisory committee was "inappropriately influenced" where that assertion was disputed.[7]  To the contrary, in the few instances where judges have reached the merits of such a claim, they have held for the government. For example, in *Cargill*, the Fifth Circuited rejected an "inappropriate influence" claim where plaintiffs alleged that "ten of fifteen" committee members were former HHS employees or fellows and eight members "were recipients of a total of more than $4 million in [government] grants."  173 F.3d at 338.  As the court explained, "the fact that some [committee] members have ties to HHS does not in itself render them susceptible to improper influence."  *Id.* at 339.  Because the agency was a major sponsor of occupational safety and health research, it was "not surprising" that the committee, "whose members [were] selected because they are experts in that field, would include some persons who had worked for or received a grant from HHS."  *Id.*  The court emphasized that [w]orking for or receiving a grant from HHS, or co-authoring a paper with a person affiliated with the department, does not impair a scientist's ability to provide technical, scientific peer review of a study sponsored by HHS or one of its agencies."  *Id.*

Similarly, in *Microbiological*, Judge Friedman rejected an "inappropriate influence" claim where plaintiffs alleged that a majority of the committee's members were employees, contractors, or consultants of the food industry.  886 F.2d at 425.  Judge Friedman concluded that plaintiffs "ha[d] not shown" that the committee was inappropriately influenced by food industry representatives, where

---

[7] Again, the *NAACP* court held that the directive establishing the commission did not contain appropriate provisions to guard against inappropriate influence, but the government in that case did not contest that conclusion, as (unlike here) the documents establishing the commission "lacked *any* provisions aimed at preventing inappropriate influence."  *NAACP III*, 2021 WL 723993, at *1–2 ("If the Court declines to dismiss [for lack of standing], defendants ask the Court to enter summary judgment in favor of [plaintiff].").

only some of the Committee's members were employed by the food industry and "[t]he mere fact that . . . professors have performed some consulting work for food companies in the past," did not demonstrate that they were subject to inappropriate influence. *Id.*

For the same reasons, even if the Court were to consider the "inappropriate influence" provision as placing a substantive constraint on a committee's membership, Plaintiffs have not shown that the Committee is susceptible to inappropriate influence. As in *Cargill* and *Microbiological*, the sole basis for Plaintiffs' claim in this regard is that "[f]ive of the seven members of the reconstituted Committee are principal investigators on EPA grants," three of which involve grants of over a million dollars, and might therefore "rubberstamp the Agency's preferred agenda" to curry its favor. Mot. 22. But, as *Cargill* and the other cases cited above squarely concluded, and as government ethics regulations make clear, the mere fact that a scientist works for an institution that has received an EPA grant, or served as an investigator on such a grant, "does not impair a scientist's ability to provide technical, scientific peer review of a study sponsored by" an agency. *Cargill*, 173 F.3d at 339; *see also Physicians for. Soc. Resp.*, 956 F.3d at 641 (scientists "may ethically serve on advisory committees that affect an otherwise disqualifying interest so long as they limit their participation to topics of broad applicability"); *Union of Concerned Scientists*, 954 F.3d at 14–15 ("Traditionally, EPA grant recipients have been permitted to serve on advisory committees while they are receiving EPA grants."). Aside from their mere affiliation with institutions receiving EPA grants, Plaintiffs point to nothing about the members of the Committee that suggests they would be subject to inappropriate influence. Thus, as in *Cargill* and *Microbiological*, their claim fails.

### C.    EPA's Decision Was Not Arbitrary and Capricious

Plaintiffs also contend that EPA's decision to reconstitute the Committee was arbitrary and capricious in violation of the APA. *See* Compl. Count VII; Mot 25–30. "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that

35

of the agency." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins. Co.*, 462 U.S. 29, 43 (1983). Deference is particularly warranted where, as here, the agency action is not one that imposes benefits or burdens upon regulated parties, but rather is simply an exercise of the agency's discretion to select members of committees "utilized solely for advisory functions." 5 U.S.C. App. II § 9(b). The Court's review of an agency's action under the APA is generally limited to the administrative record compiled by the agency. *See* 5 U.S.C. § 706; *Camp v. Pitts*, 411 U.S. 138, 142 (1973).

