## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

S. STANLEY YOUNG, *et al.*,

      *Plaintiffs,*

      *v.*

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, *et al.*,

      *Defendants.*

No. 1:21-CV-2623-TJK

**PLAINTIFFS' COMBINED REPLY IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION OR, IN THE ALTERNATIVE, FOR EXPEDITED PARTIAL SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..............................................................................ii

INTRODUCTION ....................................................................................... 1

ARGUMENT ............................................................................................. 1

I.    This Court Has Jurisdiction .................................................................. 1

II.   This Court Should Preliminarily Enjoin the Committee's Activities ................ 4

    A.    EPA's Reconstitution of the Committee Is Unlawful ................................. 4

        1.    The reconstitution is substantively unlawful ..................................... 4

        2.    The reconstitution is procedurally unlawful ..................................... 13

        3.    The reconstitution is reviewable .................................................... 18

    B.    The Equities Favor a Preliminary Injunction ......................................... 22

        1.    Plaintiffs are threatened with irreparable harm ............................... 22

        2.    The balance of the equities favors an injunction .............................. 24

III.  An Injunction is Appropriate .............................................................. 24

CONCLUSION ......................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adarand Constructors, Inc. v. Pena,*
515 U.S. 200 (1995) ........................................................................ 15

*Allied Loc. & Reg'l Mfrs. Caucus v. EPA,*
215 F.3d 61 (D.C. Cir. 2000) ................................................ 14, 18

*Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton,*
813 F. Supp. 82 (D.D.C. 1993) .......................................................... 23

*Barlow v. Collins,*
397 U.S. 159 (1970) ........................................................................ 21

*Cargill, Inc. v. United States,*
173 F.3d 323 (5th Cir. 1999) .............................................. 6, 7, 11, 13

*Carson v. Am. Brands, Inc.,*
450 U.S. 79 (1981) ........................................................................ 24

*Clark v. Martinez,*
543 U.S. 371 (2005) ........................................................................ 6

*Cody v. Cox,*
509 F.3d 606 (D.C. Cir. 2007) ...................................................... 21

*Dalton Trucking, Inc. v. EPA,*
808 F.3d 875 (D.C. Cir. 2015) ........................................................ 3

*Del. Dep't of Nat. Res. & Env't Control v. EPA,*
785 F.3d 1 (D.C. Cir. 2015) ............................................................ 14

*Dep't of Com. v. New York,*
139 S. Ct. 2551 (2019) ............................................................ 20, 21

*DHS v. Regents of Univ. of Cal.,*
140 S. Ct. 1891 (2020) ...........................................................*passim*

*Dickson v. Sec'y of Def.,*
68 F.3d 1396 (D.C. Cir. 1995) ...................................................... 21

*Epic Sys. Corp. v. Lewis,*
138 S. Ct. 1612 (2018) .................................................................. 9

*FCC v. Fox Television Studios, Inc.,*
556 U.S. 502 (2009) .................................................................. 15, 16

*Fla. Power & Light Co. v. Lorion,*
470 U.S. 729 (1985) ...................................................................... 17

*Gordon v. Holder*,
632 F.3d 722 (D.C. Cir. 2011) ............................................. 23

*League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ................................................ 22

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .......................................................... 14

*\*NAACP Legal Def. & Educ. Fund, Inc. v. Barr*,
496 F. Supp. 3d 116 (D.D.C. 2020) ...............................*passim*

*NAACP Legal Def. & Educ. Fund, Inc. v. Barr*,
No. 20-cv-1132, 2020 WL 6392777 (D.D.C. Nov. 2, 2020)...................25

*NAACP Legal Def. & Educ. Fund, Inc. v. Wilkinson*,
No. 20-cv-1132, 2021 WL 723993 (D.D.C. Feb. 24, 2021) ...................12

*Nat'l Anti-Hunger Coal. v. Exec. Comm. of President's Priv.*
*Sector Surv. on Cost Control*,
566 F. Supp. 1515 (D.D.C. 1983)..............................................7

*Nat'l Rev., Inc. v. Mann*,
140 S. Ct. 344 (2019) ......................................................7

*New York v. EPA*,
133 F.3d 987 (7th Cir. 1998) ..............................................3

*NRDC, Inc. v. EPA*,
438 F. Supp. 3d 220 (S.D.N.Y. 2020) ............................... 2, 16

*NRDC, Inc. v. Herrington*,
637 F. Supp. 116 (D.D.C. 1986)............................................1

*Nw. Ecosystem All. v. Off. of U.S. Trade Representative*,
No. C99-1165R, 1999 WL 33526001 (W.D. Wash. Nov. 9, 1999)....................5, 7

*Physicians for Soc. Resp. v. Wheeler*,
359 F. Supp. 3d 27 (D.D.C. 2019) ........................................19

*\*Physicians for Soc. Resp. v. Wheeler*,
956 F.3d 634 (D.C. Cir. 2020) ....................................*passim*

*\*Pub. Citizen v. Nat'l Advisory Comm. on*
*Microbiological Criteria for Foods*,
886 F.2d 419 (D.C. Cir. 1989) ....................................*passim*

*Radzanower v. Touche Ross & Co.*,
    426 U.S. 148 (1976) ........................................................... 9

*SEC v. Chenery Corp.*,
    318 U.S. 80 (1943) ....................................................... 9, 17

\**Union of Concerned Scientists v. Wheeler*,
    954 F.3d 11 (1st Cir. 2020)....................................... 2, 20, 21

*United States v. Duvall*,
    740 F.3d 604 (D.C. Cir. 2013) .......................................... 19

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001) .......................................................... 7

STATUTES

5 U.S.C. app. 2 § 5......................................................*passim*

5 U.S.C. app. 2 § 9............................................................. 2

5 U.S.C. app. 2 § 14........................................................... 2

5 U.S.C. § 701 ................................................ 19, 20, 21, 22

28 U.S.C. § 1331 ............................................................... 1

42 U.S.C. § 4365 ............................................................... 3

42 U.S.C. § 7409................................................... ........ 1, 8, 9

42 U.S.C. § 7607................................................... ....... 1, 2, 3

OTHER AUTHORITIES

161 Cong. Rec. H10,161 (daily ed. Dec. 17, 2015) .................... 13

EPA, *Grantee Research Project Results Search* ...................... 10

Fed. R. Civ. P. 18 .............................................................. 3