Here, EPA reasonably explained its decision to reconstitute the Committee. EPA indicated that "process irregularities" stemming from "decisions made in recent years" prompted the agency's decision to reset the Committee. *See* A.R. 1420–23. Specifically, the agency explained that the prior administration eliminated "key air pollution panels that have augmented the [Committee] for decades" and departed from the "standard process for appointing [C]ommittee members, as noted in a July 2019 Government Accountability Office report on EPA Advisory Committees."[8] *Id.* The agency then explained that it would reestablish the membership of the Committee to ensure that the agency received "the best possible scientific insight to support [its] work to protect human health and the environment." *Id.* Per its usual process, EPA solicited nominations to the Committee through a *Federal Register* notice and sought comment from the public. A.R. 7–8. The agency encouraged former Committee members to reapply. *See* A.R. 1420–23. EPA's Science Advisory Board Staff Office then evaluated all 115 nominees, reviewed all 88 public comments, and summarized its recommendations and the reasons for them in a decision memo for the Administrator. Brennan Decl. ¶ 15.

Plaintiffs nonetheless contend that EPA failed "to engage in 'reasoned decisionmaking'" in forming the Committee for two reasons, neither of which has merit. *See* Mot. 25–30.

---

[8] *See* A.R. 1341–1405  The GAO report concluded that in 2018, EPA did not follow a "key step" in appointing members to the Committee:  it did not include in the appointment packets for the Committee documents "reflecting EPA staff rationales for proposed membership, as called for by EPA's established process."  A.R. 1342.

1.      First, Plaintiffs contend that EPA "failed to articulate a satisfactory explanation for its action," a requirement that they say is "especially important" here because the agency "change[d] course." Mot. 25 (quoting *Physicians for Soc. Resp.*, 956 F.3d at 644). But the agency did not "change course" in its decision to reconstitute the committee. Rather, after the 2017 Directive was vacated, the agency explained that it would return to the policies that existed before the issuance of the directive. A.R. 1416–19  The Administrator then determined that reconstituting the Committee was necessary to return to the "time-tested, fair, and transparent process" that EPA had traditionally used to select Committee members. A.R. 1420–23

In any event, the Supreme Court has made clear that agency action is not subject to a heightened or more searching standard of review simply because it represents a change in administrative policy or a return to a previous policy. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514–15 (2009). "As *Fox* noted, the Supreme Court has 'neither held nor implied that every agency action representing a policy change must be justified by reasons more substantial than those required to adopt a policy in [the] first instance.'" *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1037 (D.C. Cir. 2012) (quoting *Fox*, 556 U.S. at 514). "To the contrary, the *State Farm* case affirmed that 'an agency's view of what is in the public interest may change, either with or without a change in circumstances.'" *Id.* (quoting *State Farm*, 463 U.S. at 57). Here, EPA "satisfied the core requirement that *Fox* makes clear an agency must meet when changing course: it . . . 'provide[d] reasoned explanation for its action,' which 'would ordinarily demand that it display awareness that it *is* changing position." *Id.* (quoting *Fox*, 556 U.S. at 515).

a.      While Plaintiffs concede that the Administrator's announcement of the reconstitution was "sufficient to acknowledge" any alleged change in policy, Mot. 25, they contend that EPA failed to provide a "reasoned explanation for the change" because the agency allegedly "made no effort to address" whether and how "the reconstituted Committee is fairly balanced and free of inappropriate