GAO, *Federal Advisory Committees: Additional Guidance Could Help
Agencies Better Ensure Independence and Balance* (Apr. 2004).......... 15

**INTRODUCTION**

EPA offers little defense for purging the Clean Air Scientific Advisory Committee of dissenters and stacking it with Agency loyalists. Its thin opposition and flimsy record confirm that this reconstitution is substantively and procedurally unlawful. Its novel jurisdictional theory has no support and misreads the relevant statute. And its argument that FACA claims are not justiciable failed in the D.C. Circuit 30 years ago and in this Court last year. As Senior Judge Bates did recently in similar circumstances, this Court should enjoin the Committee's activities and bar EPA from receiving any advice from the Committee until it is lawfully reconstituted.

**ARGUMENT**

**I. This Court Has Jurisdiction.**

It is indisputable that federal district courts have jurisdiction to consider FACA challenges under 28 U.S.C. § 1331. *E.g.*, *NRDC, Inc. v. Herrington*, 637 F. Supp. 116, 117 n.1 (D.D.C. 1986). EPA nevertheless contends (Opp. 12–13) that *this* FACA challenge falls within the D.C. Circuit's exclusive jurisdiction to review a "nationally applicable … final action taken[] by the Administrator under [the Clean Air Act]." 42 U.S.C. § 7607(b)(1). But the Agency identifies not a single case in which a FACA challenge was directly routed to the D.C. Circuit under this provision, and its attempt to shoehorn this FACA challenge into § 7607(b)(1) fails for two reasons.

*First*, EPA's reconstitution of the Committee is not an action taken "under" the Clean Air Act. While the Act mandates the existence of the Committee and specifies some membership requirements, *see id.* § 7409(d)(2)(A), the Administrator's decision

1

to reconstitute the Committee fell under the purview of FACA, which governs the establishment, renewal, and continuation of advisory committees like the one here. *See* 5 U.S.C. app. 2 §§ 9, 14. That is why the Committee's current charter expressly "renews" the Committee "in accordance with the provisions of … FACA." A.R. 1. That is why Plaintiffs' claims arise "under" FACA and not the Clean Air Act. Am. Compl. ¶¶ 105–33. That is why the first page of EPA's opposition concedes that Plaintiffs "challenge the composition of the Committee *under* the Federal Advisory Committee Act." Opp. 1 (emphasis added). And that is why EPA's non-reviewability argument is premised on FACA (not the Clean Air Act) governing the Committee's activities and composition. Opp. 16–23. Because the actions reconstituting the Committee were not taken "under" the Clean Air Act, § 7607(b)(1) does not apply.

Indeed, treating the reconstitution as an action taken "under" the Clean Air Act for purposes of § 7607(b)(1) would create numerous anomalies. To start, the Administrator's 2017 directive, like the reconstitution, affected the "selection of Committee members," Opp. 13, yet EPA never contended that this action was taken "under" the Clean Air Act. To the contrary, the recent slate of FACA challenges to that directive governing the Committee were all adjudicated first in district court, and EPA acquiesced in a district court's vacatur of that agency action. *See Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 641 (D.C. Cir. 2020); *Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 16 (1st Cir. 2020); *NRDC, Inc. v. EPA*, 438 F. Supp. 3d 220 (S.D.N.Y. 2020); A.R. 1416–19. The discrepancy is inexplicable.

On top of that, EPA's position would require Plaintiffs to split their claims, even though a party may join "as many claims as it has against an opposing party" in a single complaint. Fed. R. Civ. P. 18(a). Because the provision mandating the existence of the Scientific Advisory Board falls outside the Clean Air Act, *see* 42 U.S.C. § 4365(a), EPA's theory would have Plaintiffs simultaneously pursue their challenge to the Board's reconstitution in this Court and their challenge to the Committee's reconstitution in the D.C. Circuit—even though the steps in each reconstitution occurred around the same time and violated the same laws (FACA and the APA).

Further, Congress presumed that any action taken "under" the Clean Air Act for purposes of § 7607(b)(1) would be published "in the Federal Register." *Id.* § 7607(b)(1). Yet EPA never published the Administrator's decision to terminate the existing Committee or his decision to appoint new members in the Federal Register. That failure shows that EPA never thought the Committee's reconstitution was governed by § 7607(b)(1) until it needed to come up with a defense for this suit.

*Second*, even if the reconstitution somehow qualified as an action "under" the Clean Air Act, it would not be a "nationally applicable" one. *Id.* "To determine whether a final action is nationally applicable" under § 7607(b)(1), courts may consider "only" the "face" of EPA's action and not "its practical effects." *Dalton Trucking, Inc. v. EPA*, 808 F.3d 875, 881 (D.C. Cir. 2015); *see New York v. EPA*, 133 F.3d 987, 990 (7th Cir. 1998) (explaining that the test cannot turn "on where the effects of the action are felt" because "any major action by the EPA under the Clean Air Act" will likely "be felt" widely). EPA's claim (Opp. 13) that the reconstitution is

"nationally applicable" merely because the Committee's advice pertains to the Agency's "national air-quality standards" is therefore dead on arrival. That theory improperly shifts the focus from the agency action challenged in this case to the practical effect of the Committee's *future* activity. Viewed properly, the reconstitution applies, on its face, to only the 7 Committee members who were abruptly fired and the 115 individuals nominated to take their place (a group that includes some of the terminated members). *See* A.R. 9–39, 329–33, 1420–23. That narrow scope of agency action cannot be characterized as "nationally applicable."