influence." *See* Mot. 25–27. But in his March 31, 2021 announcement directing EPA to reset the Committee, the Administrator explained that he made the decision to reestablish the membership of the Committee to ensure that the agency receives the best possible scientific insight to support the agency's mission. A.R. 1420–23. He explained that the decision sought to reverse deficiencies caused by certain actions in recent years, including "[e]liminating key air pollution review panels that have augmented the CASAC for decades," and "[n]ot following the standard process for appointing committee members, as noted in a July 2019 Government Accountability Office report on EPA Advisory Committees." *Id.* Plaintiffs may not agree with the *substance* of EPA's decision in this regard, but they cannot dispute that EPA explained its *reasons* for that decision. And, of course, at the time of the March 31 decision, EPA could not have explained "whether and how the reconstituted Committee is fairly balanced and free of inappropriate influence," Mot. 25, as it had not yet made a decision as to the composition of the new Committee.

EPA likewise provided ample reasons for its June 17, 2021 decision announcing the members of the new Committee. A.R. 329–33. EPA explained that its selections were "well-qualified experts with a cross-section of scientific disciplines and experience needed to provide advice on the scientific and technical bases for the National Ambient Air Quality Standards." *Id.* EPA noted that the new members included "four prior members of the committee, including two members selected by the previous administration," and provided biographical summaries of each of the candidates explaining each of their backgrounds and areas of expertise. *Id.*). EPA explained that the membership solicitation, evaluation, and selection process used the agency's "time-tested, fair, and transparent process," *id.*, which included the Science Advisory Board Staff Office preparing a decision memo explaining its recommendations for the Committee as well as a proposed set of alternates. Brennan Decl. ¶ 15. Nothing in the APA required the agency to explain specifically why it was not appointing "representatives" from any particular interest group or sector, let alone an "industry representative,"

as nothing in FACA or the Clean Air Act required the agency to appoint such a representative at all. *See* Section III.A, *supra*.

**b.**    Plaintiffs also criticize the agency for failing to offer a "reasonable explanation" for "abandoning" its restrictions on the ability of grant recipients to serve on advisory committees. *See* Mot. 27. This argument should be rejected out of hand. First, Plaintiffs are not challenging EPA's June 2020 decision to return to its pre-2017 policies following the vacatur of the 2017 Directive; they are challenging its decision to reconstitute the Committee. Second, EPA explained in June 2020 that it could not continue to follow the restrictions set forth in the 2017 Directive because a federal court had *vacated* those restrictions. *See* A.R. 1416–23. It was not unreasonable for the agency, in light of that vacatur, to "follow the relevant policies as they existed before issuance of the 2017 Directive," A.R. 1417, which included detailed provisions designed to ensure that committee members would be free from conflicts-of-interest and inappropriate influence. *See* Section III.B, *supra*.[9]

**2.**    Plaintiffs also contend that EPA failed to consider "alternatives that are within the ambit of the existing policy." Mot. 28–30 (quoting *DHS v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020)). As an initial matter, EPA *did* consider *all* of the nominees—including nominees affiliated with industry—as part of its thorough evaluation process. Brennan Decl. ¶¶ 11–15; A.R. 9–39. And, as Plaintiffs concede, the agency ultimately did select two members who had been selected by the previous administration. *See* Mot. 28. EPA also considered seven specific alternates, but the Administrator ultimately adopted the staff office's recommendations. Brennan Decl. ¶ 15. Moreover, as explained above, nothing in FACA or the Clean Air Act required EPA to consider appointing a "representative" from any particular interest group or sector, let alone an "industry representative"

---

[9] In particular, EPA was not required to pursue a different course because a 2013 OIG report concluded that EPA could "better document" resolution of certain ethics and partiality concerns. *See* Mot. 23. Nothing in that report even suggested, let alone required, that EPA impose new "restrictions on the ability of grant-affiliated individuals to serve on the Committee." Mot. 27.

specifically. In any case, while EPA did consider (but ultimately decided not to) appoint an industry-affiliated member to the Committee, nothing required it to select an industry-affiliated member or explain specifically why it was not selecting Plaintiffs or any other member in particular.