## II.   This Court Should Preliminarily Enjoin the Committee's Activities.

### A.   EPA's Reconstitution of the Committee Is Unlawful.

#### 1.   *The reconstitution is substantively unlawful.*

**a.**   EPA's opposition fails to explain how the reconstituted Committee could remotely be described as "fairly balanced in terms of the points of view represented." 5 U.S.C. app. 2 § 5(b)(2). The Agency does not dispute that it purged the Committee of industry-affiliated members and stacked it with EPA-funded academics. Nor does it deny that in doing so, it has ensured that only one point of view on a critical issue before the Committee—whether the current air-quality standards leads to premature death—will be represented. PI Mem. 20. Instead, EPA insists that the Committee is nevertheless "fairly balanced" for three reasons, none of which is persuasive.

**i.**   EPA's lead move is to suggest that the phrase "fairly balanced in terms of the points of view represented," 5 U.S.C. app. 2 § 5(b)(2), takes on a different meaning when it comes to "scientific and technical questions," Opp. 29. That is its

only meaningful response to the recent decision from Senior Judge Bates holding that the Justice Department violated the fair-balance requirement by staffing a commission on law enforcement solely with law-enforcement officials. *NAACP Legal Def. & Educ. Fund, Inc. v. Barr*, 496 F. Supp. 3d 116, 144 (D.D.C. 2020); *see* Opp. 29 (noting that committee "was not concerned with scientific and technical questions").[1]

Indeed, EPA evidently defines "points of view" here to mean "scientific disciplines." Brennan Decl. ¶ 11 (asserting that the Committee is "balanced in terms of the points of view (i.e., scientific disciplines) represented"). In other words, the Agency believes that if it packed the Committee almost exclusively with in-house scientists from oil companies who had announced the current air-quality standards need to be kept the same (or even loosened), the Committee would nonetheless be fairly balanced so long as those experts represented "a cross-section of scientific disciplines." Opp. 28. But an interdisciplinary echo chamber is still an echo chamber, which is presumably why not even EPA maintains that a commission on law enforcement staffed entirely with law-enforcement officials would be "fairly balanced" solely because it drew on the wisdom of both police officers and prosecutors. *See NAACP*, 496 F. Supp. 3d at 124 (noting that the committee had both). The Agency is thus claiming that FACA's meaning changes when it comes to "scientific and

---

[1] The government also notes that it "did not contend that the committee" in *NAACP* "was 'fairly balanced,'" Opp. 29, but the meaning of FACA cannot turn on the Executive Branch's litigating position. And the government is simply wrong in insisting that "Plaintiffs cite no case holding that an advisory committee was not 'fairly balanced' where the government disputed that assertion." *Id.*; *see Nw. Ecosystem All. v. Off. of U.S. Trade Representative*, No. C99-1165R, 1999 WL 33526001, at *4–7 (W.D. Wash. Nov. 9, 1999) (Rothstein, J.), *cited in* PI Mem. 21.

technical questions." Opp. 29. But that would give the "same words" in FACA "a different meaning" depending on the "category" of committee and thus "invent a statute rather than interpret one." *Clark v. Martinez*, 543 U.S. 371, 378 (2005).

EPA's only support for this untenable view is *Cargill, Inc. v. United States*, 173 F.3d 323 (5th Cir. 1999), and Judge Friedman's concurring opinion in *Public Citizen v. National Advisory Committee on Microbiological Criteria for Foods*, 886 F.2d 419 (D.C. Cir. 1989) (*Microbiological*). *See* Opp. 25–28. Neither helps EPA here. In *Cargill*, the Fifth Circuit held that because a committee tasked with "peer-reviewing … a plan for how to conduct a scientific study" on mining safety had a "politically neutral and technocratic" mandate, FACA did not require "representatives from the management of the subject mines to serve." 173 F.3d at 337. In *Microbiological*, Judge Friedman similarly opined that a committee with the "primarily technical and scientific" task of making recommendations "on the development of microbiological criteria" for food safety could be "'fairly balanced'" even if it had no "consumer advocates." 886 F.2d at 420, 423 (concurring in the judgment).

Here, by contrast, it defies reality to describe the Committee as having a "politically neutral and technocratic" mandate. *Cargill*, 173 F.3d at 337. Were that true, Administrator Regan would not have fired its entire membership less than a month after being sworn in. Rather, the Committee's core function—providing statutorily-mandated advice that EPA must address to revisit its national air-quality standards, carefully distinguishing between matters of science and matters of policy—concerns the subject of a day-one executive order, threatens to impose billions

6

of dollars of costs on regulated industries, and implicates the government's response to climate change, "one of the most hotly debated issues of the day." *Nat'l Rev., Inc. v. Mann*, 140 S. Ct. 344, 347 (2019) (Alito, J., dissenting from denial of certiorari); *see* PI Mem. 10, 19; *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001) (reviewing EPA's 1997 revision of the air-quality standard for particulate matter and ozone). Rather, this case is similar to *Northwest Ecosystem Alliance v. Office of the U.S. Trade Representative*, No. C99-1165R, 1999 WL 33526001 (W.D. Wash. Nov. 9, 1999), where Judge Rothstein concluded that two forest-products advisory committees comprised entirely of industry representatives were not balanced because they "routinely advise the government on trade issues that affect the environment nationally and internationally" and thus "cannot be characterized as 'politically neutral and technocratic.' " *Id.* at *5, *7; *see Nat'l Anti-Hunger Coal. v. Exec. Comm. of President's Priv. Sector Surv. on Cost Control*, 566 F. Supp. 1515, 1517 (D.D.C. 1983) (Gesell, J.) (concluding that committee comprised almost entirely of business executives was not "balanced" when its recommendations bore on matters "of general national import").