## IV.    PLAINTIFFS' REQUESTED REMEDIES ARE INAPPROPRIATE

Even if Plaintiffs could overcome the threshold hurdles identified above and establish that they are entitled to judgment as a matter of law, the primary remedy that they seek—an injunction that would "enjoin[] the . . . Committee" and its Chair "from conducting any committee or subcommittee activities" and enjoin "EPA and the Administrator . . . from receiving any recommendation or advice from the Committee," *see* Pls.' Proposed Order, ECF No. 8-26, is overbroad and unwarranted.

Courts have been reluctant to issue injunctions in FACA cases because of the availability of less intrusive alternatives and the First Amendment and separation-of-powers implications of granting an injunction in this context. *See, e.g.*, *NAACP v. Barr ("NAACP II")*, No. 20-1132, 2020 WL 6392777, at *5–6 (D.D.C. Nov. 2, 2020); *N.W. Forest Res. Council v. Espy*, 846 F. Supp. 1009, 1015 (D.D.C. 1994) (declining to issue injunction because doing so would "exceed the injury presently to be redressed" and because it would "represent [an affront] to the separation-of-powers" principle); *see also Nat. Res. Def. Council v. Pena*, 147 F.3d 1012, 1025 (D.C. Cir. 1998). For example, Plaintiffs note that Judge Bates recently awarded equitable relief in a FACA case, *see* Mot. 16, but Judge Bates in his remedies opinion in that case rejected plaintiff's request for a broad "use" injunction similar to the injunction that Plaintiffs request here. *See NAACP II*, 2020 WL 6392777, at *3–6. As Judge Bates explained, "[b]ecause of its First Amendment implications, punitive effect, and likely standing complications, a use injunction should be the remedy of last resort." *Id.* at *5 (quoting *Pena*, 147 F.3d at 1025). Such a remedy "should be awarded only rarely" and is appropriate only if "denial of a use injunction would 'render FACA a nullity.'" *Id.* (quoting *Pena*, 147 F.3d at 1025).

As Judge Bates explained in *NAACP II*, the broad injunction that plaintiff was seeking in that case was unwarranted because plaintiff could obtain "significant relief" from less intrusive remedies. Specifically, the court entered declaratory relief and a "limited use injunction" that required that any version of the commission's report "include a clear statement that the Commission violated FACA, and must attach the Court's remedial order." *Id.* at *4. The Court explained that such relief would give plaintiff "ammunition in the arena of public opinion" in challenging any recommendation from the commission. *Id.* at *2 (quoting *Nat. Res. Def. Council v. Abraham*, 223 F. Supp. 2d 162, 182–83 (D.D.C. 2002)); *see also Pena*, 147 F.3d at 1026 n.6 ("The declaratory relief provided the appellees and others ammunition for their attack on the Committee's findings.") Such a disclaimer would also qualify the "political legitimacy" of decisions based on recommendations from the commission. *NAACP II*, 2020 WL6392777, at *4.

In rejecting plaintiff's requested injunction, Judge Bates also held that the injunction would be "wasteful" and "not necessary to serve FACA's purpose of public accountability." *Id.* at *5. The court explained that the commission had already undertaken substantial work and would have to "restart its inquiry afresh" if the court granted the requested injunction. *Id.* And the court concluded that an injunction was unnecessary to serve FACA's purpose of public accountability, as the commission's "membership ha[d] been public from the beginning, nearly all of its hearings were attended by the press, and hearing summaries [were] available on the Commission's public website." *Id.* "Further, the Commission solicited public comments . . . and invited a wide array of organization[s] to participate in its hearings." *Id.* Accordingly, the court held that "requiring compliance with FACA or, alternatively, a limited use injunction based on inclusion of a disclaimer in the Commission's report will adequately redress the injuries here." *Id.* at *6.