In addition, the challengers in *Cargill* and *Microbiological* had "pointed to no evidence indicating that [the committee's] membership is somehow biased toward one particular point of view." *Cargill*, 173 F.3d at 338; *see Microbiological*, 886 F.2d at 421 (Friedman, J., concurring in the judgment) (noting that the challengers "had offered no evidence … 'that consumer viewpoints are not adequately represented'") (brackets omitted). But Plaintiffs have done so here. As EPA does not dispute, the Committee lacks a single industry-affiliated member—even though its charter and

the Clean Air Act require it to advise the Agency on the "economic … effects" of air-quality standards, A.R. 1; 42 U.S.C. § 7409(d)(2)(C)—or a single scientist who disagrees with the Chair's position that the current air-quality standards are responsible for thousands of premature deaths each year. *See* PI Mem. 20. Contrary to the government's straw-man assertions, Plaintiffs do not "cynically assume[]" that industry-affiliated scientists will automatically advise what is best "for 'industry.' " Opp. 28. Rather, they *know* that "scientists with industry experience" have "different … points of view" from their academic counterparts and that a supermajority of the Committee (at least) is "fully convinced that current air quality is bad" under EPA's existing standards. Young Decl. ¶¶ 18, 20; *see* Cox Decl. ¶¶ 4–9. Short of discovery into deliberative materials, it is hard to imagine more compelling evidence of a lack of fair balance "in terms of the points of view represented." 5 U.S.C. app. 2 § 5(b)(2).

      **ii.**      Grasping for a defense, EPA accuses Plaintiffs of seeking to "rewrite" the Clean Air Act by adding a requirement for industry representation. Opp. 26. According to the Agency, FACA does not "impose[] an independent" fair-balance requirement on the theory that the Act already mandates that the Committee include "at least one member of the National Academy of Sciences, one physician, and one person representing State air pollution control agencies," *id.*; 42 U.S.C. § 7409(d)(2), and that is "the only" requirement necessary to meet here "to achieve a 'fairly balanced' committee" here, Opp. 26. But EPA evidently thought otherwise before filing its brief: the administrative record both shows that the Agency thought it was bound by FACA's fair-balance requirement and contains no indication that the Clean

Air Act suggested otherwise. *See* A.R. 4–6, 1491–92; *cf.* Brennan Decl. ¶ 11. But "[a]n agency must defend its actions based on the reasons it gave when it acted," not force "litigants and courts to chase a moving target." *DHS v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1909 (2020); *see SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943).

Even if there were not a *Chenery* problem here, this novel theory would not help the Agency. By definition, this argument is relevant only if the reconstitution would otherwise violate FACA's fair-balance requirement; if the Committee is already "fairly balanced" under FACA, there is no need to bring the Clean Air Act into the mix. EPA is thus arguing that by specifying some membership requirements in the Clean Air Act, Congress implicitly displaced FACA. But that theory cannot overcome "the strong presumption that repeals by implication are disfavored and that Congress will specifically address preexisting law when it wishes to suspend its normal operations in a later statute," as nothing in the Clean Air Act qualifies as the necessary "clear and manifest" indication that Congress wanted to displace FACA here. *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1624 (2018) (cleaned up). Section 7409(d)(2)'s membership requirements can "mutually coexist" with FACA's fair-balance requirement, *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 155 (1976); indeed, the two statutes did so before the Committee's reconstitution. And Congress's 1977 decision *not to copy* membership requirements governing a *different* (and *obsolete*) panel when it enacted § 7409(d)(2) is even less relevant, *see* Opp. 26, as FACA can plainly coexist with a statutory provision that no longer exists.

**iii.** EPA also complains that enforcing FACA would create an "unworkable" framework with no "limiting principle." Opp. 29. But it is hardly unworkable to ensure at least *some* industry representation, and corresponding intellectual diversity and healthy skepticism, on the Committee; indeed, over 40% of the members of another one of EPA's committees "are affiliated with industry." Opp. 6. More fundamentally, this argument is just a variation on the mistaken claim that the fair-balance requirement is judicially unenforceable. *See infra* Pt. II.A.3. In any event, there is no need for this Court to hold that FACA requires the Committee to draw from the ranks of "environmental justice groups" to condemn the violation here. Opp. 29. Rather, it can simply confirm that an agency's "'deliberate and explicit effort to avoid the representation of any competing viewpoints on the subject matter of an advisory committee'" goes too far. *NAACP*, 496 F. Supp. 3d at 134.

**b.** EPA fares no better in contending that the reconstituted Committee "will not be inappropriately influenced by the appointing authority or by any special interest." 5 U.S.C. app. 2 § 5(b)(3). It acknowledges "that five of the seven members of the Committee are principal investigators on EPA grants, three of which involve grants of over a million dollars." Opp. 32. And the administrative record further reveals that the "seven specific alternates" considered by the Agency, Opp. 39, were a similarly beholden bunch: Five of them were principal investigators on EPA grants as well, all of which involved sums in the seven figures. *See* A.R. 1435–36; EPA, *Grantee Research Project Results Search*, https://bit.ly/3DjZ7d8 (last visited Nov. 15,

2021).  The Agency nevertheless offers three reasons for why this state of affairs satisfies FACA's inappropriate-influence provision.  None holds water.

i.       EPA's first contends that the inappropriate-influence provision requires only "that an advisory committee's founding documents contain 'provisions' to assure that the committee will not be inappropriately influenced," and thus does not permit challenges to "a committee's substantive composition."  Opp. 30 (citation omitted); *see* Opp. 18.  But as the Agency is forced to concede (Opp. 34–35), both the Fifth Circuit in *Cargill* and Judge Friedman in *Microbiological* considered whether a committee was "properly constituted to avoid inappropriate influence."  *Cargill*, 173 F.3d at 338; *see Microbiological*, 886 F.2d at 425–26 (concurring in the judgment).  And for good reason.  Anything less would invite evasion of FACA's requirement once the agency had added some baseline protections in its charter.

In fact, EPA's theory proves too much.  According to the Agency, FACA's mandate that an agency comply with the inappropriate-influence provision "in creating an advisory committee," 5 U.S.C. app. 2 § 5(c), limits judicial review to a "'committee's founding documents,'" Opp. 30; *see* Opp. 18.  The Committee's charter, however, appears to "contain[] *no* provisions that even purportedly would prevent inappropriate influence."  Opp. 32 (cleaned up); *see* A.R. 1–3.  EPA therefore faces a dilemma:  Either review here is confined to the charter (and the Agency has violated FACA from the get-go), or courts can look beyond that document (and the Committee's membership is open for consideration).