All of the reasons that led Judge Bates to reject plaintiff's requested injunction in *NAACP II* apply equally here. A broad injunction prohibiting the Committee from meeting or EPA from relying

41

on the Committee's recommendations would raise serious First Amendment and separation-of-powers concerns.  *See id.* at *5–6.  And such a remedy is unnecessary because plaintiff can obtain "significant relief" from the less intrusive remedies ordered in *NAACP II*.  Ordering the Committee to be reconstituted would also be wasteful, as the agency already devoted significant resources to soliciting and evaluating nominees for the current Committee.  Nor is the broad injunction that Plaintiffs seek necessary to serve FACA's purpose of public accountability, as the Committee's membership is public, its meetings are available to the press and public, and meeting minutes and materials are available on the Committee's website.  Moreover, in the event EPA engages in any future rulemaking after receiving the Committee's scientific and technical advice, the public—including Plaintiffs—will have an opportunity to comment on such proposed rulemaking as well as the Committee's advice.  Accordingly, while Defendants maintain that no relief is appropriate for the reasons explained above, if the Court disagrees, it should deny Plaintiffs' requested injunction and instead limit any remedy to the declaratory relief and "limited use" injunction entered by the Court in *NAACP II*.

## V.    PLAINTIFFS CANNOT SATISFY ANY OF THE REQUIREMENTS FOR A PRELIMINARY INJUNCTION

### A.    Plaintiffs Are Not Likely to Succeed on the Merits

As explained above, all of Plaintiffs' claims fail as a matter of law.  For this reason, Plaintiffs cannot establish the first requirement for a preliminary injunction—a substantial likelihood of success on the merits.  *See Jack's Canoes*, 933 F. Supp. 2d at 75–76.

### B.    Plaintiffs Cannot Demonstrate Irreparable Harm

Regardless of the merits of his claims, Plaintiffs cannot obtain an injunction without establishing that they are "likely to suffer irreparable harm in the absence of preliminary relief."  *Winter*, 555 U.S. at 20.  This showing is not optional: "[t]he failure to demonstrate irreparable harm is 'grounds

for refusing to issue a preliminary injunction, even if the other three factors . . . merit such relief.'" *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 50 (D.D.C. 2011) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)). "In this Circuit, a litigant seeking a preliminary injunction must satisfy 'a high standard' for irreparable injury." *ConverDyn v. Moniz*, 68 F. Supp. 3d 34, 46 (D.D.C. 2014) (quoting *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297). Plaintiffs must demonstrate that they face an injury that is "both certain and great; it must be actual and not theoretical." *Wis. Gas. Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). And insofar as Plaintiffs are seeking a mandatory injunction that would alter the *status quo* by requiring the Administrator to reconstitute the Committee, *see* Compl. Prayer for Relief, Plaintiffs must "show[] clearly that [they are] entitled to relief or that extreme or very serious damage will result from the denial of the injunction." *Dall. Safari Club*, 465 F. Supp. 3d at 398 (citation omitted). Plaintiffs have not made that showing here.

First, Plaintiffs' unexplained delay in bringing this suit undercuts their claims of irreparable injury. "Courts in this jurisdiction have found that '[a]n unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm.'" *Id.* at 403 (quoting *Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005)). "The D.C. Circuit has held that a delay of forty-four days before bringing action for injunctive relief was 'inexcusable,' and 'bolstered' the 'conclusion that an injunction should not issue.'" *Id.* (quoting *Fund for Animals v. Frizzell*, 530 F. 2d 982, 987 (D.C. Cir. 1975); *see also Pub. Citizen Health Rsch. Grp. v. Acosta*, 363 F. Supp. 3d 1, 22 (D.D.C. 2018) (Kelly, J.) (delay of over three months "strongly discredit[ed] Plaintiffs' claim that they [were] suffering irreparable harm").

Here, the Administrator announced his decision to reestablish the Committee's membership on March 31, 2021, and EPA announced the selection of the new Committee members on June 17, 2021. *See* Compl. ¶¶ 47, 51. Dr. Young, however, waited until October 7, 2021 to file his complaint— more than six months after the Administrator's March announcement and nearly four months after

EPA announced the selection of new Committee members.  Plaintiffs do not explain why they failed to bring a challenge shortly after the Administrator announced his decision to reestablish the Committee's membership or, at a minimum, after they learned that they were not selected to serve on the Committee.