**ii.** EPA pivots to arguing that it has complied with FACA's inappropriate-influence requirement because "[as] special government employees, Committee members are subject to U.S. Office of Government Ethics regulations." Opp. 30. But due to "FACA's government-wide implementing regulations," Opp. 4, that is true for *all* "advisory committee members," who, "like all other government employees, are bound by federal ethics rules," *Physicians for Soc. Resp.*, 956 F.3d at 640. If those regulations are enough here, then *no* inappropriate-influence challenge could ever prevail, which is not the law. *See NAACP Legal Def. & Educ. Fund, Inc. v. Wilkinson*, No. 20-cv-1132, 2021 WL 723993, at *6–7 (D.D.C. Feb. 24, 2021) (Bates, J.).

So EPA points to some "additional rules of its own," Opp. 31, which do nothing to check the risk of inappropriate influence here. Presumptively "capping membership terms at six years," *id.*, for example, cannot prevent the Agency from cycling through a rotating cast of grant-dependent academics. Nor does requiring members "to file financial disclosure forms" make a difference, *id.*, as disclosing one's status as an EPA grantee is no impediment to service under the current regime.

**iii.** Ultimately, EPA just rejects the view "that the receipt of a grant itself creates an inherent conflict of interest," Opp. 33, without compelling justification. For example, EPA notes that its "grants fund only a fraction" of the Chair's salary, but the fact that a litigant funded "only 2–20%" of a law clerk's income would provide little assurance that this money "had 'no influence over'" the clerk's advice to the judge. *Id.* Likewise, while the Chair, who "has received EPA grants in the past," may not "'currently'" be on the EPA dole, Opp. 32, and Congress itself has raised

concerns about the "receipt of former … Federal grants" by Committee members. 161 Cong. Rec. H10,161, H10,220 (daily ed. Dec. 17, 2015). (In any event, she is just one of five conflicted members.) And even if "federal ethics rules" or "'[t]radition[]'" permit this situation, Opp. 33, 35, that does not mean EPA has complied with a statute enacted "'to constrain executive discretion.'" *NAACP*, 496 F. Supp. 3d at 135.

That leaves EPA with the Fifth Circuit's conclusion that "receiving a grant from HHS … does not impair a scientist's ability to provide technical, scientific peer review of a study sponsored by HHS." *Cargill*, 173 F.3d at 339; *see* Opp. 33–35. But again, the Committee members are not furnishing "technical, scientific peer review" for an EPA study. Rather, their core function is provide congressionally-mandated advice that the Agency must address before it can revise its air-quality standards. *See supra* Pt. II.A.1.a.i. That key role in the policymaking process—implicating billions of dollars and the hotly disputed issue of climate change—distinguishes the conflicted members here from ones conducting peer reviews of scientific studies.[2]

### 2. *The reconstitution is procedurally unlawful.*

In any event, EPA's opposition and the administrative record confirm that the Agency did not engage in the reasoned decisionmaking required under the APA.

**a.** To start, EPA failed to provide an adequate explanation for its decision to reconstitute the Committee in multiple respects. PI Mem. 25–28.

---

[2] EPA also invokes (Opp. 33–35) Judge Friedman's *Microbiological* concurrence, but the committee there likewise had a "primarily technical and scientific" task, and in any event, "[o]nly six of the 18 members were employed by the food industry." 886 F.2d at 420–21, 425 (concurring in the judgment).

**i.** *First*, EPA does not dispute that the Administrator never addressed whether and how the reconstituted Committee is fairly balanced and free of inappropriate influence—not in purging the existing members, not in soliciting nominations, and not in announcing the new appointees. PI Mem. 25–27. Instead, it contends that "[n]othing in the APA required" the Administrator to address the question. Opp. 38. That assertion is mystifying. EPA never denies that this issue was "an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). And the Agency received multiple comments raising this very question. *See* A.R. 66–68, 145–46, 1468. Yet in announcing the new appointees, EPA did not address this key issue. But an agency "must respond to significant points raised during the public comment period" for its "decisionmaking to be rational," and it is uncontested that EPA failed to do so here. *Allied Loc. & Reg'l Mfrs. Caucus v. EPA*, 215 F.3d 61, 80 (D.C. Cir. 2000); *accord Del. Dep't of Nat. Res. & Env't Control v. EPA*, 785 F.3d 1, 16 (D.C. Cir. 2015).[3]

Indeed, EPA proved quite adept in addressing comments that raised "factors which Congress has not intended it to consider," *State Farm*, 463 U.S. at 43—namely, the race and sex of appointees. One comment, for example, lamented that while "federal advisory committees are required to be fair and balanced, … that definition has traditionally been narrowly focused on balanced expertise and viewpoints rather than" on a balance between "different races" and "genders." A.R. 137. The

---

[3] While EPA quibbles (Opp. 38) that it could not have discussed the issue during the purge, that is no defense for its failure to do so when announcing the new members.

Administrator evidently took that remark to heart, leading his announcement of his new appointees with the observation that the "committee will be comprised of five women and two men, including three people of color, making it the most diverse panel since the committee was established." A.R. 329. That approach is consistent with the administrative record, which reveals that the race and sex of the nominees was a critical factor in their selection. *See* A.R. 1433–36, 1491.

But while that sort of balance may have been preferred by some commenters, Congress required EPA to achieve a balance only "in terms of the points of view represented." 5 U.S.C. app. 2 § 5(b)(2). As the Government Accountability Office has explained, consideration of the "race" or "gender" of appointees "cannot ensure an appropriate balance of viewpoints relative to the matters being considered by the committee." GAO, *Federal Advisory Committees: Additional Guidance Could Help Agencies Better Ensure Independence and Balance* 40 (Apr. 2004) (GAO-04-328), https://bit.ly/3qpdnh3. EPA's substitution of irrelevant (if not impermissible) factors for mandatory ones is yet another instance of arbitrary decisionmaking. *Cf. Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 214 (1995).