Setting aside Plaintiffs' unexplained delay in bringing their claims, Plaintiffs also cannot demonstrate that they are imminently likely to suffer an injury that is "both certain and great" in the absence of an injunction.  *Wis. Gas. Co.*, 758 F.2d at 674.  Plaintiffs have no "cognizable personal right to an advisory committee appointment."  *Nat'l Anti-Hunger*, 711 F.2d at 1074 n.2; *see also Microbiological*, 886 F.2d at 423 (Friedman, J., concurring) (no one is "entitled to a position on" a federal advisory committee).  Recognizing this, Plaintiffs do *not* seek an injunction that would require the Administrator to appoint Plaintiffs specifically to the Committee.  *See* Compl. Prayer for Relief.  Thus, Plaintiffs have not shown that it is "likely" (as opposed to speculative) that an injunction will remedy their alleged harm of not *personally* "participating in the Committee's imminent deliberations regarding the air-quality standards for particulate matter" or "provid[ing] decisionmakers with contrary viewpoints." *See* Mot. 38–40.  This is especially so considering that the agency received 100 nominations for individuals who were interested in serving on the Committee, and neither Dr. Young nor Dr. Cox were on the list of proposed "alternates" for the Committee. Brennan Decl. ¶ 15.

Nor can Plaintiffs rely on an alleged loss of a "fair opportunity to be appointed to" support the extraordinary relief of a preliminary injunction. *See* Mot. 37.  Even assuming *arguendo* that such an abstract injury is sufficient for Article III standing purposes, *but see TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (injury must be "'concrete'—that is, 'real, and not abstract'" (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016)), it is not the kind of "extreme or very serious" "certain and great" irreparable injury that would justify the mandatory injunctive relief that plaintiffs seek. *Dallas Safari Club*, 435 F. Supp. 3d at 398; *Wis. Gas. Co.*, 758 F.2d at 674.  Plaintiffs, both of whom served on

EPA advisory committees in the recent past, have had ample opportunities to make their views known to the agency, and there is no suggestion that the current Committee members, four of whom served on the Committee previously, are unaware of Plaintiffs' views.  Moreover, Plaintiffs will have an opportunity to present their views by providing comment on any rule that the agency ultimately proposes.  In light of these alternative ways in which Plaintiffs can express their views, Plaintiffs cannot demonstrate that they will be severely and irreparably harmed in the absence of an injunction.

## C.    The Balance of Harms and the Public Interest Weigh Against Injunctive Relief.

In contrast to the Plaintiffs' abstract and speculative harms, the harm to the government and the public would be real and significant if the Court were to grant Plaintiffs' requested injunction and enjoined the Committee from "conducting any committee or subcommittee activities" and EPA "from receiving any recommendation or advice from the Committee."  Pls.' Proposed Order, ECF No. 8-26.  As explained above, enjoining the Committee from meeting  or EPA from receiving recommendations or advice from the Committee, would raise serious First Amendment and separation-of-powers concerns.  *See* Section IV, *supra*; *NAACP II*, 2020 WL 6392777, at *5–6. Entering Plaintiffs' requested injunction would also be wasteful and would not serve the interest of public accountability.  *See* Section IV, *supra*.  Especially given the existence of less intrusive remedies discussed above and Plaintiffs' unexplained delay in filing suit, the balance of harms and public interest weigh against Plaintiffs' requested injunction.

## CONCLUSION

The Court should deny Plaintiffs' motion for a preliminary injunction or, in the alternative, for partial summary judgment, grant Defendants' cross-motion for partial summary judgment, and enter judgment for Defendants on Counts V–VIII.

Dated:  November 5, 2021

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

/s/ John Robinson
JOHN ROBINSON (D.C. Bar No. 1044072)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington D.C. 20005
(202) 616-8489
john.j.robinson@usdoj.gov

*Counsel for Defendants*