**ii.**     *Second*, EPA failed to provide "a reasoned explanation … for disregarding facts and circumstances that underlay" its "prior policy" of imposing restrictions on the ability of grant-affiliated individuals to serve. *FCC v. Fox Television Studios, Inc.*, 556 U.S. 502, 516 (2009); *see* PI Mem. 27–28. The Agency does not deny that in 2017, it found that service on the Committee by investigators on EPA grant projects "can create the appearance or reality of potential interference

with their ability to independently and objectively serve." ECF 8-23 at 4. It does not contest that the reconstitution necessarily "rests upon factual findings that contradict" that prior determination, *Fox*, 556 U.S. at 515—otherwise it would not have appointed such investigators. And it does not dispute that in reconstituting the Committee, it "ignore[d] such matters." *Id.* That omission renders the Committee's reconstitution "arbitrary [and] capricious." *Id.*

Although EPA protests that the action challenged here is the reconstitution rather than the "June 2020 decision to return to its pre-2017 policies following the vacatur of the 2017 Directive," Opp. 39, that misses the point. In returning to its pre-2017 policies last June, EPA did not pack the Committee with academics beholden to "the appointing authority." 5 U.S.C. app. 2 § 5(b)(3). When it did so this year, it became incumbent upon EPA to explain why it now disagreed with its 2017 finding.

Nor is it relevant that "a federal court had *vacated*" the 2017 restrictions on service. Opp. 39. The vacatur of the *restrictions* on *procedural* grounds, *see NRDC*, 438 F. Supp. 3d at 231–34, did not relieve EPA of its responsibility to address the *substance* of the underlying *factual finding*—just as DHS's determination of DACA's "illegality" did not permit that agency to disregard "reliance interests," *Regents*, 140 S. Ct. at 1915; *see* A.R. 154 (comment noting that EPA "d[id] not explain why the conflict-of-interest policy, struck down on procedural grounds, is not sound").

The government also makes the baffling claim that EPA "did not 'change course'" here. Opp. 37. It should have asked the Administrator, who was quite clear that he was going to "reverse" the practices of his predecessor and "reset" the

Committee. A.R. 1420–21. In any event, whether purging and packing the Committee amounts to a change of course, all agree that EPA was required to engage in reasoned decisionmaking here. *See* Opp. 37. Yet it failed to do so.

**iii.** The administrative record offers EPA no help. Apart from the comments themselves, it is devoid of any non-conclusory discussion of the fair-balance and inappropriate-influence requirements. *See* A.R. 4–6, 1433, 1491–92. Because "the record … does not support" the reconstitution—or even give this Court a "basis" to "evaluate" that decision—EPA's action cannot be sustained. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985). And to the extent that EPA's lack of explanation is attributable to its legally erroneous view that the fair-balance requirement does not apply to the Committee, *see supra* Pt. II.A.1.a.ii, then the reconstitution must still be set aside because "the agency has misconceived the law," *Chenery*, 318 U.S. at 94.

**b.** The Administrator likewise has no defense for his failure to "consider the alternatives that are within the ambit of the existing policy." *Regents*, 140 S. Ct. at 1913 (cleaned up); *see* PI Mem. 28–30. The government does not dispute that the Administrator sacked the existing Committee *in toto* "'without any consideration whatsoever'" of narrower solutions—such as merely removing one or two members—and that his ostensible reasons for taking this drastic step "did 'not cast doubt'" on these less draconian measures. *Regents*, 140 S. Ct. at 1912. And its only defense of this procedural failure is entirely non-responsive. Specifically, EPA asserts that in "appointing" the new Committee members, it "*did* consider *all* of the nominees," including "seven specific alternates," and "ultimately did select two members" who

had been fired.  Opp. 39.  But nothing about the steps taken during the *appointing* process justifies the Administrator's undisputed failure to consider less severe measures in deciding to *fire* the entire Committee in the first place.  By way of analogy, no one thinks that the Supreme Court in *Regents* would have excused DHS's failure to contemplate narrower alternatives to scuttling DACA had it considered different ways of "winding down the program."  140 S. Ct. at 1910.

In any event, the Administrator at least could have addressed this issue in appointing the new members after a commenter explained that there were "simpler and more direct ways to address the agency's alleged concerns," A.R. 156; *see* A.R. 154–56, 1469.  But again, the Administrator did not "respond to [this] significant point."  *Allied Loc.*, 215 F.3d at 80.  He did not, for instance, elaborate on why he found it necessary to fire "*every* [Committee] member because of the *possibility* that some qualified people may not have been considered," A.R. 154, or provide any "discussion" of why a less drastic "option" would not have worked, *Regents*, 140 S. Ct. at 1913.  These omissions render the reconstitution arbitrary and capricious.  *Id.*

### 3. *The reconstitution is reviewable.*

Given these deficiencies, EPA understandably spills considerable ink trying to shield its decision from review.  Opp. 13–24.  But Plaintiffs have explained why that path is foreclosed, PI Mem. 30–36, and EPA's opposition fails to establish otherwise.

**a.**  On precedent, EPA does not dispute that "that two of the three judges" who decided *Microbiological* (Judges Edwards and Friedman) necessarily concluded that the fair-balance and inappropriate-influence provisions provide meaningful

standards under 5 U.S.C. § 701(a)(2). *NAACP*, 496 F. Supp. 3d at 312; *see* PI Mem. 31–33. Nor does it deny that other courts of appeals have understood *Microbiological* to have settled the D.C. Circuit's position. PI Mem. 32–33. And while EPA protests that Judge Friedman did not *explicitly* "address the threshold justiciability question," Opp. 21, it has no answer to the fact that he "necessarily" deemed the provisions "justiciable … because he judged" them. *NAACP*, 496 F. Supp. 3d at 136.[4]

Switching targets, EPA suggests (Opp. 21) that Judge Edwards's opinion was irrelevant because *Microbiological*'s judgment rested on the opinions of Judges Friedman and Silberman. But Judge Edwards *concurred* in part, which can only be explained if he agreed with Judge Friedman's implicit conclusion on § 701(a)(2). In any event, EPA misses the forest for the trees. There is no good reason for a lower court to "decide a case contrary to how a majority" of the higher court "in the governing precedent would decide the case." *United States v. Duvall*, 740 F.3d 604, 617 n.8 (D.C. Cir. 2013) (Kavanaugh, J., concurring in denial of rehearing en banc).

**b.** Even if reviewability were somehow an open question in the D.C. Circuit, there would be only one correct answer. EPA's choice to reconstitute the Committee is not one of "those rare administrative decisions traditionally left to agency discretion," *Regents*, 140 S. Ct. at 1905 (cleaned up); *see* PI Mem. 30–36, and its arguments to the contrary do not hold up under scrutiny.

---

[4] While EPA cites (Opp. 21) three decisions from this Court disagreeing with Senior Judge Bates on the import of *Microbiological*, those rulings make the same mistake in concluding that "Judge Friedman's opinion affirmed … without addressing justiciability." *E.g.*, *Physicians for Soc. Resp. v. Wheeler*, 359 F. Supp. 3d 27, 44 (D.D.C. 2019) (cleaned up), *rev'd and remanded*, 956 F.3d 634.

**i.** EPA first contends that the reconstitution is unreviewable on the theory that it involved "a complicated balancing of a number of factors which are peculiarly within the agency's expertise." Opp. 14 (cleaned up). "But that description applies to most things that the EPA does"—indeed, most things *any* agency does—"including mandated non-discretionary activities." *Union of Concerned Scientists*, 954 F.3d at 18. EPA's theory would therefore have § 701(a)(2)'s " 'quite narrow[]' " exception swallow the APA's " 'basic presumption of judicial review.' " *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2567–68 (2019)—all for a statute enacted to constrain "agency discretion in handling advisory committees," *Union of Concerned Scientists*, 954 F.3d at 18.

**ii.** Relying on Judge Silberman's *Microbiological* concurrence, EPA also insists there are no "judicially manageable standards" for reviewing the reconstitution. Opp. 16. This argument suffers from at least four defects.

*First*, as EPA does not deny, "[i]f a statute provides a meaningful standard for review even in extreme cases, it is justiciable." *NAACP*, 496 F. Supp. 3d at 134; *see* PI Mem. 34. Its theory therefore reduces to the remarkable position that courts would be powerless under FACA even if an agency declared that "only persons paid by a regulated interested business could serve on a committee," *Union of Concerned Scientists*, 954 F.3d at 19, or that it " 'would exclude all points of view except one,' " *NAACP*, 496 F. Supp. 3d at 134. That cannot be the law.

*Second*, as EPA recognizes, both this Court and others have already applied the fair-balance and inappropriate-influence provisions. *See* Opp. 24–29; PI Mem. 34. That courts "have entertained" such "challenges" in the past provides further

20

confirmation that reconstituting an advisory committee "is not one of those areas traditionally committed to agency discretion." *Dep't of Com.*, 139 S. Ct. at 2568. While EPA suggests that this Court and others were making "'political'" rather than "legal" judgments in doing so, Opp. 17, 19, these judges were ensuring that agencies complied with the mandates of FACA, even if "defining the boundaries" of that law can sometimes prove "difficult[]." *Cody v. Cox*, 509 F.3d 606, 610 (D.C. Cir. 2007).

*Third*, the Supreme Court and the D.C. Circuit have "found meaningful standards to apply 'under far more permissive and indeterminate language.'" *Physicians for Soc. Resp.*, 956 F.3d at 643. Here are just a few examples of laws that have not triggered § 701(a)(2): (1) a provision of the Census Act directing the Secretary of Commerce "to take 'a decennial census of population' in 'such form and content as he may determine,'" *Dep't of Com.*, 139 S. Ct. at 2568; (2) a statute authorizing the Secretary of Agriculture to "'prescribe such regulations[] as he may deem proper to carry out the provisions of this chapter,'" *Barlow v. Collins*, 397 U.S. 159, 165 (1970); (3) a statute requiring "'high quality and cost-effective'" health care, *Cody*, 509 F.3d at 610; and (4) a statute providing that the government "'may excuse a failure to file … if it finds it to be in the interest of justice,'" *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1399 (D.C. Cir. 1995). FACA's provisions are "at least as manageable" as those, especially as the "concepts of fairness, balance, and influence are not foreign to courts." *Union of Concerned Scientists*, 954 F.3d at 19.

*Fourth*, FACA's implementing regulations and EPA's handbook offer judicially manageable standards in any event. PI Mem. 36. As EPA concedes (in a footnote),

the D.C. Circuit has already held in *Physicians for Social Responsibility* that FACA's implementing "regulations provide[] meaningful standards" under § 701(a)(2). Opp. 22 n.6. EPA nevertheless insists this case is different on the theory that Plaintiffs challenge "the substantive composition of an advisory committee" as opposed to a "discrete agency policy." *Id.* But that is just wordplay. By its terms, § 701(a)(2) applies to any "agency action," 5 U.S.C. § 701(a)(2), and whether a *particular action* is characterized as "a discrete agency policy" or a decision regarding "the substantive composition of an advisory committee" makes no difference when it comes to whether *FACA's implementing regulations* provide judicially manageable standards.

## B. The Equities Favor a Preliminary Injunction.

### 1. *Plaintiffs are threatened with irreparable harm.*

Absent immediate relief, the Committee will soon provide its recommendation to EPA without Plaintiffs' input and in violation of FACA. PI Mem. 36–41. In the near future, Plaintiffs will thus permanently lose the opportunity to participate in this formulation of recommendations, which cannot be adequately remedied after the process ends. *Id.* EPA neither disputes any of this nor contests the many authorities holding that FACA violations cause irreparable harm. PI Mem. 37–38. And its various arguments for why Plaintiffs do not face irreparable harm all fail.

*First*, EPA asserts that Plaintiffs seek a "mandatory" injunction, which is one that "'command[s] some positive act'" and subjects movants to a higher burden. Opp. 11; *see* Opp. 43. But the D.C. Circuit "has rejected any distinction between a mandatory and prohibitory injunction." *League of Women Voters of U.S. v. Newby*,

838 F.3d 1, 7 (D.C. Cir. 2016).  In any event, Plaintiffs seek an injunction to *preserve* the status quo by *prohibiting* the Committee from meeting and EPA from receiving any recommendation until they comply with FACA.  *See* Pls.' Mot. 1; *see, e.g.*, *Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*, 813 F. Supp. 82, 95 (D.D.C. 1993), *rev'd on other grounds*, 997 F.2d 898 (D.C. Cir. 1993).  No higher standard applies.

*Second*, EPA contends that Plaintiffs' "delay" in bringing this suit undercuts their claim of irreparable harm (while never suggesting that their timing threatens disruption to the government or the courts).  Opp. 43.  But "'[t]he factor of delay is only significant *if the harm has occurred*.'"  *Gordon v. Holder*, 632 F.3d 722, 725 (D.C. Cir. 2011) (emphasis added). Here, however, Plaintiffs will not be irreparably harmed until the Committee meets in January or February of 2022 to formulate its recommendations.  PI Mem. 13.  Plaintiffs' timing here is thus irrelevant.[5]

*Third*, EPA argues that Plaintiffs' claimed injuries are too "speculative" on the premise that they are not guaranteed a seat on the Committee if it is lawfully reconstituted.  Opp. 44.  That is beside the point.  Plaintiffs have never claimed an entitlement to a spot on the Committee; they have sought only a "fair opportunity" to be appointed and to participate in the Committee's imminent deliberations.  PI Mem. 37.  And while EPA suggests that the denial of a "fair opportunity" is insufficient to establish irreparable injury, Opp. 44, that theory is foreclosed by precedent.  *See*

---

[5] Although EPA notes (Opp. 43) that it announced the decision to reestablish the Committee on March 31, 2021, that is irrelevant.  Plaintiffs could not have become aware of their full injuries and the full extent of the legal violations here until June 17, 2021, when EPA announced the new Committee members.  Am. Compl. ¶ 57.  And it was not until August 2, 2021 that Plaintiffs became aware of EPA's violation of FACA with respect to the Science Advisory Board.  Am. Compl. ¶ 60.

*Carson v. Am. Brands, Inc.*, 450 U.S. 79, 89 & n.16 (1981) (being "denied specific job opportunities" due to unlawful discrimination can constitute "irreparable harm").

*Fourth*, EPA contends that Plaintiffs' lost opportunities are not sufficiently "extreme" or "serious" because they served on EPA advisory committees before and made their views known with respect to past matters. Opp. 44. But EPA cites no relevant authority for this position, or for its baseless assertion that commenting on the Committee's current proposals as a member of the public is somehow an adequate substitute for participating on the Committee itself. *Id.*

### 2. *The balance of the equities favors an injunction.*

Rather than grapple with any of Plaintiffs' five reasons for why the equities tip in their favor, PI Mem. 41–44, EPA merely asserts that the requested injunctive relief is an "inappropriate" remedy, Opp. 45. That argument is meritless. *See infra* Pt. III.

## III. An Injunction is Appropriate.

Relying on authorities addressing "use injunctions" on committee reports that are complete or nearly complete, EPA asserts that the injunction requested here is "overbroad and unwarranted." Opp. 40. But Plaintiffs are not seeking a use injunction. Rather, they request a preliminary injunction prohibiting the Committee from conducting further activities and EPA from receiving any advice or recommendations from the Committee until it is lawfully reconstituted. *See* Pls.' Mot. 1–2; PI Mem. 4. In *NAACP*, the case on which EPA principally relies, Senior Judge Bates issued that exact relief, which is appropriate to remedy FACA violations. *See Microbiological*, 886 F.2d at 434 (Edwards, J., concurring in part and dissenting in

part) (explaining that "an injunction suspending operation of the Committee until consumers are represented on it" would "easily remed[y]" the FACA violation).[6]

While Senior Judge Bates ultimately declined to completely prohibit the government from releasing or using the committee's report, that was because it was "in the process of wrapping up its affairs" and "need[ed] only a week's worth of ministerial work to finalize its report." *See NAACP Legal Def. & Educ. Fund, Inc. v. Barr*, No. 20-cv-1132, 2020 WL 6392777, at *5 (D.D.C. Nov. 2, 2020) (*NAACP II*). Those concerns are not relevant here because Plaintiffs seek preliminary relief well in advance of the Committee's first meeting, and thus well before the Committee produces its recommendations. PI Mem. 13. Nor is there any separation-of-powers or First Amendment issue with Plaintiffs' requested relief, Opp. 42, because the Committee's recommendations are not being compiled "for the President," *NAACP II*, 2020 WL 6392777, at *5, and no report ready for publication has even been compiled, *see id.* And this Court need not consider EPA's suggestion of "less intrusive remedies," Opp. 42, because granting Plaintiffs' requested relief at this early stage will *avoid* the possibility of a more intrusive use injunction in the future.

## CONCLUSION

The Court should grant Plaintiffs' motion.

---

[6] Specifically, Senior Judge Bates's injunction stated that, "until the requirements of [FACA] have been satisfied … the Commission shall not hold further meetings, sessions, or hearings, or conduct any official business," and that "until the requirements of FACA have been satisfied, defendants shall not submit, accept, publish, employ, or rely upon any report or recommendations produced by the Commission." ECF 44 at 2–3, *NAACP*, No. 20-cv-01132 (D.D.C. Oct. 1, 2020).

Dated: November 15, 2021

Respectfully submitted,

*s/ Brett A. Shumate*

Brett A. Shumate (D.C. Bar No. 974673)
Stephen J. Kenny (D.C. Bar No. 1027711)
Joseph P. Falvey (D.C. Bar No. 241247)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700

*Counsel for Plaintiffs*